**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
SHARON DORSETT, individually and as the
Administratix of the Estate of JO'ANNA BIRD,

                            Plaintiff,

            - against -

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, OFFICE OF THE
NASSAU COUNTY DISTRICT ATTORNEY,
 Detective ROBERT ARIOLA, in his official
and individual capacities, Police Officers And/Or
Detectives JOHN AND JANE DOES 1-10,
DISTRICT ATTORNEY JOHN AND JANE
DOES 1-10, and LEONARDO VALDEZ-CRUZ,

                         Defendants.
-----------------------------------------------------------X

                       **MEMORANDUM**
                  **DECISION AND ORDER**

            CV 10-1258 (ADS) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

      This civil rights action arises out of the March 2009 tragic death of Jo'Anna Bird, a

young mother, at the hands of her former boyfriend and father of her child, Leonardo Valdez-

Cruz, who is a defendant in this case. Jo'Anna Bird had obtained several orders of protection

against Valdez-Cruz on her own behalf as well as on behalf of her children. Valdez-Cruz was

tried and convicted for the murder of Jo'Anna Bird and is currently serving his sentence. In the

current case, Plaintiff Sharon Dorsett, the mother of Jo'Anna Bird, both individually and as the

Administratrix of her daughter's estate, has brought a series of claims asserting, among other

things, Section 1983 violations against the individual Nassau County defendants, municipal

liability against Nassau County pursuant to *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978),

a Section 1983 conspiracy claim against Leonardo Valdez-Cruz and the Nassau County

defendants, as well as claims asserting negligence, abuse of process and wrongful death.

Before the Court at this time is a motion by the County of Nassau, the Nassau County Police Department ("NCPD"), the Office of the Nassau County District Attorney, Detective Robert Ariola, Police Officers and/or Detectives John and Jane Does 1-10, and District Attorney John and Jane Does 1-10 (collectively, the "Nassau County Defendants") for an injunction and/or protective order prohibiting the disclosure, dissemination, release or revelation of the contents of Internal Affairs Unit Report 14-2009 ("IAU Report") which documents the Nassau County Police Department's internal investigation into the death of Jo'Anna Bird.  The motion was prompted by a press release issued by Plaintiffs' counsel on November 30, 2010 announcing a press conference to be held at 11 a.m. on December 1, 2010 at the offices of Plaintiffs' counsel, at which time, Plaintiffs' counsel intended to release the IAU Report to the press and public. Defendant Valdez-Cruz, although having been served with the summons and complaint on April 1, 2010 (*see* DE 8), has not appeared in this action.

## I.  PRELIMINARY STATEMENT

Counsel for the County Defendants contacted the Court at approximately 2 p.m. on November 30, 2010 seeking an emergency hearing based on the information contained in the press release prepared by the Plaintiffs' law firm.  At that time, Defendants' counsel was directed to contact Plaintiffs' counsel to arrange a conference call with the Court at 5 p.m. when the Court concluded its calendar of cases for the day.  Defendants' counsel was also informed that both sides could submit in the interim any cases which they wished to have the Court consider and counsel was directed to convey that information to Plaintiffs' counsel as well.

Immediately prior to and during the 5 p.m. conference call, the Court received, via facsimile, various cases from Defendants' counsel.  During that telephone call, the Court heard

preliminary argument from both sides regarding the County Defendants' oral application for an injunction and temporary restraining order ("TRO"). The Court made clear to counsel that it was not going to make a final ruling on an issue of such significance based solely upon the oral representations of counsel, without the benefit of any briefing or discussion of cases in the Second Circuit applicable to the specific circumstances of this case. *See* Redacted Transcript of November 30, 2010 Telephone Conference ("11/30/10 TelCon Tr."), DE 59, at 29-31. However, given the intention of Plaintiffs' counsel to release the IAU Report the next morning, and balancing the equities involved, this Court granted Defendants' motion and temporarily restrained and preliminarily enjoined Plaintiffs' counsel and his law firm (and the Administratrix and family members to the extent that any of them had actually seen the IAU Report) from releasing or disclosing to any person, entity or organization in written or oral form or in any other manner the contents of the IAU Report (including any references to specific contents of the Report) pending a review and determination by the Court after the parties briefed the issues discussed. In addition, the Court noted to all counsel that a short delay pending the Court's review and decision on the briefs to be submitted would result in no prejudice to the Plaintiffs since the IAU Report, which had been in the possession of Plaintiffs' counsel for some time, could be disclosed within a short time if the Court ruled in Plaintiffs' favor. On the other hand, the Defendants could be irreparably harmed by the immediate disclosure of the IAU Report if it turned out that the Report was not subject to public disclosure, thereby rendering Defendants' rights meaningless. 11/30/10 TelCon Tr. at 30-31. A briefing schedule was then set with counsel for the parties. *Id*. at 35-36. A written Order summarizing the ruling was entered by the Court at 8:57 p.m. on November 30, 2010. *See* DE 25.

3

Following up on that telephone conference, Defendants have submitted their motion papers seeking the following relief: (1) an injunction pursuant to Rule 65; (2) a protective order pursuant to Rule 26(c); and/or (3) the issuance of an order of confidentiality, all pertaining to the proposed disclosure by Plaintiff of the contents of the IAU Report.  *See* DE 50.[1]

In addition, on December 6, 2010, Newsday LLC and News 12 Networks LLC (collectively, "Press Applicants") filed a motion seeking to intervene in this action for the limited purpose of: (1) opposing defendants' motion to enjoin plaintiffs, plaintiffs' counsel and plaintiffs' relatives from disclosing the contents of a redacted Internal Affairs Unit Report produced in this litigation and to seal all court records and proceedings relating to that motion; (2) vacate any on-going injunction barring disclosure of the redacted IAU Report or its contents; (3) unseal all motion papers and transcripts and open all subsequent hearings in this matter; (4) request reconsideration under Fed. R. Civ. P. 59(e); Local Civil Rule 6.3, of the Court's denial of modification of its December 1, 2010 order sealing the parties' motion papers.  *See* DE 28.  The Press Applicants' motion seeking to intervene was granted on December 7, 2010.  *See* DE 31. This Memorandum and Order addresses only the Press Applicants' arguments relating to Defendants' motion.  A separate order will follow on the relief sought by the Press Applicants.

---

[1] In addition to the motion papers from the parties, AMISTAD Long Island Black Bar Association ("AMISTAD") and the Police Benevolent Association of the Police Department of Nassau County ("PBA") were granted leave to file briefs *amicus curie*.  *See* DE 29, 48.

## II.    PROCEDURAL BACKGROUND

On March 19, 2010, Plaintiffs filed a Complaint against the Defendants alleging violations of 42 U.S.C. § 1983 as well as various state law claims.  *See* DE 1.  The Initial Conference to establish a discovery plan for this case was held on August 5, 2010, during which time Plaintiffs' counsel placed on the record his previous attempts to obtain the IAU Report prepared by the NCPD Internal Affairs Unit regarding the response of police department personnel in the underlying circumstances involving the death of Jo'Anna Bird.  *See* DE 37 (Initial Conf. Tr.), at 9-10.  Specifically, Plaintiff's counsel stated

> [e]ven after this action was filed and served, we asked -- we wrote letters to the County Attorney asking for copies of the report and investigation so that we might be able to not actually act in a blind fashion going through this process, so we can name the actual officers who need to be named in the complaint, serve, so that we don't have to go backwards six months from now.  We believe that that report is key.  It is crucial to our ability to evaluate and name the individuals, and we would like to have that provided to us post haste.

*Id.*  After the Court inquired whether Defendants were objecting to production of the IAU Report, Defendants' counsel stated that it was her belief that the Report was not complete but that she would look into it.  *Id.* at 11.  Based on the response of Defendants' counsel, the Court advised that

> . . . we need to get some indication, sooner rather than later, even when it is complete, if there -- if the position of the Defendants is that they're not going to turn that over, then you're going to have to make a Motion for a Protective Order, all right?  And I want a date certain by which we're going to do that . . . I'll give you until September 3rd to file any protective -- Motion for a Protective Order

*Id.* at 12-13.

Also during that same conference, the Court asked the parties whether there was any information to be exchanged which warranted a confidentiality agreement. *See id.* at 25. In response, Plaintiffs' counsel argued that "[w]e don't think so, and we don't see how there could even be a need for a Protective Order. . . . given the public nature of much of what has taken place" and "[a]t this point, that's been a big issue because the lack of disclosure we believe has created real public concern." *Id.* The Court responded:

> the only thing I see here as potentially raising an issue down the road is if there are personnel records that might in some way be encompassed in what's typically part of a Confidentiality Order, but you'll address that as you're going forward if it becomes an issue, all right?

*Id.* These discussions were memorialized in the Court's August 5, 2010 Civil Conference Minute Order. *See* DE 13, ¶ 3 ("Defendants may be seeking a protective order with regard to the report. If they intend to proceed in this direction, I have given defendants a deadline of September 3, 2010 to file a letter motion for a protective order, including the legal support for their position."); ¶ 7 ("Counsel for the parties will discuss whether a Stipulation and Order of Confidentiality is necessary in this case based upon the nature of some of the records to be produced.").

On August 6, 2010, Defendants' counsel wrote to the Court and advised that the IAU Report was complete, with the exception of the disciplinary review phase. *See* DE 15. Defendants' counsel further noted that they were in the process of reviewing the IAU Report and reserved their right "to move for a protective order, a stipulation of confidentiality or, alternatively, a request for *in camera* inspection, by September 3, the date designated by the Court." *Id.* On September 9, 2010, Plaintiffs' counsel wrote to the Court advising that the

County had neither supplied the IAU Report nor filed a motion for a Protective Order on or before September 3, 2010 as directed by the Court. *See* DE 16. The Court then issued an Order on September 10, 2010 requesting that the County Defendants inform the Court by September 15, 2010 why the IAU Report was not produced by September 3 and to provide information concerning any underlying circumstances related to the delay. *See* Electronic Order of Sept. 10, 2010.

In response to the Court, counsel for the Nassau County Defendants filed a letter dated September 15, 2010 stating that "[t]he delay has been occasioned by the necessity to review and redact certain information from the voluminous report as well as the necessity to request the reproduction of the police officers' memo-book pages contained in the report." DE 18. The letter further advised that the Report would be furnished that week. *Id.* In light of that response, the Court deemed the issues raised in Plaintiffs' letter [DE 16] moot.

On October 12, 2010, Plaintiffs' counsel wrote to the Court seeking full disclosure of the IAU Report after advising that certain pages were withheld and made part of a privilege log and that substantial redactions had been made of various portions of the Report as produced. *See* DE 20. Plaintiffs' counsel argued that

> [f]rom all appearances, what has been deleted includes names and addresses of persons with direct knowledge of the wrongful acts of Police, including other members of the public that have been victimized as was Ms. Bird. The names and addresses of witnesses who have relevant information about the improper acts of these officers are relevant to our *Monell* claims, as well as our claims under Federal and State law dealing with the failure to train, supervise, monitor and follow the County's own rules and procedures. The citizens who were the victims of the police failures and intentional acts of these officers have a right to be informed and protected.

*Id.* That same day, counsel for the County Defendants filed a letter opposing production of an unredacted copy of the IAU Report. *See* DE 21. After reviewing the submissions of both sides, the Court directed Defendants' counsel on October 13, 2010 to submit the redacted and unredacted IAU Report for an *in camera* inspection. On October 29, 2010, the Court granted in part and denied in part Plaintiffs' application and specifically identified portions of the IAU Report which were to be produced without redactions. *See* DE 22. With regard to two pages which were part of the County Defendants' privilege log, the Court found that

> although these documents may be work product, they are similar to other documents produced in the litigation, may be relevant to Plaintiff's *Monell* claim, and are not obtainable by Plaintiff from any other source. However, I also find that these documents are entitled to be produced on an "Attorney's Eyes Only" basis and to the extent the parties have not entered into a Confidentiality Agreement regarding the same, I am instructing them to do so.

*Id.* at 5. The County Defendants were given a week to review the documents from which the Court ordered the redactions to be removed and to notify the Court by November 5, 2010 of any matter involving the safety or security of any third-party which Defendants' counsel had not previously identified to the Court. Otherwise, the newly unredacted documents were to be produced to the Plaintiffs by November 10, 2010. *Id.* at 4. The Court heard nothing further from the parties at that point.

Less than one month later, on November 30, 2010, counsel for the County Defendants contacted the Court to request an emergency hearing after learning indirectly that Plaintiffs' counsel had issued a press release earlier that day stating the following:

PRESS RELEASE –  PRESS RELEASE – PRESS RELEASE – PRESS RELEASE

• EMBARGO-EMBARGO *For Release December 1, 2010 at 11 a.m.* EMBARGO-EMBARGO•

**ATTORNEYS AND FAMILY OF JO'ANNA BIRD RELEASE CONTENTS OF SECRET
INTERNAL AFFAIRS REPORT FINDING MASSIVE VIOLATIONS AND FAILURES
BY MULTIPLE MEMBERS OF THE NASSAU COUNTY POLICE - - ALL LEADING
TO THE DEATH OF JO'ANNA BIRD**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

*NASSAU COUNTY POLICE KNEW JO'ANNA WAS IN DANGER AND CARELESSLY REFUSED TO
SAVE HER*

On **December 1, 2010 at 11:00 a.m. in The Law Offices of Frederick K. Brewington, Main
Conference Room, 556 Peninsula Blvd.  (corner of Tyler and Peninsula), Hempstead, New
York, the Attorneys and family of Jo'Anna Bird,** the 24 year old Westbury mother of two that was
brutally murdered, by Leonardo Valdez Cruz, will hold a **press conference.**  The content of the Secret
Internal Affairs Report will be shared with the public for the first time.  This over **700 page report**
demonstrates the systemic failures and intentional actions by members of the Nassau County Police
Department in refusing to follow New York State Law; follow their own rules and regulations and more
importantly protect the life and Civil Rights of **Jo'Anna Bird**.

*Details* will be revealed which uncover the depth and scope of the Nassau police involvement in
allowing Valdez Cruz to commit the murder of Ms. Bird on Mach 19, 2009, their utter disregard for
Orders of Protection in her favor, disregard for her safety and their disregard for the safety of the
community.                    ***Shocking details will be released that demonstrate that Nassau misled the
public.***

**-END-**

*See* Declaration of Deputy County Attorney Liora M. Ben-Sorek, Ex. C.  Based upon an e-mail

header and the letterhead of the Law Offices of Frederick K. Brewington which are found

physically above the press release, it appears that the press release was being sent by an employee

or representative of the Brewington Law Firm to approximately 14 media outlets as well as

various individuals.  *Id*.

Because of the imminence of the press conference the next morning, the Court agreed to

hear from the parties by telephone at 5 p.m. on November 30 in light of the other commitments

of counsel and the short notice of the telephone conference.   Specifically, and as noted above,

Defendants' counsel made an application during the phone conference to enjoin Plaintiffs' counsel from publicly disclosing the IAU Report. Plaintiffs' counsel opposed and advised the Court that he had filed a letter on ECF prior to the phone conference. The Court retrieved that letter [DE 24] and considered its contents as well.

After hearing from both sides during the telephone conference, this Court ruled that the County Defendants had met the requirements for a preliminary injunction/TRO and that Plaintiffs had not established any prejudice that would accrue by permitting the parties to brief an issue of such significance to both sides so that a reasoned determination could be made upon an appropriate review of more fully developed and supported legal arguments. *See* DE 25. Thus, the preliminary injunction, which temporarily restrained and preliminarily enjoined Plaintiffs from releasing or disclosing the contents of the Report temporarily stayed the disclosure of the IAU Report at least until the issue was briefed and a decision on the merits could be made. *Id.* The parties were provided with a briefing schedule and were directed to file their motion papers under seal. *Id.* at 3. With this procedural setting in mind, the Court now turns to the merits of the fully briefed motion.

## III.  THE COUNTY DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

As an alternative to injunctive relief, the County Defendants assert that they are entitled to a protective order for the IAU Report on a showing of good cause pursuant to Fed. R. Civ. P. 26(c). Defs.' Mem. at 21-22. The County Defendants argue that on balancing the need for the information against the injury which might result from compelled disclosure, the Court should find that the scales tip in favor of the Defendants. *Id.* at 22 (*citing In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 415 (E.D.N.Y. 2007)). On the other hand, Plaintiffs maintain that the County

Defendants are not entitled to a protective order because: (1) the County's disclosure of the existence of an IAU Report has waived any privilege; (2) the County failed to file a timely motion for a protective order; (3) the IAU Report was not listed on Defendants' privilege log; and (4) Defendants voluntarily disclosed the IAU Report to the Plaintiffs, thereby waiving any privilege.  Pls.' Mem. at 7-11.

It is well established that courts have an inherent equitable power to grant confidentiality orders.  *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35-36 (1984).  Under Rule 26(c), "a court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c).  This equitable power includes prohibiting the disclosure of certain materials.  *See* Fed. R. Civ. P. 26(c)(A).  "The unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders."  *Seattle Times Co. v. Rhinehart,* 467 U.S. at 26; *see also In re Zyprexa Injunction,* 474 F. Supp. 2d at 415 ("Much of the material produced in discovery is neither incorporated in motions made to the court nor admissible at trial.  In order to mitigate the substantial risk of litigants' privacy and other rights posed by the expansive scope of pretrial discovery, courts are given broad discretion in Rule 26(c) to craft sealing orders").  Since protective orders can implicate the public's First Amendment and common law right of access to the courts, however, Rule 26(c) requires the party seeking the order to demonstrate good cause. *See In re Agent Orange Prod. Liab. Litig.,* 821 F.2d 139, 145 (2d Cir. 1987); *In re Terrorist Attacks on Sept. 11, 2011*, 454 F. Supp. 2d 220, 221 (S.D.N.Y. 2006).

In determining whether good cause has been shown, courts must weigh the private interests advanced against the public's interest in the information contained in the documents.

*Cumberland Packing Corp. v. Monsanto Co.,* 184 F.R.D. 504, 505 (E.D.N.Y. 1999); *see also In re Zyprexa Injunction,* 474 F. Supp. 2d at 415 ("Balancing requires taking into account litigants' privacy rights as well as the general public's interest in the information."). Therefore, "Rule 26(c)'s 'good cause' analysis is informed by the common law presumption of public access." *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 621 F. Supp. 2d 55, 61 (S.D.N.Y. 2007).

Defendants argue that the public at large has no right to review documents exchanged during the discovery process. *See* Defs.' Mem. at 11-13. Plaintiffs contend however that absent a protective order, materials produced in discovery may be disclosed by the receiving party to the public. *See* Pls.' Mem. at 12. Plaintiffs rely upon *Schiller v. City of New York,* No. 04 Civ. 7922, 2007 WL 136149 (E.D.N.Y. Jan. 19, 2007). However, the circumstances surrounding *Schiller* are distinguishable from the present action. *Schiller* involved the arrest of various persons conducting a protest in connection with the 2004 Republican National Convention. *Id.* at *1. There, the parties had already entered into a negotiated protective order which enabled any party to designate discovery materials as "Confidential" and subject to the terms of the order. *Id.* Some time after the agreement in *Schiller* was "so ordered," the defendant City of New York notified plaintiffs' counsel that it was designating as "Confidential" *all* of the materials previously produced to the plaintiffs. After plaintiffs succeeded in getting the defendants to remove the designation from a small number of documents, the defendant moved for a protective order to cover the remaining documents. *Id* at *2. The court directed that the motion papers and supporting declarations be filed initially under seal. *Id.* Upon considering the arguments of both sides, the court found that "[i]n the absence of such a protective order, 'parties to a law suit may

12

disseminate materials obtained during discovery as they see fit.'" *Id.* (quoting *Jepson, Inc. v. Makita Elec. Works, Ltd*., 30 F.3d 854, 858 (7th Cir. 1994)).  However, the court in *Schiller* also went on to note that "[w]hile materials produced in discovery may be disclosed by the receiving party in the absence of a protective order, the public does not have a *right* of access to those materials."  *Schiller*, 2007 WL 136149, at *2 n.2.  The court ultimately held that because the City had *voluntarily* produced privileged documents, the City had waived the privilege.[2]  *Id.* at *5.  By contrast, in the instant motion, the County Defendants have placed before this Court the issue of whether good cause for the imposition of a protective order exists in the first instance.

In arguing further, Plaintiffs also maintain that Defendants fail to make particular and specific demonstrations of fact showing that disclosure would result in an injury sufficiently serious to warrant protection and instead rely on broad allegations of unsubstantiated harm.  Pls.' Mem. at 13.  Plaintiffs emphasize that the burden to make such a showing was and remains with the Defendants as the movants here.  In this regard, Plaintiffs claim that the cases cited by Defendants do not shift that burden to the Plaintiffs to demonstrate a legitimate interest to prevent a sealing order, but as affirmed in *Byrnes v. Blue Cross Blue Shield,* No. 98 Civ. 8520, 2000 WL 60221, at *1 (S.D.N.Y. Jan. 25, 2000), that burden remains with the producing party to establish "good cause" to prevent public access.  *Id.* at 13-14.  The Court now turns to analyzing the parties' legal positions.

---

[2]      The question of whether the County Defendants have waived any privilege is discussed *infra*.

### A.      Common Law Right of Public Access

The existence of a common law right of public access to judicial documents is clear.  *See Nixon v. Warner Comm'ns, Inc.,* 435 U.S. 589, 597-98 ("[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."); *Gambale v. Deutsche Bank,* 377 F.3d 133, 140 (2d. Cir. 2004) (public has a common law presumptive right of access to judicial documents).  However, that right of access is not absolute.  The Second Circuit established a framework in *Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110 (2d Cir. 2006) for court to utilize in determining when the public has a right of access to particular documents.  *Lugosch* involved the attempts of several news organizations to intervene to obtain access to documents filed under seal in conjunction with a motion for summary judgment.  *Id.* at 112.  The Court of Appeals held that "[b]efore any such common law right can attach, however, a court must first conclude that the documents at issue are indeed 'judicial documents.'" *Lugosch*, 435 F.3d at 119.  "Once the court has determined that the documents are judicial documents and that therefore a common law presumption of access attaches, it must determine the weight of that presumption." *Id.*  "Finally, after determining the weight of the presumption of access, the court must 'balance competing considerations against it.'" *Id.* at 120.  Utilizing this framework, the Court now turns to its assessment of the IAU Report in this context.  The first question raised, then, is what constitutes a judicial document?

### 1.      *Judicial Document*

Judicial documents have been defined as "items filed with the court that are relevant to the performance of the judicial function and useful in the judicial process."  *See In re Terrorist Attacks on Sept. 11, 2011*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (quoting *SEC v.*

*TheStreet.com,* 273 F.3d 222, 231 (2d Cir. 2001) (internal quotation marks omitted).

Significantly, however, the Second Circuit has also stated that "an abundance of statements and documents generated in federal litigation actually have little or no bearing on the exercise of Article III judicial power. . . . Unlimited access to every item turned up in the course of litigation would be unthinkable." *In re Terrorist Attacks*, 454 F. Supp. 2d at 222-23.

Consequently, courts have held that unfiled documents do not qualify as judicial. *See Standard Inv.,* 621 F. Supp. 2d at 63 ("Because the unfiled documents did not in any way figure into the Court's performance of its Article III functions, the documents do not qualify as judicial"). Further, "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access. . . . the item must be relevant to the performance of the judicial function and useful in the judicial process." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("Amodeo I"); *see also United States v. Sattar,* 471 F. Supp. 2d 380, 385 (S.D.N.Y. 2006) (determining that for a document to be judicial, "[i]t is sufficient that the document was submitted to the Court for purposes of seeking or opposing an adjudication").

The Second Circuit has enumerated the steps that a district court must take when deciding whether to issue a protective order, the first of which is determining whether the documents(s) at issue is a judicial document" *Standard Inv.,* 621 F. Supp. 2d at 62 (citing *Lugosch v. Pyramid Co. Of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006)). If the document is not "judicial," then there is "no presumption of public access and the movant need only make a baseline showing of good cause in order to justify the imposition of a protective order." *Id.* at 62. In *Standard Investment*, the court spent considerable time discussing the framework established by

15

the Second Circuit in *Lugosch* for determining whether a document is judicial.  Citing *United States v. Amodeo,* 71 F.3d 1044 (2d Cir. 1995) ("Amodeo II"), the court in *Standard Investment* agreed with the defendant that certain documents did not qualify as judicial based on the guidance provided in *Amodeo II* that documents "passed between the parties in discovery lie entirely beyond the presumption's reach . . . ."  *Standard Inv.,* 621 F. Supp. 2d at 63 (quoting *Amodeo II*, 71 F.3d at 1050).  As Judge Kram noted, "[a]t the first *Lugosch* step, however, the Court is only focused on what role the documents played in the underlying litigation."  *Id.* Finding that the unfiled documents did not figure in any way into the court's performance of its Article III functions, Judge Kram held that the documents did not qualify as judicial and therefore carried no presumption of public access.  *Id.*

The IAU Report in the instant case was not filed with the Court.  In addition, the mere fact that this Court had previously reviewed the document *in camera* before directing its production to the Plaintiffs does not transform the Report into a judicial document.  *See SEC v. TheStreet.Com*, 273 F.3d at 233 (rejecting argument that "the very exercise by the District Court of its power to enter a protective order and to seal the Confidential Testimony transformed the Confidential Testimony into a 'judicial document' presumptively open to the public") ; *United States v. Wolfson*, 55 F.3d 58, 61 (2d Cir. 1995) ("We are not aware, however, of any common-law principle that documents submitted to a court *in camera* for the sole purpose of confirming that the refusal to disclose them to another party was proper, are to be deemed judicial records open to the public.").  In light of the fact that the IAU Report was not filed with the Court and did not play any role in the performance of Article III functions, this Court finds that the Report is not a judicial document in accordance with the applicable case law.

## 2.    *Weight of the Presumption of Access*

Even if the Court had determined that the IAU Report is a judicial document, the debate would not end there.  Such a finding would require the Court to proceed with the second step of the *Lugosch* analysis to determine the weight of the presumption of access to the judicial document at issue.  Even judicial documents can be restricted under certain circumstances.  *See Nixon,* 435 U.S. at 598 (determining that "the right to inspect and copy judicial records is not absolute" as "every court has supervisory power over its own records and files").  The presumption created "is based on the need for federal courts, although independent . . . to have a measure of accountability and for the public to have confidence in the administration of justice" and such public monitoring "is not possible without access to testimony and documents that are used in the performance of Article III functions."[3]  *Amodeo II*, 71 F.3d at 1048.  This Circuit has concluded that

> the weight to be given the presumption of access must be governed

_____

[3]    Irrelevant to this determination is the motive behind the person or entity seeking the disclosure.  *See Standard Inv.*, 621 F. Supp. 2d at 63 ("The Second Circuit has held that the motive of the party seeking access to, or disclosure of, documents is irrelevant").  Indeed, in *Lugosch,* the Second Circuit determined

> [i]t is true that journalists may seek access to judicial documents for reasons unrelated to the monitoring of Article III functions.  Nevertheless, assessing the motives of journalists risks self-serving judicial decisions tipping in favor of secrecy.  Where access is for the purpose of reporting news, moreover, those interested in monitoring the courts may well learn of, and use, the information whatever the motive of the reporting journalist.

*Lugosch,* 435 F.3d at 123 (determining that "consideration of the Newspapers' ultimate interest in the case should not affect the weight of the presumption").  Therefore, Defendants' contentions regarding the possible motivation of the media is not a consideration for this Court.  *See* Defs.' Mem. at 16.

by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.  Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.

*Id.* at 1049; *see also Cumberland Packing Corp.,* 184 F.R.D. at 505 (finding that the strength of the presumption "will vary with its role in the adjudicatory process").  Therefore, the presumption in favor of public access to judicial documents will be given the strongest weight possible where the documents played a role in determining the litigants' substantive rights, and, as the documents role becomes more attenuated from the exercise of Article III judicial power, the weight of the presumption declines.  *See, e.g., Gambale,* 377 F.3d at 140 (holding that presumptive right is "at its apogee" when the documents at issue were used by parties moving for or opposing summary judgment); *Cumberland Packing Corp.,* 184 F.R.D. at 505 (finding "a document submitted as the principal basis for a dispositive motion is given a strong presumption"); *NYCOMED v. Glenmark Generics, Inc.,* No. 08-CV-5023, 2010 WL 889799 (E.D.N.Y. Mar. 8, 2010) (holding that letter briefs in support of motions to amend "do relate to motions, that, if denied, might be dispositive of at least some of the parties' claims and defenses" and thus "fall on the side of the common law continuum strongly favoring public access").

The foregoing cases which strongly favor public access stand in direct contrast to those cited previously in *Amodeo II* where the Second Circuit held that documents passed between the parties during discovery lie beyond the reach of the presumption favoring public access. *Amodeo II*, 71 F.3d at 1050; *see also Joy v. North,* 692 F.2d 880, 893 (2d Cir. 1982) ("Discovery involves the use of compulsory process to facilitate orderly preparation for trial, not to educate or

titillate the public."); *In re Zyprexa Injunction,* 474 F. Supp. 2d at 413 ("The entry of a protective

order for documents produced in discovery does not affect the assumption of non-access which

attached to those documents."); *In re Terrorist Attacks*, 454 F. Supp. 2d at 222 (determining that

a public interest does not equate to a public right of access to discovery materials); *compare*

*Gambale*, 377 F.3d at 143 (no established presumption of access to settlement documents which

are not themselves part of the court record); *Standard Investment*, 621 F. Supp. 2d at 66

(documents submitted in connection with a Rule 12(b)(6) motion cannot qualify as judicial).

Because the Court has determined that the IAU Report is not a judicial document, no

presumption is afforded to the Report.  Assuming for the sake of argument that the IAU Report

did satisfy the judicial document inquiry, since the Report was passed between the parties in

discovery, it lies entirely beyond the presumption's reach.  *See In re Terrorist Attacks*, 454 F.

Supp. 2d at 222 (concluding that "no public right of access exists with respect to materials

produced during the initial stages of discovery"); *Schiller,* 2007 WL 136149, at *2 n.2 (holding

that "the public does not have a *right* of access" to materials produced in discovery).[4]  Plaintiffs,

putting aside these decisions within the Second Circuit, rely upon *Doe v. Chicago Police Officer*

*E. Marsalis*, 202 F.R.D. 233 (N.D. Ill. 2001) and argue that "[d]iscovery produced documents are

presumed to be matters within the public domain."  *See* Pls.' Mem. at 26.  However, this Court

notes that it is not bound by a decision of a federal district court in Illinois relying on Seventh

Circuit precedent when there is ample precedent in the Second Circuit.  In addition, Plaintiffs

---

[4]      Plaintiffs' counsel states his intention to attach or include mention of the IAU Report in
future motions and that may well come to be.  However, that argument is not relevant to the
instant determination.  *See Byrnes*, 2000 WL 60221, at *5.

misconstrue the holding in *Doe* which actually states that "*Court related documents* are presumed to be matters within the public domain."[5]  *Doe,* 202 F.R.D. at 239 (emphasis added). The IAU Report, as noted, is not a court document.

### 3.    *Balancing Interests*

Once a court determines the weight of the presumption of access, it is to apply the third *Lugosch* factor, namely, balancing the competing considerations against the presumption. *Amodeo II,* 44 F.3d at 1050; *Standard Investments,* 621 F. Supp. 2d at 62-63.  Although a non-judicial document passed in discovery is not afforded a presumption of accessibility, the party seeking non-disclosure must still demonstrate good cause. *See Byrnes v. Empire Blue Cross Blue Shield,* No. 98 Civ. 8250, 2000 WL 60221, at *1 (S.D.N.Y. Jan. 25, 2000) (determining that the "public interest in access to discovery materials is recognized as generally of a limited order, although most courts have held that the producing party still has the burden of demonstrating good cause for preventing public access to discovery materials").  That good cause determination, however, requires the movant when dealing with a non-judicial document to make only a "baseline showing of good cause in order to justify the imposition of a protective order." *Standard Investment,* 621 F. Supp. 2d at 62.  Therefore, with regard to the IAU Report, "there is no presumption against sealing, and thus even a minimal showing of possible harm from disclosure should trigger a sealing order unless an interested party, whether litigant or non-litigant can demonstrate a legitimate interest in preventing such sealing." *Byrnes,* 2000 WL

---

[5]      In fact, subsequent to the *Doe* case, the Seventh Circuit drew a distinction between materials generated by pretrial discovery and materials that are in the public records.  *See Baxter Int'l v. Abbott Laboratories*, 297 F.3d 544 (7th Cir. 2002).  This newly drawn distinction was then followed by the Northern District of Illinois.  *See Hobley v. Chicago Police Commander Burge,* 225 F.R.D. 221, 224 (N.D. Ill. 2004).

60221, at *6.

### a.    Harm to Defendants

One competing consideration this Circuit recognizes as "worthy of protection" is the law

enforcement privilege.  *See Amodeo II,* 44 F.3d  at 147.  In fact, the Second Circuit just recently

reaffirmed its recognition of the law enforcement privilege.  *See In re City of New York*, 607 F.3d

923, 944-45 (2d Cir. 2010).  In so doing, the Court of Appeals provided a set of guidelines to

analyze claims of law enforcement privilege.[6]  *Id.* at 948. "First, the party asserting the law

enforcement privilege bears the burden of showing that the privilege indeed applies to the

documents at issue."  *Id.*  This is accomplished by demonstrating "that the documents contain

information that the law enforcement privilege is intended to protect."  *Id.*  The law enforcement

privilege encompasses: (1) information pertaining to law enforcement techniques and

procedures; (2) information that undermines the confidentiality of sources; (3) information that

would endanger witnesses and law enforcement personnel; (4) information that would undermine

the privacy of individuals involved in an investigation; or (5) information that would seriously

impair the ability of law enforcement agencies to conduct future investigations.  *Id.; see also*

*Morrissey v. City of New York*, 171 F.R.D. 85, 90 (S.D.N.Y. 1997)*; Amodeo II,* 44 F.3d  at 147.

The applicability of the privilege does not hinge on whether an investigation has been concluded

---

[6]    Plaintiffs assert that the investigation done in *In re City of New York* is distinguishable from this case since it was based on field reports by undercover NYPD officers regarding potential security threats.  *See* Pls.' Mem. at 27.   To that extent, Plaintiffs' statement is correct. However, the step-by-step analysis presented by the Second Circuit was not conditioned on the specific facts of that case.  *See In re City of New York*, 607 F.3d at 948.  Further, this Court agrees with Plaintiffs that the IAU Report at issue here was created for the purpose of accountability.  However, the immediate purpose and goal of the IAU Report was accountability within the Nassau County Police Department.

or is still ongoing. *In re New York City,* 607 F.3d at 944 (finding that an investigation "need not be ongoing . . . as the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed to the public").

If the privilege applies, there is a "strong presumption" against lifting the privilege. That presumption can only be rebutted by the party seeking disclosure showing (1) that the suit is non-frivolous and brought in good faith; (2) the information sought is not available through other discovery or from other sources; and (3) there is a compelling need for the privileged information. *See In re City of New York*, 607 F.3d at 948. If the presumption against disclosure is successfully rebutted, only then will the court weigh the interest in non-disclosure against the need for access to the privileged information. *Id.* Lastly, the Second Circuit noted that "[t]o access both the applicability of the privilege and the need for the documents, the district court must ordinarily review the documents in question." *Id.* It should be noted at the outset here that the guidelines promulgated by the Second Circuit for distilling the law enforcement privilege in *In re City of New York* dealt with a motion to compel information *between the actual parties* to the litigation. In the instant case, Plaintiffs are already in possession of the information at issue but are seeking full public disclosure. Notwithstanding that fact, the Court finds the Circuit's reasoning helpful in analyzing the current circumstances.

Plaintiffs argue that the Defendants have failed to meet their burden of demonstrating that the law enforcement privilege applies. *See* Pls.' Mem. at 28. For these purposes, the Court refers to the Affidavit of Thomas C. Krumpter, Deputy Chief of the Nassau County Police Department, submitted in support of the County Defendants' motion for a protective order regarding the IAU Report ("Krumpter Aff."). Deputy Chief Krumpter states that the Internal

Affairs Unit conducts both criminal and administrative investigations and that a "final investigation is the product of various law enforcement investigative techniques." Krumpter Aff. ¶ 8. Krumpter asserts that public dissemination of the IAU Report will reveal the particular techniques and methodology utilized by this specialized unit.

In their opposition, Plaintiffs argue that there is no reference at all in Defendants' papers as to what procedure or technique it is that Defendants claim is covered by this privilege. *See* Pls.' Mem. at 27. However, the Court directs attention to the following excerpt from the Krumpter affidavit:

**- REDACTED -**

In light of this information, Krumpter maintains that "public disclosure would therefore negatively impact the ability of the officers assigned to this unit to conduct investigations in the future using techniques which would now be publicly revealed." *Id.* According to Krumpter, permitting public disclosure would effectively be forcing the NCPD to change the manner in which investigations are conducted. *Id.* ¶ 9. Based upon this Court's previous examination of the IAU Report, as well as the information and arguments submitted by the Defendants and the applicable case law, the Court finds that the law enforcement privilege applies to the IAU Report. *See In re City of New York*, 607 F.3d at 944 (where the information "clearly relates to 'law enforcement techniques and procedures," the information is covered by

the law enforcement privilege, a privilege that is qualified and not absolute) (quoting *In re Dep't of Investigation of the City of New York*, 856 F.2d 481, 484 (2d Cir. 1988)).

In addition, the privacy interests of third parties carry great weight in the balancing of interests.[7]  *See Amodeo I,* 71 F.3d at 1050-51 ("determining that such interests "are a venerable common law exception to the presumption of access."); *see also In re Newsday, Inc.,* 895 F.2d 74, 79-80 (2d Cir. 1990) (concluding that "the privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure of the [ ] material should weigh heavily in a court's balancing equation"); *Kelly v. City of New York,* No. 01 Civ. 8906, 2003 WL 548400, at *5 (S.D.N.Y. Feb. 24, 2003) (holding that the sensitive investigation records of non-party individuals should be "guard[ed] against disclosure that has the potential to invade their privacy and impair their personal reputations").  The Court notes that this privacy interest has been also incorporated into the law enforcement privilege as it protects "information that would undermine the privacy of individuals involved in an investigation."  *In re City of New York*, 607 F.3d at 948.  Here, the IAU Report contains the names of numerous officers not yet parties to this litigation as well as witnesses and other third-parties not related to this action whose privacy interests would be seriously jeopardized with the publication of the IAU Report.[8]

_____

[7]    Typically, the weight to afford these privacy rights are considered pursuant to such factors as "the degree to which the subject matter is traditionally considered private rather than public" and the "nature and degree" of the injury.  *Amodeo I,* 71 F.3d at 1051.  However, based upon the document at issue here, Defendants need only make the "baseline showing of harm" referred to earlier since there is no presumption of access in play here.

[8]    This interest, as it pertains to those officers named in the IAU Report yet not named as Defendants in this action, is further argued in the *amicus* brief submitted by the firm Greenberg Burzichelli Greenberg P.C. on behalf of the Police Benevolent Association of the Police Department of Nassau County ("PBA").  The PBA states that pursuant to state and local law, when an officer is served with a charge or specification, he is entitled to a due process hearing or

The Second Circuit has identified the danger of impairing law enforcement efficiency as another relevant competing interest against disclosure. *Amodeo I,* 71 F.3d at 1050. "Officials with law enforcement responsibilities may be heavily reliant upon the voluntary cooperation of persons who may want or need confidentiality." *Id.* Therefore, "[i]f release is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access." *Id.* This interest also has also been included in those protected by the law enforcement privilege. *See Floyd v. City of New York*, -- F. Supp. 2d --, 2010 WL 2594627, at *4 (S.D.N.Y. 2010) (finding law enforcement privilege generally applicable as internal affairs investigations are confidential and "public disclosure of either the existence of an ongoing investigation or the specific investigative steps taken or planned could possibly taint the inquiry or chill the accessibility and candor of complainants and witnesses").[9] In his Affidavit, Deputy Chief Krumpter maintains that if internal investigations are disseminated publicly, "there would be a chilling effect on civilians who may be less inclined to initiate a complaint with Internal Affairs when they feel it is warranted, as they may fear that the investigation into the complaint may one day be the subject of a press conference." Krumpter Aff. ¶ 9. He adds that the Nassau County Police Department relies both on the investigatory techniques and the candor of witnesses to prepare an IAU Report. *Id.*

---

can elect to proceed to final and binding arbitration. Therefore, the PBA argues that those officers who may be subject to discipline based on findings contained within the IAU Report, created from a source external to the accused officers, would be unfairly prejudiced if the Report was disseminated to the public prior to the full adjudication of any disciplinary proceeding.

[9] It is important to point out that the court in *Floyd* did direct the defendants to disclose a limited number of documents in the IAB files to the *party plaintiffs* and did so with an instruction that these documents could be redacted and were subject to an "attorneys' eyes only" protective order. *Id.* at *1.

**- REDACTED -**

The Court finds that the Defendants have made the necessary minimal showing of possible harm. *See Byrnes,* 2000 WL 60221, at *6 (noting that "defendant offers a very thin and speculative basis for sealing, but, absent any presumption against sealing, it should suffice for the limited purpose of protecting discovery materials as such."). Because the Court finds the law enforcement privilege applicable here, the burden shifts to the Plaintiffs to rebut the strong presumption against disclosure by showing a compelling need for public disclosure of the IAU Report.

###### b.	Plaintiffs' Interests

Plaintiffs claim that they have no burden to show a legitimate interest in the public

disclosure of the IAU Report.  *See* Pls.' Mem. at 14.  However, Plaintiffs do assert in conclusory

fashion that the purpose of disseminating and publicizing the IAU Report "is to inform the

community and public of the factual findings of the internal investigation, and to correct certain

misleading statements by the County."  Pls.' Mem. at 5.  Plaintiffs do not identify any of the

allegedly misleading statements.  To further their argument concerning the asserted need to

inform the community, Plaintiffs attach several declarations from non-parties to the Declaration

of Plaintiffs' counsel.[10]  For example, Michele McKeon, Chief Executive Officer of the New

York State Coalition Against Domestic Violence ("NYSCADV"),[11] argues that information on

police activity must be made available to the entire community because if police officers learn

that there are no legal consequences for failing to enforce protective orders, there will be little

incentive to enforce such orders.[12]  *See* Decl. of Michele McKeon, annexed as Ex. J to the Decl.

of Frederick K. Brewington, Esq. ("McKeon Decl.") ¶ 21.  Although the Court understands the

important general interest being asserted by CEO McKeon and the NYSCADV, the statements

made here assume in a conclusory manner that there are no legal consequences for police officers

---

[10]	Although these declarations are discussed by Plaintiffs in connection with the preliminary injunction, they are also at issue with regard to the Plaintiffs' interests here.

[11]	The Court notes that although Ms. McKeon refers to herself as a "non-party witness" in this matter, none of the contents of the McKeon Declaration provide information, facts or personal observations of the underlying incidents which give rise to this litigation.

[12]	NYSCADV's stated mission is to "eradicate domestic violence and to ensure the provision of effective and appropriate services to victims of domestic violence though community outreach, education, training, technical assistance and policy development."  *See* McKeon Decl. ¶ 4.

who fail to enforce protective orders unless all information regarding police activity in these circumstances is publicly disseminated. In reality, that argument is undercut by the commencement of this § 1983 litigation against the individual Defendants whose identities have been disclosed to the Plaintiffs through their access in discovery to the IAU Report. Plaintiffs seek to hold those Defendants accountable in this forum. In due course as discovery progresses in this case, the caption of the action will be amended by the Plaintiffs to replace the current "John and Jane Doe" designated defendants with the specific names of the individuals against whom Plaintiffs bring these charges. Those names will be a matter of public record without dissemination of the IAU Report to the public.

NYSCADV also claims that "our experience is that when more information is available to victims and they can hold police accountable, there is a heightened expectation that the response will improve and thus confidence in making the complaint to police is increased." *Id.* ¶ 22. The Court notes that no empirical evidence is submitted as part of the McKeon Declaration to support that general conclusion. CEO McKeon goes on to state the following:

> Tragically, the diminishment of women's status, and efforts to exert power and control over women, is normative in our society. Therefore, all efforts to serve abused women must include them as equal partners in all decisions regarding their safety and support and promote women's empowerment and self-determination. The fact that information is being sought to be withheld from the women and others who are subject to domestic violence about police and their refusal and or failures to forthrightly address complaints of domestic violence, is yet a furtherance of attempting to exclude victims and potential victims from the public discourse.

*Id.* ¶ 14. Contrary to the foregoing presumption, the victim has not been excluded from the process here because her attorneys have been provided with the information contained in both the

public record relating to the death of Jo'Anna Bird as well as the internal police investigation into the underlying incidents. Plaintiffs' counsel has and will continue to have every opportunity to explore the facts and circumstances leading up to and culminating in the tragic death of Jo'Anna Bird as discovery progresses, depositions are taken, and this case is given a full airing at trial in open court. Precluding the *public* dissemination of the IAU Report at this juncture does nothing to alter that fact and the public will be privy to that information by other available means.

Plaintiffs also submit the Declaration of the Economic Opportunity Commission of Nassau County, Inc. ("EOC") in the person of Chief Executive Officer Iris A. Johnson.[13] *See* Decl. of Iris A. Johnson, annexed to the Brewington Decl. as Ex. K ("Johnson Decl."). In connection with the death of the decedent, Ms. Johnson states that the EOC "is committed to seeing that any and all steps that can be taken to prevent this type of event from happening in [the] future are taken." *Id.* ¶ 20. In this regard, the EOC argues that "[p]ublic access to information about what goes on in the Community from government in general and the Police in specific is a must if public confidence is to exist and for trust to be built where it is sorely needed." *Id.* ¶ 22. The EOC asserts a specialized interest here in that the son of Jo'Anna Bird was a student in the EOC's Westbury Head Start program at the time of his mother's death and that these events have had a devastating impact upon him. *Id.* ¶¶ 18-19. The Court is mindful of the horrific impact on both the decedent's children and family, as well as the community at large

---

[13]     The EOC is the designated anti-poverty agency for Nassau County whose purpose is to provide low-income and minority individuals the opportunity for education, training, employment, healthcare and decent housing. *See* Johnson Decl. ¶¶ 4-6. The Court notes here once again that Ms. Johnson is neither a party nor a witness to the underlying incidents giving rise to this §1983 litigation. Instead, Ms. Johnson states that she submits her declaration "as a friend of the Court in Support of Plaintiffs' Opposition to Defendant's motion to block the release [of] the Internal Affairs Report . . . ." *Id.* ¶ 2.

in that area.  Notwithstanding that sensitivity, the Court finds, for the same reasons articulated above, that both the family and the community will obtain the facts and information regarding the events at issue here without public dissemination of the IAU Report.

Plaintiffs lastly submit the Declaration of Eric Josey, a retired New York City police officer and co-founder of 100 BLACKS IN LAW ENFORCEMENT WHO CARE.[14]  *See* Decl. of Eric Josey, annexed to the Brewington Decl. as Ex. L ("Josey Decl.") ¶ 1.  Mr. Josey states that after a conference was held by his organization with staff experts on police internal affairs investigations, his constituents  "unanimously support" full public disclosure of the IAU Report.  *Id.* ¶¶ 5-6.  Describing the general experience of his membership, Mr. Josey asserts that general routine reports and internal police reports are regularly requested by the public under FOIL and are often publicly disclosed in Court proceedings and/or media.  *Id.* ¶ 7.  Mr. Josey also argues that internal police investigations are of "grave public concern, particularly when police actions result in death," and that full disclosure of the IAU Report "serves the greater good in correcting and changing bad police practice, policy and procedure."  *Id.* ¶¶ 10, 12.  The organization also asks the Court to consider the undue burden and expense to the taxpayers of Nassau County "in attempting to cover-up this unfavorable internal police report without any legal foundation to substantially support the defendant's position," without identifying what that burden and expense might be.  *Id.* ¶ 13.  Although Mr. Josey and the organization assert that internal police reports are often publicly disclosed in Court proceedings (distinguishable from documents exchanged by the parties in discovery), the Court notes that IAU Reports are not disclosable in response to a

---

[14]      100 Blacks in Law Enforcement is a professional law enforcement group of retired and active police officers from various agencies in New York advocating for civil rights, justice, the latest police training and independent oversight of law enforcement.  Josey Decl. ¶ 3.

FOIL request, among other things. Notwithstanding the fact that the Court finds the interests expressed by 100 Blacks in Law Enforcement to be important concerns for the Court and the litigants, the arguments advanced by the organization to support the Plaintiffs' compelling interests do not tip the scale in favor of disclosure here.[15]

Based on the supporting information submitted by both sides here, the Court finds that the competing considerations regarding the presumption of access weigh in favor of the Defendants who have established the limited baseline showing of "good cause" to warrant a protective order restricting access to the IAU Report to the parties in this litigation – a showing that the Plaintiffs have not overcome.

### B.        First Amendment Right of Access

One of the Plaintiffs' primary arguments against restricting access to the IAU Report is that such restriction is a prior restraint on speech that violates the First Amendment. *See* Pls.' Mem. at 14-22. Likewise, the Press Applicants, whose motion to intervene was granted by this Court (*see* DE 31), argue that Defendants cannot establish the high threshold to restrain "extrajudicial speech" and to obtain an injunction. *See* Press Applicants' Mem. at 5-12. A prior restraint on speech "is a law, regulation or judicial order that suppresses speech-or provides for its suppression at the discretion of government officials-on the basis of the speech's content and

---

[15]        The Court also notes the *amicus* brief submitted by executive director J. Stewart Moore of the AMISTAD Long Island Black Bar Association ("Amistad") arguing in favor of public dissemination of the IAU Report. The arguments raised by Amistad in support of public disclosure of the Report (*i.e.* high public interest and concern, raise awareness of police misconduct and domestic violence cases, enhance trust in law enforcement) have already been addressed by the Court. Further, the general First Amendment arguments presented by Amistad will be addressed *infra.*

in advance of its actual expression." *United States v. Quattrone*, 402 F.3d 304, 308 (2005). It is also settled law that the public and press have a "qualified First Amendment right to attend judicial proceedings and to access certain judicial documents." *Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 91 (2d Cir. 2004).

Although the Supreme Court has previously acknowledged "that most information obtained in civil discovery would rarely fall into the classes of speech unprotected by the First Amendment, such as obscenity, defamatory statements, threats, and the like. . . . [I]t 'does not necessarily follow, however, that a litigant has an unrestrained right to disseminate information that has been obtained through pretrial discovery.'" *In Re Zyprexa,* 474 F. Supp. 2d at 417 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31 (1984)) (internal citations omitted). Indeed, in a case cited frequently by Plaintiffs, the Supreme Court reasoned that in a situation where a litigant gained access to the information solely by virtue of the court's discovery process, "[a] litigant has no First Amendment right of access to information made available only for purpose of trying his suit." *Seattle Times,* 467 U.S. at 32; *see also Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information."). Accordingly, and in contrast to Plaintiff's position, [p]rotective orders prohibiting dissemination of materials discovered before trial 'are not the kind of classic prior restraint that require[ ] exacting First Amendment scrutiny." *In Re Zyprexa,* 474 F. Supp. 2d. at 417 (quoting *Seattle Times,* 467 U.S. at 31). Therefore, the Court finds that the circumstances here do not constitute a prior restraint on Plaintiffs' First Amendment speech.[16]

---

[16] The argument raised by Plaintiffs regarding the analysis found in *U.S. v. Quattrone*, 402 F.3d 304 (2d Cir. 2005) is misplaced. In *Quattrone*, during jury selection for a criminal proceeding, Judge Owen ordered that no member of the press or media organization was to

In addition, and similar to the common law right of access, "upon a showing of 'good cause' the public access to discovery materials may be limited." *In re Agent Orange Prod. Liab. Litig.,* 104 F.R.D. 559, 566 (E.D.N.Y. 1985). Although the First Amendment and common law right of access substantially overlap, "[t]he First Amendment demands broader disclosure than the common law." *In re NBC Universal,* 426 F. Supp. 2d 49, 56 (E.D.N.Y. 2006). Like the common law presumption in favor of public access, a similar presumption also stems from the First Amendment. *See Standard Inv. Chartered,* 621 F. Supp. 2d at 71. In fact, "the First Amendment presumption gives rise to a higher burden on the party seeking to prevent disclosure than does the common law presumption of access.[17] *Lugosch,* 435 F.3d at 125. However, similar to the common law presumption, the First Amendment applies only to judicial documents. *See id.* (holding no First Amendment presumption with unfiled non-judicial documents). This Court has found that the IAU Report is not a judicial document. Consequently, the Court finds that no First Amendment right of access attaches to the IAU Report.

---

divulge the names of any prospective or selected jurors. *Quattrone*, 402. F.3d at 308. Since that order forbade the publication of information disclosed in a public judicial proceeding, the Second Circuit determined the order to be a prior restraint and applied a 3-part analysis to determine whether a court could restrict news coverage of speech otherwise protected by the First Amendment in order to ensure a fair trial. *Id.* 310-11. Here, the alleged speech at issue involves the contents of an IAU Report disclosed to Plaintiffs during discovery – not information gained by the parties and public in open court. Therefore, the Court finds that *Quattrone* is not applicable to the instant circumstances.

[17]     Despite a finding that the public and press should receive First Amendment protection in their attempts to access a particular judicial document, the document may nevertheless remain from the public's view if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *In re New York Times Co.,* 828 F.2d 110, 116 (2d Cir. 1987). As such, general or broad findings are insufficient to preclude the public's right to a document. *Id.*

C.      **Waiver**

Although waiver was primarily argued by Plaintiffs in response to Defendants' assertion

of privilege regarding the IAU Report, the Court concludes that Plaintiffs' waiver arguments are

equally applicable here and worthy of discussion.

### *1.      Waiver by Conduct*

Plaintiffs first contend that the Defendants' own disclosure of the existence of the IAU

Report and their statements to the media relating to the contents of the Report have waived any

protection afforded to the Report. *See* Pls.' Mem. at 7-8.  Specifically, Plaintiffs identify the

following statements made by Nassau County Police Commissioner Lawrence Mulvey to the

media, and broadcast by local news channels, as conduct constituting a waiver: (1) "I wish we

did provide better service to the family on the 15th and 17th.  In that sense we failed;" (2) "Our

domestic policy requires that we attempt to identify the affected parties and we attempt to get the

facts.  What was the argument about-what was the nature of it-is there an order of protection that

kind of thing.  Those kinds of things did not occur;" (3) "There was very little documentation

taken at those encounters;" (4) "I think we could've done a much better job in responding to

those calls.  I don't know if the outcome would have been different."  *See* Pls.' Mem. at 7-8; and

Exhs. C and D (DVDs of News 12 and ABC Eyewitness News Reports), annexed to the

Brewington Decl.

The Court finds that the above statements made by the Police Commissioner do not rise

to the level of conduct which would constitute a waiver by the Defendants.  The IAU Report

consists of 700+ pages.  None of the above statements directly mention the IAU Report or refer

to its specific contents.  In fact, the references are an array of general statements regarding

department policy, questions being mulled over by the Police Commissioner, an opinion that a better response could have been made, an expression of generalized displeasure with the officers' actions, and speculation whether the outcome would have been different. Further, the various assertions made by the media in those reports regarding the internal investigation, without more, do not equate to statements made by the Defendants which would lend support to a waiver argument. Lastly, Plaintiffs' conclusory argument that the various media outlets reported that the Police Commissioner provided them with detailed information related to the investigation is unavailing. Without any proof of what purported information was provided by the Defendants to the media, the Court finds no grounds to declare a waiver by the Defendants on this basis.[18] As such, the Court does not find that the "cat's-already-out-of-the-bag" with regard to the IAU Report and that no waiver has occurred based on Defendants' conduct.

### 2. *Waiver by Failure to File*

According to the Plaintiffs, the Defendants waived their right to seek a protective order since they failed to file a motion within the time frame stated by the Court during the parties' appearance for a conference. *See* Pls.' Mem. at 9. Plaintiffs are correct that on August 5, 2010, the Court issued a Civil Conference Minute Order summarizing the rulings made at the Initial Conference, which included a September 3, 2010 deadline for Defendants to either produce documents to the Plaintiffs or to file a protective order. *See* DE 13, ¶ 3. However, at the time of the Initial Conference, the issue before the Court was Defendants' reluctance to produce the IAU Report *to the Plaintiffs*. *See* DE 37, at 9-10. Indeed, Plaintiffs' counsel argued for production of

---

[18]    In fact, the News 12 reporter who claimed to have been provided detailed information related to the investigation acknowledges that the Police Commissioner declined to release the IAU Report or the names of the officers contained in it. *See* Brewington Decl., Ex. C.

the Report since it would be "crucial to our ability to evaluate and name the individuals." *Id.* At no point during the discussion of the protective order did Plaintiffs' counsel voice his intention to disseminate the IAU Report to anyone, including the media and general public. The thrust of the representations to the Court was the need/desire to get the IAU Report into the hands of Plaintiffs' counsel so that the Complaint could be properly amended. At a point later in the conference, the Court raised the issue of whether a confidentiality agreement was needed. *Id.* at 25. In response, Plaintiffs' counsel stated that he did not see how there could be a need for a protective order given the public nature of this matter. However, the Court notes that this discussion occurred subsequent to and distinct from the September 3, 2010 deadline for turning over documents to Plaintiffs' counsel or alternatively filing a motion for a protective order. In fact, the Court did not set a deadline for a confidentiality agreement. Rather, the Court directed the parties to confer in good faith, pursuant to their obligations under Local Civil Rule 37.3, to discuss whether a confidentiality order was needed. *See* DE 13. Accordingly, the ruling by the Court establishing a September 3, 2010 deadline to file for a protective order was with regard to production of the IAU Report solely to the Plaintiffs in this litigation. Therefore, there has been no waiver of Defendants' right to move for a protective order preventing Plaintiffs' further dissemination of the Report.

### 3. *Remaining Waiver Arguments*

Plaintiffs' remaining waiver arguments regarding Defendants' alleged failure to satisfy Rule 26 and the "voluntary" disclosure of the Report are unpersuasive.[19] Plaintiffs claim that

---

[19]     Although Plaintiffs proffer these waiver arguments as they relate to privileges afforded to the IAU Report pursuant to Section 50-a, described *infra*, the Court finds them relevant to any asserted privilege, and here, specifically, the law enforcement privilege.

Defendants waived any privilege asserted regarding the Report by failing to submit an index of documents (*i.e.*, privilege log) containing the 700 pages of the IAU Report. *See* Pls.' Mem. at 9-10. However, this argument confuses the issue before the Court. Rule 26(b)(5) addresses "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged." Fed. R. Civ. P. 26(b)(5). Here, Defendants did not "withhold information" from the Plaintiffs. The IAU Report was turned over to the Plaintiffs at the Court's direction. The issue is whether the Report, already produced in discovery to the Plaintiffs, must subsequently be disseminated to the public. The current dispute is not similar to *Jackson v. Edwards*, No. 99 CIV. 982, 2000 WL 782947 (S.D.N.Y. June 16, 2000), as Plaintiffs assert, where one party to an action claimed privilege and withheld producing documents to another party to the action. The County Defendants here produced the IAU Report in compliance with the Court's instructions, albeit in redacted form, and withheld outright 20 pages which appropriately appeared on Defendants' privilege log.

In addition, Plaintiffs' argue that Defendants' waived any privilege with respect to the IAU Report since it was knowingly produced to Plaintiffs. *See* Pls.' Mem. at 10-11. To support this contention, Plaintiffs cite the four factor analysis in *Lois Sportswear, U.S.A. v. Levi Strauss & Co.,* 104 F.R.D. 103 (S.D.N.Y. 1985). The four elements include: the reasonableness of the precautions to prevent inadvertent disclosure, the time taken to rectify the error, the scope of the discovery and the extent of the disclosure. *See Lois Sportswear,* 104 F.R.D at 105. According to the Plaintiffs, Defendants readily agree that they did not take any precautions to prevent the disclosure of the IAU Report. Given the fact that the IAU Report was disclosed by Defendants intentionally, and not inadvertently, Plaintiffs contend that "no further evaluation" under *Lois*

*Sportswear* was needed.  Pls.' Mem. at 10-11.  However, in *Lois Sportswear,* to resolve a dispute *among the parties*, the court applied the four factors to determine "whether or not the release of the documents was a knowing waiver or simply a mistake."  *Lois Sportswear,* 104 F.R.D at 105.  Here, Defendants have never argued that they mistakenly or inadvertently produced the IAU Report to the Plaintiffs.  Therefore, the analysis in *Lois Sporstwear* is irrelevant here.  Likewise, the Court is hard pressed to categorize the conduct here as a "voluntary disclosure" when Defendants declined to turn over the IAU Report in response to Plaintiffs' FOIL requests (s*ee* Brewington Decl., Exs. F, G, H), and only did so when the Court directed production to the party Plaintiffs.  Consequently, the Court does not agree that such production in discovery has "waived any privilege or any claim for protective order" as argued by the Plaintiffs.  *See* Pls.' Mem. at 11.

## IV.   CONFIDENTIALITY OF THE IAU REPORT

Defendants first argue that because internal affairs reports are used to evaluate the performance of officers, they are considered to be part of a personnel file pursuant to New York State Civil Rights Law § 50-a, and, as such, enjoy statutory protections against inspection and review.  *See*  Defs.' Mem. of law in Supp. of County Defs.' Mot. ("Defs.' Mot.") at 9.  Although acknowledging that state law does not control in federal court, Defendants argue that federal courts "need not ignore state privacy rules" (quoting *King v. Conde,* 121 F.R.D. 180, 187 (E.D.N.Y. 1988)), and that "[s]imply because Plaintiff's counsel came into possession of the subject report as part of the discovery process . . . does not vitiate the applicability of § 50-a when he then seeks to release the documents to non-parties."  *Id.* at 10.  Furthermore, Defendants assert that in these circumstances, § 50-a applies as a bar against Plaintiffs' revelation of the IAU Report.  Noting that Plaintiffs' counsel is a seasoned civil rights practitioner, Defendants state

that counsel is also well aware that internal affairs investigation reports are exempt from

disclosure when a FOIL request is received. *Id.* at 11.

Plaintiffs counter that pursuant to the New York State Public Officer's Law § 87, police

records are presumptively open for public inspection unless the record falls under one of the

narrowly construed exemptions set forth in § 87(2). *See* Pls.' Mem. at 3-4. Plaintiffs argue that

the IAU Report is not a personnel record since it is not used to evaluate performance.[20] *Id.* at 25.

According to the Plaintiffs, since the IAU Report is not part of a personnel file within the

meaning of § 50-a, no narrow exemption is triggered under § 87(2) and the IAU Report should be

produced. *Id.* at 4. Counsel notes that "[t]his is not a matter where public disclosure will directly

affect whether our office determines to add or not add defendants. . . . The purpose of publication

is to inform the community and public of the factual findings of the internal investigation and to

correct certain misleading statements by the County." *Id.* at 4-5. Moreover, Plaintiffs allege that

since state law privileges are not controlling in a Section 1983 action, direct application of § 50-a

---

[20]     Plaintiffs cite no case law to support this contention. However, they immediately thereafter quote *Mercy v. County of Suffolk*, 93 F.R.D. 520, 523 (E.D.N.Y. 1982), asserting that the IAU Report is, rather, a "document of the entire police department" and, as such, should be disseminated. Pls.' Mem. at 25-26. Significantly, Judge Pratt's decision in *Mercy* included a discussion of why various privileges asserted by the defendants there (*i.e.* executive, attorney-client and work product) did not protect a 10-page internal affairs narrative report and police officer statements from *limited* disclosure. Judge Pratt stated that "[t]he court recognizes that police department self-evaluation and remedial action do serve an important public policy, but such policy will not be hindered by the disclosure ordered here. On the contrary, *limited* disclosure can only further this policy. . . . [K]nowledge that a *limited* number of persons, as well as a state or federal court, may examine the file in the event of civil litigation may serve to insure that these investigations are carried out in an even-handed fashion . . . ." *Mercy*, 93 F.R.D. at 522 (emphasis added). Having made a determination that *limited* disclosure was appropriate, Judge Pratt directed one of the municipal defendants to turn the 10-page report over to the *plaintiff*. *Id.* at 523-24. Plaintiffs' reliance on *Mercy* to push the boundary beyond *limited* disclosure, in light of the fact that Plaintiffs are already in possession of the IAU Report, is misplaced.

would be improper. *Id.* at 6. Lastly, Plaintiffs here also argue that any alleged privilege attached to the IAU Report was waived by the Defendants' actions. *See id.* at 7–8.

### A. Applicability of Civil Rights Law §50-a(1)

New York State Civil Rights Law § 50-a provides that

> [a]ll personnel records, used to evaluate performance toward continued employment or promotion, under the control of any police agency . . . shall be considered confidential and not subject to inspection or review without the express written consent of such police officer . . . except as may be mandated by lawful court order.

N.Y. Civil Rights Law §50-a(1). Under New York State Public Officer's Law § 87, where agency records are presumptively available for public inspection and disclosure under FOIL,[21] an agency may nonetheless deny access to records that are specifically exempted from disclosure by either state or federal statute. *See* N.Y. Pub. Officer's Law §87(2)(a); *Gould v. New York City Police Dep't*, 89 N.Y.2d 267, 274-75 (1996).

Although "personnel records" are not specifically defined under § 50-a (other than requiring that they be under the control of the police agency and used to evaluate performance), the New York Court of Appeals has determined that the definition includes documents "containing personal, employment-related information about a public employee . . . received, processed and maintained as part of a [public employer's] operations" and "are clearly relied upon in evaluating the employee's performance." *Prisoners' Legal Servs. v. New York Dep't of Corr. Servs.*, 73 N.Y.2d 26, 31 (1988). Thus, "whether a document qualifies as a personnel record under Civil Rights Law § 50-a(1) depends upon its nature and use in evaluating an

---

[21]     Section 87 is part of Article 6 of Public Officers Law, entitled the Freedom of Information Law ("FOIL").

officer's performance." *Id.* at 32.

The Defendants argue that internal affairs investigations are initiated to inquire into conduct by law enforcement officials and the findings not only lead to potential administrative actions but also are used to evaluate performance toward continued employment. *See* Defs.' Reply Mem. at 2. As one New York court put it, "[t]he purpose of an internal investigation is to gather all pertinent information relating to possible police misconduct to enable the police department to evaluate the conduct of the officer and to determine appropriate disciplinary action." *Wunsch v. City of Rochester*, 438 N.Y.S.2d 896, 899 (Sup. Ct. Monroe Cty. 1981). The Defendants are correct in pointing out that the IAU Report identifies deficiencies, and, as a result, officers are subject to upcoming disciplinary proceedings. Accordingly, taking into account the guidelines provided in defining a personnel record by the New York State Court of Appeals, this Court finds that some portions of the IAU Report fall within that definition. *See Matter of Capital Newspapers Div. of Hearst Corp. V. City of Albany*, 63 A.D.3d 1336, 1338, 881 N.Y.S.2d 214, 217 (3d Dep't 2009) ("Documents pertaining to an officer's misconduct are the type of records specifically intended to be kept confidential under the statute, mainly to prevent use of the records in litigation to harass, embarrass, degrade or impeach an officer's integrity.").

Despite the existence of state statutes, "state law does not govern discoverability and confidentiality in federal civil rights actions." *See King v. Conde*, 121 F.R.D. at 187; *see also Jackson v. Edwards*, No. 99 CIV. 0982, 2000 WL 782947, at *2 (S.D.N.Y. June 16, 2000) (determining that state law privileges do not control in a Section 1983 claim). However, as noted previously, a court "need not ignore state privacy rules" where no federal rule exists which governs the same types of privileges afforded by the state. *See King*, 121 F.R.D. at 187; *see also*

*Lora v. Board of Education,* 74 F.R.D. 565, 576 (E.D.N.Y. 1977) ("[A] strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy."). However, "the nonexistence of a federal law in this area does not give license for free and unfettered discovery of police personnel documents." *Cody v. New York State Division of State Police*, No. CV 07-3735, 2008 WL 3252081, at *2 (E.D.N.Y. July 31, 2008). Instead, a court "must balance the interests favoring and opposing confidentiality in the discovery phase of the litigation." *King*, 121 F.R.D. at 187; *Gibson v. New York City Police Officer Carmody*, No. 89 Civ. 5358, 1990 WL 52272, at *2 (S.D.N.Y. Apr. 19, 1990) (holding where there is no comparable federal privilege, "the Court must balance the interests favoring and opposing confidentiality in discovery proceedings to determine whether to apply the state privilege."). But courts have made clear that "[f]ederal law disfavors privileges barring disclosure of relevant evidence" and "state rules protecting state officers must always be viewed with caution." *Id.*

Although Defendants correctly identify the issue before the Court as one unrelated to a discovery dispute between parties to this action, the Court rejects their position that § 50-a should therefore apply as a direct bar against Plaintiff's disclosure of the IAU Report to the public. *See King*, 121 F.R.D. at 187 (holding that "simple direct application of the state rule would be undesirable and improper"). Indeed, even in state court where § 50-a is directly applied, police personnel records are not afforded absolute protection from disclosure as argued by the Defendants. *See* N.Y. Civil Rights Law §50-a(2)-(3) (setting up a legal process whereby the confidentiality of police personnel records can be lifted by a court upon a clear showing of facts establishing that the records are relevant and material to the requested party and an *in camera*

42

inspection of the documents).  As the court *in King* reasoned:

> [i]t is also important to note in this context that even the "privilege" embodied in New York Civil Rights Law § 50-a . . . is not really a privilege in the sense that it could justify complete refusal to disclose relevant evidence. . . . Although the statute begins by calling the personnel records "confidential and not subject to inspection or review" except by court order, all that section 50-a ultimately requires is that all personnel records be viewed *in camera* first, to determine their relevance; as long as a record is relevant, it must be disclosed to the [requesting party].  The sole function of section 50-a is thus to protect irrelevant materials from disclosure: to prevent fishing expeditions, not to safeguard privacy itself.

*King,* 121 F.R.D. at 192 (internal quotations omitted).  Thus, the purpose behind § 50-a is that it

be used as a shield against irrelevant and improper disclosure of documents and not as a sword to

strike down any and all discovery requests as argued here.[22]

Taking into account that the relevant cases up to this point have decided whether § 50-a is

applicable in a federal action between the parties to that action, this Court is of the opinion that

since there is no federal privilege afforded to police personnel records, the Court must apply the

relevant balancing test to determine the applicability of the state statute.

## B.  The *King* Test

A police defendant asserting a claim of privilege against disclosure of police materials

under §50-a "must do more than alert the court to the state privilege law or the generalized

policies which support it."  *See King,* 121 F.R.D. at 189.  To properly balance the interests,

courts find guidance in the two-prong test established in *King v. Conde.  See, e.g., Cody,* 2008

WL 3252081, at *3; *McKenna v. Village of Northport*, No. CV 06-2895, 2007 WL 2071603, at

---

[22]     As Plaintiffs point out, § 50-a did not prevent Plaintiffs from obtaining the Report after an *in camera* inspection and redaction of certain information.  *See* DE 22.

*7 (E.D.N.Y. July 13, 2007). Under the first prong of the *King* test, "the police bear the burden of making a 'substantial threshold showing' that harm is likely to occur as a result of disclosure of the requested documents." *Cody,* 2008 WL 3252081, at *3 (quoting *King,* 121 F.R.D. at 189). "Unless the government, through competent declarations, shows the court *what interests* [of law enforcement or privacy] would be harmed, *how* disclosure under a protective order would cause the harm, and *how much* harm there would be, the court cannot conduct a meaningful balancing analysis." *King,* 121 F.R.D. at 189 (internal quotations omitted) (emphasis in original). The declaration or affidavit submitted must (1) be under oath and penalty of perjury; (2) from a responsible official within the agency who has personal knowledge of the principal matters to be attested to; and (3) upon personal review of the documents. *Id.* Only upon satisfying this initial threshold showing will a Court turn to the next prong and weigh the factors in favor of and against disclosure. *See Cody,* 2008 WL 3252081, at *3; *McKenna,* 2007 WL 2071603, at *7.

Although the potential discoverability of police personnel records, including internal investigations, under §50-a, have been analyzed by courts in the limited purview of actual parties to a litigation, the New York State Court of Appeals has determined that the

> legislative objective [of § 50-a] went beyond precluding disclosure on behalf of defendants in pending criminal cases. . . . The legislative purpose was to prevent disclosure of officers' personnel records except when a legitimate need for them has been demonstrated sufficiently to obtain a court order.

*Daily Gazette Co. v. City of Schenectady*, 93 N.Y.2d 145, 154-5, 688 N.Y.S.2d 472 (1999).

Furthermore, the court in *King* declared that its procedure and test "govern[s] all discovery disputes over police records in federal civil rights actions in this district, regardless of the label used to refer to the privilege." *See King,* 121 F.R.D. at 188. Accordingly, the Court finds no

44

reason why it should not apply this established two-prong analysis to the instant circumstances where the parties are disputing whether the IAU Report – a significant portion of which this Court has now found to constitute "personnel records" – can be turned over to a non-party (in this case, various media outlets).

As noted earlier in this decision, the Defendants have submitted the Affidavit of Thomas C. Krumpter, Deputy Chief of the Nassau County Police Department. Deputy Chief Krumpter states that he is "familiar with this action" and that dissemination of the IAU Report is "unlawful pursuant to State statutes" and "will result in irreparable harm to the involved Officers and the Department." *See* Krumpter Aff. ¶ 1. According to Krumpter, New York State statutes prohibit public dissemination of such information and any request from the public for access to the Report would be denied as the Report "is deemed a confidential report as a matter of law, pursuant to Civil Rights Law § 50-a." *Id.* ¶ 2. Thus, Krumpter concludes that any production of the IAU Report by Plaintiffs to the public violates §50-a and Public Officers Law § 87. *Id.* ¶ 3. Aside from violating the state statutes, Krumpter asserts that significant irreparable harm would result if the Report is disseminated to the public. *Id.* ¶¶ 5-7. Specifically, Krumpter argues that dissemination will "taint and spoil the local arbitrators' independent, neutral review of the matter" and "taint the prospective jury pool." *Id.* Krumpter further maintains that the Department's Internal Affairs Unit will be harmed because the confidential techniques and methodology utilized by this specialized unit when conducting investigations will be disclosed, thereby undermining future investigations. Likewise, Krumpter points to the chilling effect public disclosure may have on civilian witnesses. *Id.* ¶¶ 8-9.

Although the Defendants have arguably presented identifiable procedural and substantive elements to establish a threshold showing *(i.e.* a showing of what interests would be harmed and how much harm there would be through the affidavit under oath from a responsible official within the agency who has personal knowledge of the principal matter), others have not been met. For example, under the *King* analysis, the affiant must make his representations upon personal review of the documents at issue. Here, there is no representation in his affidavit that Deputy Chief Krumpter personally reviewed the entire IAU Report. The Court is left to infer that such is the case. More significant, however, is the absence of information specifically identifying h*ow* disclosure under a protective order would nevertheless cause the harms identified by the Defendants. Thus, the Court finds that Defendants have not satisfied the substantial threshold showing required under *King* which would bring the IAU Report within the confidentiality provisions of § 50-a.[23]  *See Cody,* 2008 WL 3252081, at *3 ("Where defendants have not satisfied their burden of justifying the application of any privilege, the Court will not shield the requested documents and information from disclosure based on Section 50-a.").

## V.   PRELIMINARY INJUNCTIVE RELIEF

Defendants next argue that they are entitled to an injunction prohibiting the dissemination of the IAU Report or its contents by the Plaintiffs. *See* Defs.' Mem. at 14-15. Federal Rule 65 governs the issuance of a preliminary injunction. *See* Fed. R. Civ. P. 65(a). The decision whether to grant or deny a preliminary injunction rests with the Court's sound discretion. *Weight Watchers Int'l Inc. v. Luigino's, Inc.,* 423 F.3d 137, 141 (2d Cir. 2005); *Sierra Club v. United*

---

[23]     As the Court declines to afford the IAU Report the privilege proffered  by Defendants pursuant to § 50-a, the Court will not address the various waiver arguments by Plaintiffs with respect to this privilege.

*States Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir. 1984). To obtain a preliminary

injunction, the movant is traditionally required to show (1) irreparable harm and (2) either (a)

that it is likely to succeed on the merits or (b) sufficiently serious questions regarding the merits

of the claim to make them fairly litigable, with the balance of hardships tipping decidedly in the

movant's favor.[24]  *See Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir. 2008); *1-800 Contacts, Inc.*

*v. When U.com, Inc.* 414 F.3d 400, 406 (2d Cir. 2005); *No Spray Coalition, Inc. v. City of New*

*York,* 252 F.3d 148, 150 (2d Cir. 2001). A preliminary injunction is a drastic and extraordinary

remedy that should not be granted routinely. *See JSG Trading Corp. v. Tray-Wrap, Inc.,* 917

F.2d 75, 80 (2d Cir. 1986); *Collagenex v. Ivax Corp.,* 375 F. Supp. 2d 120, 123 (E.D.N.Y. 2005).

Therefore, a party seeking preliminary injunctive relief has a "heavy burden" to sustain. *See*

*Robert W. Start, Jr. v. New York Exchange, Inc.,* 466 F.2d 743,744 (2d Cir. 1972); *City of*

*Newburgh v. Sarna*, 690 F. Supp. 2d 136, 163-64, (S.D.N.Y. 2010).

A.  **Irreparable Harm**

"A showing of irreparable harm is the single most important prerequisite for the issuance

of a preliminary injunction." *See Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110,

118 (2d Cir. 2009) (internal quotations omitted). "The threat of irreparable harm must not be

merely speculative, but 'actual and imminent, and one that cannot be remedied if a court waits

until the end of trial to resolve the harm.'" *City of Newburgh*, 660 F. Supp. 2d 136, 164 (quoting

*Faiveley,* 559 F.3d at 118) (internal quotations omitted); *see also Mountain Info. Mgmt., Inc. v.*

*Taddeo,* 455 F. Supp. 2d 124, 132 (E.D.N.Y. 2006) ("The law in this circuit requires a showing

---

[24]  Defendants' argue that "Plaintiff will suffer no prejudice, harm or ill effect if an injunction is issued." *See* Defs.' Mem. at 15. However, the burden here is on the movant to satisfy the elements necessary to issue a preliminary injunction.

that irreparable damages are likely, not merely possible.").

Based upon the submitted documents, the alleged irreparable harm Defendants claim would result if Plaintiffs disclosed the IAU Report to the media and public falls within five categories: (1) tainting the jury pool; (2) incomplete, false and inaccurate accounts; (3) prejudicial impact on arbitrators at police officer disciplinary hearings; (4) undermining police investigatory techniques and procedures; and (5) reluctance of domestic violence victims to cooperate with district attorney offices. *See* Defs.' Mem. at 16-20. Plaintiffs counter that Defendants' conclusory arguments fail to make a clear showing that they will suffer imminent irreparable harm. *See* Pls.' Mot. at 23.

### 1.    *Jury Contamination*

Defendants allege if the IAU Report were disclosed to the media, "there is a strong probability of tainting the jury pool." *See* Defs.' Mem. at 16. Although acknowledging that discovery has just begun, Defendants maintain that if Plaintiffs' news conference were to go forward and the Report was disclosed, "there is no guarantee that, in the event this matter proceeds to trial, the media will not replay its coverage of the Plaintiff's news conference" or "prevent the media outlets from having links to prior coverage of this case on their online editions so potential jurors can log in." *Id.* Further, Defendants argue that disclosure of the IAU Report would result in skewed media coverage in favor of Plaintiffs as the County would be prohibited from addressing the IAU Report based on constraints imposed on the County by Civil Rights Law § 50-a. *Id.* at 17.

In light of the evidence presented by Defendants, the Court fails to find irreparable harm resulting from potential jury contamination. Plaintiffs are correct in pointing out that Defendants

48

fail to provide any legal support for their blanket assertions of jury contamination. In fact, the

Court could not locate a single case from this Circuit where jury contamination was the basis for

a preliminary injunction. Instead, jury taint has been argued to rebut the presumption in favor of

public access when deciding whether a *protective order* is warranted, not an injunction. *See*

*United States v. Massino*, 356 F. Supp. 2d 227 (E.D.N.Y. 2005). And even in those situations,

where a standard less stringent than irreparable harm is needed, this Circuit has concluded "that a

jury pool is unlikely to be tainted beyond repair by the widespread airing of audio recordings by

the media." *Id.* at 233. Furthermore, and as admitted by the Defendants, discovery in this case is

in its early stages and trial is many, many months away. As such, any alleged risk to a fair trial at

this stage of the matter is too speculative for such a diverse and populous District. *See In re*

*Application of Nat'l Broad. Co.,* 635 F.2d 945, 954 (2d Cir. 1980); *Massino,* 356 F. Supp. 2d at

233 ("The Eastern District of New York is not a small town with one newspaper and one radio

station. Rather, approximately eight million people of astonishing ethnic, religious, cultural,

vocational and socioeconomic diversity reside within five counties."). Accordingly, Defendants

have failed to present evidence establishing irreparable harm on the issue of jury taint.

### 2. *Incomplete and Inaccurate Account*

Defendants maintain that if the news media were permitted to broadcast Plaintiffs'

planned new conference in which Plaintiffs intend to disclose the IAU Report, the result would

not provide a complete, true and accurate account of the events in this case. *See* Defs. Mem. at

16. Only the most egregious aspects of the detailed Report would be screened to the public,

according to Defendants, resulting in sound bytes and snippets which create a sketchy, distorted

rendition of the facts. *Id.* Further, Defendants argue that any media coverage would be skewed

in Plaintiffs' favor because the County will not be able to address the IAU Report since doing so would violate § 50-a. However, as already discussed *supra*, the Court declines to adopt the absolute protection from disclosure sought by Defendants pursuant to § 50-a since the IAU Report is not subject to the protections afforded by § 50-a. Therefore, all else being equal, § 50-a would not restrain Defendants from addressing whatever they believed was incomplete or inaccurate in Plaintiffs' disclosure of the IAU Report. As such, the Court finds that Defendants have not established actual or imminent harm based upon a purported incomplete and inaccurate account of the events at issue here.

### 3. *Arbitrator Contamination*

Defendants also argue that the neutrality of arbitrators who may be appointed in connection with the disciplinary hearings of certain police officers mentioned in the IAU Report would be affected if the Report were disclosed. *See* Defs.' Mem. at 17. Following the completion of the IAU Report, charges and specifications were served upon those officers who were found by the Nassau County Police Department to have violated applicable rules and regulations. However, Defendants state that such disciplinary proceedings have not yet commenced. *Id.* Therefore, Defendants claim that "there exists a realistic concern and risk of affecting the impartiality of potential arbitrators" resulting in police officers not receiving fair and impartial hearings. *Id.*

The Court does not agree with Defendants' contention that arbitrators, sitting in a quasi-judicial capacity, will be tainted by the release of the IAU Report. It seems very likely to this Court that the arbitrators will inevitably be exposed to the contents of the Report if such disciplinary arbitrations occur. Likewise, the Court agrees with Plaintiffs that this alleged harm

is based on speculation since the argument is grounded in "un-named, unknown, and as of yet undetermined arbitrators who may be appointed." Pls.' Mem. at 26. In fact, Defendants' own contentions are filled with language evidencing the lack of actual and imminent harm. Such conditional language as "realistic concern" and "may not receive fair and impartial hearings" exemplifies the uncertainty of such harm coming to fruition. As such, the alleged contamination proffered by Defendants does not constitute irreparable harm based on the speculation and attenuation of the argument.

### 4. *Compromised Techniques and Procedures*

Another example of irreparable harm advanced by the Defendants involves disclosure of the Internal Affairs investigative techniques and procedures. *See* Defs.' Mem. at 17-18. Defendants argue that as courts recognize a law enforcement privilege, which prevents the disclosure of law enforcement techniques and procedures, irreparable harm would result if public disclosure of an ongoing investigation or specific investigative steps undertaken were to occur. *Id.* at 18-19. Specifically, Defendants maintain that disclosure would force the police department "to change the manner in which investigations are conducted, thus potentially undermining the effectiveness of the Internal Affairs Unit" and "there would be a chilling effect on civilians who may be less inclined to initiate a complaint with the IAU when they feel it is warranted as they may fear that the investigation into that complaint may one day be the subject of a press conference." *Id.* at 19.

However, Defendants' reliance on the law enforcement privilege is misplaced with regard to a preliminary injunction. Indeed, Defendants fail to identify a single case where this privilege served as the basis for injunctive relief. Although this Court has found that the law enforcement

privilege is applicable in evaluating whether to grant a protective order, the Court does not find that the materials submitted by the Defendants meet the threshold showing of actual and imminent harm to the investigative techniques and procedures of future internal affairs investigations.

### 5. *Reluctance of Domestic Violence Victims*

As to their final assertion of irreparable harm, Defendants point to the fact that the Nassau County District Attorney's office "expressed concern" that "victims of domestic violence were reluctant to cooperate with their office after Bird's murder and the subsequent criminal trial." *See* Defs.' Mem. at 20. Consequently, it is Defendants' belief that disclosure of the IAU Report "could prevent a victim from coming forward and seeking assistance." *Id.* However, Defendants' argument is permeated with conditional words such as *could prevent*, *expressed concern*, and *reluctant* – confirming that any imminent and irreparable harm is suppositional at this juncture. Although the Court appreciates the sensitivity involving victims' reluctance to cooperate with the District Attorney's office, the Court finds that Defendants have failed to make the requisite showing of irreparable harm which would warrant imposition of an injunction precluding disclosure.

### B. <u>Success on the Merits</u>

In light of the fact that the Court finds no irreparable harm here, there is no need o address whether Defendants have established a likelihood of success on the merits.

**VI.    CONCLUSION**

Defendants' remaining contentions are premature at this juncture.[25]  For the foregoing

reasons, the Court declines to issue a preliminary injunction enjoining the dissemination of the

IAU Report and finds that the Report is not afforded the protection of NY CRL § 50-a.

Nevertheless, Defendants have established the limited baseline showing of "good cause" to

warrant a protective order restricting access to the IAU Report to the parties in this litigation.

This Court therefore, grants Defendants' motion for a protective order.


                                                    **SO ORDERED.**

Dated: Central Islip, New York
       January 14, 2011


                                          /s/ A. Kathleen Tomlinson
                                          A. KATHLEEN TOMLINSON
                                          U.S. Magistrate Judge

---

[25]    Specifically, Defendants' argument that any attempt by Plaintiff to utilize the IAU Report
for purposes of proving liability would be improper pursuant to Federal Rule of Evidence 407 is
irrelevant to the issue at hand and not ripe for discussion at this early stage of the litigation.
Further, the Court declines to address Defendants' argument that the proposed actions of
Plaintiffs' counsel with regard to holding a press conference are contrary to the New York Rules
of Professional Conduct since no press conference was held.