**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
SHANNON DORSETT, individually and as the
Administratix of the Estate of JO'ANNA BIRD,

                Plaintiffs,               **MEMORANDUM OF**
                                                   **DECISION AND ORDER**
              -against-                 10-cv-1258 (ADS)(AKT)

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, OFFICE OF THE
NASSAU COUNTY DISTRICT ATTORNEY,
Detective ROBERT ARIOLA, in his official
and individual capacities, Police Officers
And/Or Detectives JOHN AND JANE DOES 1
– 10, District Attorney JOHN AND JANE
DOES 1 – 10, And LEONARD VALDEZ
CRUZ,

                Defendants.
-----------------------------------------------------------X

**APPEARANCES:**

**Law Offices of Frederick K. Brewington**
*Attorneys for the Plaintiff*
556 Peninsula Boulevard
Hempstead, NY 11550
        By:    Frederick K. Brewington, Esq.
                Valerie M. Cartright, Esq., of Counsel

**Office of the Nassau County Attorney**
*Attorneys for the Defendants*
1 West Street
Mineola, NY 11501
        By:    Sondra Meryl Toscano, Esq.
                Liora M. Ben-Sorek, Esq., of Counsel

**Greenberg Burzichelli Greenberg P.C.**
*Attorneys for the Intervenor the Police Benevolent Association of the*
*Police Department of the County of Nassau, New York, Inc.*
300 Marcus Avenue, Suite 1W7
Lake Success, New York 11042
        By:    Seth H. Greenberg, Esq., of Counsel

**Levin Sullivan Koch & Shulz, LLP**
*Attorneys for the Intevenors Newsday LLC and News 12 Networks LLC*
321 West 44th Street, Suite 510
New York, NY 10036
    By:    Jacob P. Goldstein, Esq., of Counsel

**Snitow Kanfer Holtzer & Millus, LLP**
*Attorneys for non-party* **Presiding Officer** *Peter Schmitt*
575 Lexington Avenue
New York, New York 10022
    By:    Paul F. Millus, Esq., of Counsel

**SPATT, District Judge.**

Presently before the Court is an application by Newsday LLC and News 12 Networks LLC (collectively, the "Press Applicants"), seeking the release of the transcript and exhibits arising out of a proceeding before this Court on May 31, 2012, held for the purpose of determining whether Nassau County Legislature Presiding Officer Peter Schmitt is in contempt of the Court's Confidentiality Order. For the reasons set forth below, this application is granted in part and denied in part.

## I. BACKGROUND

The details of this case and the currently disputed issue of access have been thoroughly explored in a number of previous decisions. Once again, the present controversy essentially concerns the contents of a major piece of discovery: Internal Affairs Unit Report 14-2009 ( the "IAU Report"). This Report documents the Nassau County Police Department's internal investigation into the death of Jo'Anna Bird. In December 2010, a motion was made by the Nassau County Defendants for an injunction and/or protective order prohibiting the disclosure, dissemination, or release of the contents of the IAU Report. At that time, the Press Applicants filed a first motion to intervene in this action, seeking in part to oppose the Defendants' motion

to enjoin Plaintiffs, Plaintiffs' counsel, and Plaintiffs' relatives, from disclosing the contents of a redacted IAU Report and to unseal all motion papers and transcripts in this matter.

As to the IAU Report, on January 14, 2011, United States Magistrate Judge A. Kathleen Tomlinson issued a Memorandum Decision and Order finding that on all the facts and law presented by both sides, as well as the amicus brief submitted by the AMISTAD Long Island Black Bar Association ("AMISTAD") and the Police Benevolent Association of the Police Department of Nassau County ("PBA"), the Defendants' arguments did not meet the applicable requirements for a preliminary injunction and further found that the IAU Report was not afforded the protection of NY CPLR § 50-a. ("Protective Order"). However, Judge Tomlinson did find that the Defendants established the limited baseline showing of "good cause" so as to warrant a protective order restricting access to the IAU Report to the parties in this litigation. (See Docket Entry No. 60.) This Order took into account the Press Applicants' arguments opposing the Defendants' motion for an injunction or protective order. (See Docket Entry 60 at 31–33.) Thereafter, the Press Applicants filed objections to Judge Tomlinson's Protective Order, which the Court rejected on August 11, 2011. (See Docket Entry No. 110) ("the Court finds that Judge Tomlinson adequately identified sufficient good cause for the order.").

As to other documents, at various points in the course of this litigation, Judge Tomlinson also addressed the Press Applicants' requests to unseal certain transcripts. For instance, on February 15, 2011, Judge Tomlinson specifically addressed the Press Applicants' request to unseal certain redacted portions of the transcript of an emergency hearing held on November 30, 2010. At that time, Judge Tomlinson found that with regard to the limited testimony which remained redacted, there were compelling reasons to maintain the non-disclosure of this information. In particular, Judge Tomlinson found that the law enforcement privilege,

recognized as protectable, includes (1) prevention of disclosure of law enforcement techniques and procedures and (2) safeguarding the privacy of individuals involved in an investigation. Balancing the competing interests, she found that this protectable interest outweighed the Press Applicants' qualified constitutional and common law right of access to the information. Moreover, Judge Tomlinson found that the sealed information was narrowly tailored.

Now, almost eighteen months later, the Press Applicants again seek access to the transcript of a particular judicial proceeding in this matter. And once again, the underlying foundation of why access was restricted in the first place, concerns the IAU Report.

In order to facilitate the settlement process in this case and receive final approval or denial of the settlement by the Legislature, this Court entered a Confidentiality Order on December 15, 2011. The purpose of the Confidentiality Order was to permit members of the Legislature to have an opportunity to review the IAU Report — at that time restricted only to the parties to the litigation pursuant to Judge Tomlinson's Protective Order — so they could make an informed decision as to whether to approve the settlement. In particular, the Confidentiality Order stated:

> Notwithstanding the parameters of the protective order . . . the Confidential Material [including the IAU Report] may be disclosed, summarized, described, characterized or otherwise communicated or made available in whole or in part only to members of the currently-sitting Nassau County Legislature and their in-house counsel for the sole purpose of deliberating the issue of approval of the Settlement Agreement and Release. . . .
>
> Any conversation, discussion, deliberation, communication regarding, or mention of, the Confidential Material shall be done in Executive Session and, under no circumstances shall same be communicated, disseminated, released, or disclosed to members of the public, the media or anyone other than duly-elected members of the Nassau County Legislature and their in-house counsel. . . .

4

> In the event of a breach or violation of any term or condition of this Order, the County Defendants shall have the right to seek enforcement of the terms hereof and the imposition of any other appropriate remedy including, but not limited to, sanctions and contempt.

(Docket Entry No. 128).

However, notwithstanding these clear and express prohibitions in a court order, on February 7, 2012, in a videotaped Cablevision editorial, Nassau County Presiding Officer Peter Schmitt made several statements to an interviewer that allegedly revealed contents of the IAU Report that were protected in the Court's Confidentiality Order. On May 22, 2012, the Court granted the motion by the PBA to intervene for the limited purpose of enforcing the Court's December 15, 2011 Confidentiality Order as against Presiding Officer Schmitt. In addition, the Court ordered non-party Presiding Officer Schmitt to show cause on May 31, 2012 at 10:00 am, why this Court should not find him in contempt of the Court's December 15, 2011 Confidentiality Order.

On May 31, 2012, a hearing was held in order to provide Presiding Officer Schmitt with the due process rights of notice of the charges and an opportunity to be heard; which he was entitled to in these charges of contempt of court. Close-Up Intern, Inc. v. Berov, 411 Fed App'x 349, 353 (2d Cir. 2010) ("A party charged with contempt of court [except where the contempt is made in court and is summarily punished] is entitled to notice and an opportunity to be heard.") (internal citation omitted). As a necessary predicate for the Intervenor PBA to establish that Presiding Officer Schmitt was in contempt of the Court's Confidentiality Order, the PBA needed to meet the burden of demonstrating that his statements to the media did, in fact, reveal information contained in the IAU Report. Thus, the PBA called as a witness Assistant Chief Neil J. Delargy to testify as to his familiarity with the contents of the IAU Report. He was

5

questioned as to specific details of the Report and consequently whether Presiding Officer Schmitt's videotaped statements were gleaned from information contained in the Report. This Court closed the courtroom to the public for this portion of the proceedings, as well as for Presiding Officer Schmitt's direct examination. The courtroom was then unsealed for Schmitt's cross-examination and for the duration of the hearing.

At the time of the courtroom closure, the Press Applicants objected to the closure of the courtroom to the press and the public, and requested an adjournment for the purpose of bringing counsel in to support their objection. Their request was denied by the Court. The Press Applicants then requested the immediate release of the transcript of the proceedings, as well as copies of exhibits. On June 4, 2012, this Court held a hearing in order to provide the Press Applicants with an opportunity to be heard on this issue. The Court thereafter reserved decision.

## II. DISCUSSION

As an initial matter, the Court will not reconsider whether the Press Applicants are entitled to access the information contained in the IAU Report. Those concerns have been thoroughly raised and analyzed by Judge Tomlinson and this Court previously, and this particular issue will not be relitigated. (See, e.g., Docket Entry No. 82 ("This Order took into account the Press Applicants' arguments opposing Defendants' motion for an injunction or protective order. . . . Accordingly, based on the January 14, 2011 Order, the relief sought by the Press Applicants with regard to opposing Defendants' motion has already been determined.").)

**A.** **The Common Law and the First Amendment Right of Public Access**

"Courts and commentators have long recognized the centrality of openness to adjudicatory proceedings." N.Y. Civil Liberties Union v. N.Y. City Transit Auth., __ F.3d ___, 2012 WL 10972, at *7 (2d Cir. Jan. 4, 2012). "'Without publicity, all other checks are

6

insufficient: in comparison of publicity, all other checks are of small account.'" In re Oliver, 333 U.S. 257, 271, 68 S. Ct. 499, 92 L. Ed. 682 (1948) (quoting 1 Jeremy Bentham, Rationale of Judicial Evidence 524 (1827)). The Supreme Court has recognized a First Amendment right to access to varied types of criminal judicial proceedings. See, e.g., Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 578, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980); Nixon v. Warner Commc'ns., Inc., 435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.").

Apparently, the Supreme Court has not yet considered whether there is a constitutional right of access to civil trials. See Richmond Newspapers, 448 U.S. at 580 n.17, 100 S. Ct. at 2829 n.17 ("Whether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open."). Nevertheless, this presumptive right of access has been expanded by lower courts to include almost all criminal and quasi-civil proceedings. See e.g., United States v. Valenti, 987 F.2d 708 (11th Cir. 1993) (bench conferences); Charlotte Observer v. Bakker, 882 F.2d 850 (4th Cir. 1989) (change of venue hearings); Storer Commc'ns. v. Presser, 828 F.2d 330 (6th Cir. 1987) (pre-trial ex parte recusal hearings and closure proceedings); Washington Post Co. v. Soussoudis, 807 F.2d 383 (4th Cir. 1986) (plea hearings); United States v. Smith, 787 F.2d 111 (3d Cir. 1986) (chambers conferences); CBS, Inc. v. U.S. Dist. Court, 765 F.2d 823 (9th Cir.1985) (post-conviction proceedings); Herald Co. v. Klepfer, 734 F.2d 93 (2nd Cir. 1984) (suppression hearings); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059 (3d Cir. 1984) (civil case proceedings); United States v. Chagra, 701 F.2d 354 (5th Cir. 1983) (bail hearings); Newman v. Graddick, 696 F.2d 796 (11th Cir.1983) (parole release hearings). This presumption of access

7

likely extends to contempt proceedings, as in the present case. See In re Iowa Freedom of Info. Council, 724 F.2d 658, 661 (8th Cir. 1983) ("Hence, we conclude that the protection of the First Amendment extends to proceedings for contempt, a hybrid containing both civil and criminal characteristics.").

Moreover, "[n]umerous federal and state courts have also extended the First Amendment protection provided by Richmond Newspapers to particular types of judicial documents, determining that the First Amendment itself, as well as the common law, secures the public's capacity to inspect such records." Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 91–92 (2d Cir. 2004). See, e.g., id. ("[T]he media and the public possess a qualified First Amendment right to inspect docket sheets, which provide an index to the records of judicial proceedings."); United States v. McVeigh, 119 F.3d 806, 811 (10th Cir. 1997) ("A number of circuits have concluded that the logic of [Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 7-9, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (establishing a First Amendment right of access to preliminary hearings in state criminal cases)] extends to at least some categories of court documents and records, such that the First Amendment balancing test there articulated should be applied before such qualifying documents and records can be sealed." (citations omitted)), cert. denied, 522 U.S. 1142, 118 S. Ct. 1110, 140 L. Ed. 2d 163 (1998); Republic of the Philippines v. Westinghouse Elec. Corp., , 659 (3d Cir. 1991) ("[T]he First Amendment, independent of the common law, protects the public's right of access to the records of civil proceedings."); Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d 1165, 1177 (6th Cir. 1983) (implying a First Amendment right of access to court documents), cert. denied, 465 U.S. 1100, 104 S. Ct. 1595, 80 L. Ed. 2d 127 (1984).

Thus, this right of access applies equally to judicial documents, such as the transcript of certain proceedings and related exhibits. See Gambale v. Deutsche Bank AG, 377 F.3d 133, 143

(2d Cir. 2004) ("Of course, the statements at the conference, including the settlement amount, having been reduced to transcript form and filed, were part of a judicial record to which some presumption of openness, however gauged, may have therefore attached."); Phoenix Newspapers, Inc. v. U.S. Dist. Court, 156 F.3d 940, 948 (9th Cir. 1998) (determining that the First Amendment requires "release of transcripts [of closed criminal proceedings] when the competing interests precipitating hearing closure are no longer viable"); United States v. Antar, 38 F.3d 1348, 1359-60 (3d Cir. 1994) (stating that "the right of access to voir dire examinations encompasses equally the live proceedings and the transcripts which document those proceedings" and observing that "[i]t is access to the content of the proceeding — whether in person, or via some form of documentation — that matters"); see also United States v. Amodeo ("Amodeo I"), 44 F.3d 141, 145 (2d Cir. 1995) (describing judicial documents as those that are "relevant to the performance of the judicial function and useful in the judicial process"); U.S. v. Basciano, No. 03 Cr. 929, 2010 WL 1685810, at *2 (E.D.N.Y. Apr. 23, 2010) ("Because the public can only have confidence in the 'conscientiousness, reasonableness, or honesty of judicial proceedings' if the documents on which judges rely are publicly available, . . . the right of public access creates a rebuttable presumption in favor of public availability.").

However, this right of access is not unlimited, whether under the rubric of a First Amendment right to access or the common law right of access. Under particular circumstances, the right of public access may be outweighed by certain countervailing concerns. See Press-Enterprise Co., 478 U.S. at 9, 106 S. Ct. 2735 (noting that where the constitutional right of access exists, "proceedings cannot be closed unless . . . closure is essential to preserve higher values and is narrowly tailored to serve that interest"); see, e.g., Stamicarbon, N.V. v. Am. Cyanamid Co., 506 F.2d 532, 540 (2d Cir. 1974) ("We think that this case would present an

equally convincing justification for limited in camera procedures if, in the course of the contempt trial, the district judge should find that Stamicarbon was likely to suffer irreparable injury, and that protection of its secrets could be achieved with minimal disruption of the criminal proceedings.").

**B. Countervailing Interests**

The Court presumes that, for purposes of the present application, the First Amendment and/or common law right of access attaches to the contempt proceedings at issue. Thus, the Court need not determine (1) "whether the place and the process has historically been open to the press and general public" [the "experience" prong], and (2) "whether public access plays a significant positive role in the functioning of the particular process in question" [the "logic" prong]. Press Enterprises, 478 U.S. at 8, 106 S. Ct. at 2740. This analysis is not relevant here because under any qualified right of access of which this Court can conceive, and whatever substantial weight is given to this presumption of openness, it is overcome by an overriding interest that closure was essential to preserve higher values.

As explained above, although the public right of access to judicial proceedings and records is clear, the right of access "merely creates a presumption of access that, however strong, may be overcome in a particular case by competing concerns." United States v. Massino, 356 F. Supp. 2d 227, 231 (E.D.N.Y. 2005) (citing United States v. Graham, 257 F.3d 143, 149 (2d Cir. 2001)). "Trial courts are vested with discretion to weigh these factors against the presumption of access and to decide on a case-by-case basis whether to order a release of the materials in question." Id. (citing Nixon, 435 U.S. at 599, 98 S. Ct. 1306.

The Second Circuit has made clear that there at least two "countervailing factors": (1) the danger of impairing law enforcement or judicial efficiency; and (2) the privacy interests of those

10

who resist disclosure. United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995) ("Amodeo II"). Thus, among the interests recognized by the Second Circuit as worthy of protection, "is whether public access to the materials at issue is likely to impair in a material way the performance of Article III functions." Id. See SEC v. TheStreet.Com, 273 F.3d 222, 231 n.10 (2d Cir. 2001); U.S. v. Glens Falls Newspapers, Inc., 160 F.3d 853, 857 (2d Cir. 1998) ("One consideration is whether release of the materials is likely to impair in a material way the performance of Article III functions.").

The ability of the Court to enforce its own Confidentiality Order and conduct contempt proceedings where there is an alleged flouting of the Court's authority is a significant Article III function. Alderwoods Group, Inc. v. Garcia, __ F.3d __, No. 10 Civ. 14726, 2012 WL 1940336, at *4 n.18 (11th Cir. May 30, 2012) ("Federal judges have inherent power under Article III of the United States Constitution to hold litigants in civil contempt for violating court orders,"); U. S. v. Waksberg, 112 F.3d 1225, 1227 (D.C. Cir. 1997) ("Basically it is this: separation of powers principles require the government's immunity to give way because judicial power to enforce court orders against the United States through contempt is an essential feature of the judicial function under Article III of the Constitution."). The entire contempt proceeding would "be chilled to the point of ineffectiveness if [the transcript was] to be made public." Glens Falls, 160 F.3d at 858. Cf. Blake v. Deutsche Bank AG, No. 11 Civ. 4312, 2011 WL 2946374, at *1 (S.D.N.Y. July 18, 2011) ("'the presumption of access to settlement negotiations, draft agreements, and conference statements is negligible to nonexistent. We also conclude that release of these discussions and documents is likely to impair materially the trial court's performance of its Article III function of crafting a settlement of this case.'") (quoting Glens Falls at 858).

11

The entire purpose of the contempt proceeding which the Press Applicants now seek access to was for the precise purpose of investigating whether, and to what extent, Presiding Officer Schmitt revealed the contents of the IAU Report that is under the restrictions of a Protective Order and subsequent Confidentiality Order. It was thus necessary for the Court to properly assess the allegations of contempt and provide Schmitt with his due process rights of notice and an opportunity to be heard, in part by eliciting testimony in which the contents of the IAU Report were revealed and discussed. If the Court were to release that particular testimony, it would lead to absurd results. The Court would be potentially sanctioning a non-party for supposedly revealing certain details of a protected report, while simultaneously releasing the same protected information to the public. The Court must have the ability to enforce its own orders without disturbing the protective orders already in place. Thus, because Assistant Chief Delargy's testimony concerned details of the IAU Report that are presently under a Protective Order, at the present time, in the Court's view, there is an overriding interest in the continued protection of that information that overcomes any presumption of a right to access a transcript of that portion of the proceedings.

However, a document may remain from the public's view only if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is *narrowly tailored to serve that interest*." In re N.Y. Times Co., 828 F.2d 110, 116 (2d Cir. 1987) (emphasis added) (internal quotation and citation omitted). In Amodeo I, the Second Circuit stated that "we think that it is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document," Amodeo I, 44 F.3d at 147; U.S. v. Comprehensive Drug Testing, Inc., 513 F.3d 1085, 1149 (9th Cir. 2008) ("Provisions for narrow tailoring may include later release of

transcripts, or redacted transcripts."); Kasza v. Whitman, 325 F.3d 1178, 1181 (9th Cir. 2003) ("we have already accepted the government's position that disclosure of protected information in these cases risks significant harm to national security. . . . Public release of redacted material is an appropriate response."); Jones v. Avidyne Corp., No. 06 Civ. 1656, 2010 WL 3829215, at *1 (D. Or. Sept. 24, 2010) ("Instead, [Judge Stewart] implemented a more narrowly tailored remedy in order to strike the appropriate balance between the interests of the public and the interests of the parties. After reviewing the transcript line by line, Judge Stewart redacted the transcript as to certain matters but not others. . . . she found that a redacted version of the transcript was sufficient to maintain the confidentiality of Avidyne's trade secrets, research and development, and other materials subject to a standing protective order."). Cf. U.S. v. Steinger, 626 F. Supp. 2d 1231, 1237 (S.D. Fla. 2009) (rejecting the possibility of unsealing redacted portions of sealed documents and transcripts because it would be inadequate to protect the government's interest in the ongoing investigation, and because if redacted to eliminate all references, "the redactions would be so heavy as to make the released versions incomprehensible and unintelligible.").

At the time of the hearing, the Court could not be certain whether contents of the IAU Report would similarly be revealed during the course of Presiding Officer Schmitt's testimony. Therefore, the Court also closed the courtroom during his direct examination. However, with the benefit of hindsight, the Court can now release this portion of the transcript that was previously withheld in order to serve the above-mentioned interests in a narrowly tailored manner. Upon a line by line review of Presiding Officer Schmitt's direct examination, there was nothing revealed in the questions or answers that would implicate the information contained in the protected IAU report. Thus, the Press Applicants are granted permission to obtain a copy of this portion of the transcript.

Finally, the Press Applicants have requested access to the three exhibits that were utilized during Presiding Officer Schmitt's direct examination. As is revealed in the transcript, the three exhibits were online replications of three Newsday print articles dated May 1, 2009, April 13, 2010, and April 14, 2010, relating to the underlying criminal case in this matter. As the Press Applicants were the media organization that created these articles, the Court will presume that they already have access to these three exhibits.

### III. CONCLUSION

For the foregoing reasons, the Court will release a portion of the transcript of the Contempt Hearing, specifically pages 79–118, during which time the courtroom was sealed to the public.

**SO ORDERED.**

Dated: Central Islip, New York
June 6, 2012

                                                    */s/ Arthur D. Spatt*
                                                    ARTHUR D. SPATT
                                        United States District Judge