UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
SHANNON DORSETT, individually and as the
Administratix of the Estate of JO'ANNA BIRD,

               Plaintiffs,

         - against -

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, OFFICE OF THE
NASSAU COUNTY DISTRICT ATTORNEY,
Detective ROBERT ARIOLA, in his official
and individual capacities, Police Officers
And/Or Detectives JOHN AND JANE DOES 1
– 10, District Attorney JOHN AND JANE
DOES 1 – 10, and LEONARD VALDEZ CRUZ,

               Defendants.

POLICE BENEVOLENT ASSOCIATION OF
THE POLICE DEPARTMENT OF THE
COUNTY OF NASSAU, NEW YORK, INC.,

             Intervening Party.
----------------------------------------------------------------x

**MEMORANDUM OF**
**DECISION AND ORDER**
CV 10-01258 (ADS)

**A P P E A R A N C E S:**

> **LAW OFFICES OF FREDERICK K. BREWINGTON**
>     Attorneys for the Plaintiffs
>     556 Peninsula Boulevard
>     Hempstead, NY 11550
> BY:    Frederick K. Brewington, Esq.,
>        Valerie M. Cartright, Esq., of Counsel
>
> **OFFICE OF THE NASSAU COUNTY ATTORNEY**
>     Attorneys for the Defendants
>     1 West Street
>     Mineola, NY 11501
> BY:    Sondra Meryl Toscano, Esq.
>        Liora M. Ben-Sorek, Esq., of Counsel

**GREENBERG BURZICHELLI GREENBERG, P.C.**
    Attorneys for the Intervening Party
    300 Marcus Avenue, Suite 1W7
    Lake Success, NY 11042
BY:   Seth H. Greenberg, Esq., of Counsel

**SNITOW KANFER HOLTZER & MILLUS, LLP**
    Attorneys for non-party Peter Schmitt
    575 Lexington Avenue
    New York, NY 10022
BY:   Paul F. Millus, Esq., of Counsel

**SPATT, District Judge.**

On February 23, 2012, the Police Benevolent Association of the Police Department of the County of Nassau, Inc. ("PBA") moved for dual relief. The PBA moved: (1) for leave to intervene in this action, and, (2) if such leave to intervene was granted, to enforce this Court's December 15, 2011 Confidentiality Order with regard to statements made by Presiding Officer Peter Schmitt in a press interview on February 7, 2012.

In a decision by this Court rendered on May 22, 2012, the Court granted the motion by the PBA to intervene in this action. In addition, the Court directed the non-party Presiding Officer Peter Schmitt to show cause on May 31, 2012 why the Court should not find him in contempt of the Court's prior December 15, 2011 Confidentiality Order.

## I.  BACKGROUND

The Court need not recite all the prior facts and occurrences in this major Section 1983 wrongful death action. However, a review of some of the prior facts and orders are necessary in order to lay the foundation for the resolution of a serious charge – the violation of a court confidentiality order. The relevant events in this case occurred within a relatively short time.

This Section 1983 wrongful death action was commenced on March 19, 2010. It involved the tragic death of the Plaintiff's daughter, Jo'Anna Bird, a young mother, at the hands of Leonardo Valdez-Cruz, her former boyfriend and the father of her child. Valdez-Cruz was convicted of the murder of Jo'Anna Bird, and is currently serving his sentence. This civil rights death action against the Nassau County Defendants attracted the attention of the public and several media organizations. In particular, the media and the public were interested in the contents of a Nassau County Police Department Internal Affairs investigation report with regard to the facts in this case. This report is entitled the Internal Affairs Unit Report 14-2009 (the "IAU" Report). The report documented the internal investigation of the Nassau County Police Department into the death of Jo'Anna Bird.

The Nassau County Defendants moved for an injunction and/or a protective order prohibiting the disclosure of the IAU Report. In a decision dated January 14, 2011, United States Magistrate Judge A. Kathleen Tomlinson issued a detailed and thorough memorandum decision and order granting a protective order, which restricted access to the IAU Report to the parties in this litigation.

On July 22, 2011, the parties advised the Court that they had reached a settlement, subject to the approval of the Nassau County Legislature (the "Legislature"). Following the conditional settlement, a substantial period of time ensued without any word from the Legislature. As a result, the Court called in the parties to review this unresolved settlement situation. At a hearing on December 15, 2011, this Court was advised that the members of the Legislature asked to read the IAU Report before they either approved or declined to approve this substantial monetary settlement. Accordingly, in order to resolve this long delayed situation, this Court issued a

3

Confidentiality Order on the date of the hearing, December 15, 2011. The purpose of the

Confidentiality Order was to permit members of the Legislature to review the IAU Report so that

they could make an informed decision as to whether to approve the settlement. The

Confidentiality Order of December 15, 2011, stated, in part, as follows:

> 3.      Notwithstanding the parameters of the protective order . . . the Confidential Material [including the IAU Report] may be disclosed, summarized, described, characterized or otherwise communicated or made available in whole or in part only to members of the currently-sitting Nassau County Legislature and their in-house counsel for the sole purpose of deliberating the issue of approval of the Settlement Agreement and Release.

*   *   *   *   *

> No person given access to the Confidential Material or information contained therein shall be given possession of same; nor may they copy, duplicate, photograph, record, transcribe (or have transcribed), take notes, or in any way memorialize the contents of the Confidential Material.

> Any conversation, discussion, deliberation, communication regarding, or mention of, the Confidential Material shall be done in Executive Session and, under no circumstances shall same be communicated, disseminated, released, or disclosed to members of the public, the media or anyone other than duly-elected members of the Nassau County Legislature and their in-house counsel.

*   *   *   *   *

> 7.      Every person given access to the Confidential Material or information contained therein shall be advised in writing and acknowledge in writing and acknowledge in writing in the form attached hereto as Exhibits A and B, that disclosure of Confidential Material is a violation of New York State General Municipal Law Article 18, the New York State Civil Rights Law § 50-a, as well as the Nassau County Code of Ethics and, further acknowledges to be subject to contempt of court and/or other sanctions for non-compliance with this Order.

*   *   *   *   *

4

9.      In the event of a breach or violation of any term or condition of this Order, the County Defendants shall have the right to seek enforcement of the terms hereof and the imposition of any other appropriate remedy including, but not limited to, sanctions and contempt.

(Docket Entry No. 128) (emphasis added.)

The clear and specific procedures for viewing the IAU Report, described in the Confidentiality Order, were carefully drawn to ensure that only those persons designated by the Order would be permitted to review the contents of the IAU Report.  This brings us to this contempt proceeding.  It was alleged by the intervenor PBA that on February 7, 2012, in a videotaped Cablevision Editorial, Nassau County Presiding Officer Schmitt made several statements to an interviewer that the PBA alleges revealed certain contents of the IAU Report that were protected from disclosure by the Confidentiality Order.  The statements allegedly made by Presiding Officer Schmitt were preceded by the following language in the videotaped editorial:

> The case demonstrates a top to bottom failure of Nassau's police department.
>
> So says Nassau Presiding Officer Peter Schmitt, telling News 12 he was disgusted by what he learned after reviewing an internal affairs investigation kept confidential by court order.

According to the videotaped Cablevision Editorial, Presiding Officer Schmitt then made the following statements, which constitute the basis for this motion for sanctions:

> "There are 22 police officers in this county who were mentioned in that confidential internal affairs report who ought to be ashamed to look at themselves in the mirror every morning when they get up to shave, much less be wearing the badge," Schmitt said.  "Orders of protection were ignored . . . mandatory arrests were called for and not performed, giving a cell phone to the prisoner when he was behind bars and allowing him to call the victim 35-40 times, and

5

on and on and on."

## II. THE HEARING

First, Deputy Chief of Patrol Neil J. Delargy of the Nassau County Police Department testified in a closed courtroom. He was in Internal Affairs from September 2007 to January 2012. Chief Delargy oversaw the Bird case and is familiar with the IAU Report. He testified as to the Report's contents and was examined as to whether the four statements made by Presiding Officer Schmitt were gleaned from information contained in the Report.

Second, in the intervenor's case, the Cablevision Editorial video in which the Presiding Officer made the statements set forth above, was placed in evidence and shown to the Court. The statements made by the Presiding Officer in the video are in the exact language as set forth above in this opinion.

Presiding Officer Schmitt then testified in his case. He described the duties of the Nassau County Legislature and the additional duties of the Presiding Officer. He also testified about the role of the legislature in the settlement of cases against the County of Nassau. In particular, he stated that it is the duty of the legislature to support or disapprove all settlements with the County of Nassau. As to the Jo'Anna Bird case, the settlement came to his attention in September or October 2011. Previously, he had read Newsday articles on the case, including on April 13, 2010 (Dfts' Ex. B); April 14, 2010 (Dfts' Ex. A); and on May 1, 2009 (Dfts' Ex. C). The April 14, 2010 article concerned violations of orders of protection. The April 13, 2010 article concerned the Valdez-Cruz murder trial. Presiding Officer Schmitt also testified with regard to the court proceeding concerning the confidentiality of the IAU Report and Judge Tomlinson's decision

preserving the confidentiality of the IAU Report.

After the Jo'Anna Bird wrongful death action was settled, the Legislature was advised by the County Attorney that the settlement was for $7.7 million dollars subject to the consent of the Legislature. However, the Legislators were given no underlying documentation. The Legislators determined that they would not proceed to determine whether to consent to the settlement until they received the IAU Report. After several months, the County Attorney's Office eventually furnished the requested report. However, Presiding Officer Schmitt testified that: (1) he never reviewed the Court's Confidentiality Order; (2) he never reviewed the IAU Report; and (3) while he knew he had to sign an acknowledgment as to reviewing the IAU Report, he never signed the acknowledgment. Instead, he was orally briefed on the IAU Report by his attorneys on two or three occasions and he came to a conclusion on the issue of the consent to the settlement.

The Legislature convened to vote on the settlement on January 30, 2012. Presiding Officer Schmitt bypassed the usual committee procedure and placed the matter directly before the Legislature. Prior to the vote, he spoke on the record. Significantly, at that time he acknowledged that there was a confidentiality order in place.

As to the interview with News 12 on January 30, 2012, the Legislature had consented to the settlement and the Legislature press secretary told him that Newsday wanted to interview him and they had a deadline. Presiding Officer Schmitt walked to the end of the chamber to talk to News 12. At that time, he made the statements at issue in this proceeding. In his statement to the press, Presiding Officer Schmitt mentioned four facts that the PBA alleges were referred to in the IAU Report and form the basis of this contempt proceeding.

First, he stated that "there are 22 police officers in this county who were mentioned in the

confidential internal affairs report who ought to be ashamed to look at themselves in the mirror every morning when they get up to shower, much less wearing the badge." Presiding Officer Schmitt testified that he did not know why he mentioned "22 police officers." On cross-examination, Presiding Officer Schmitt again stated that he did not read the IAU Report. He had his attorney read the Report and his attorney briefed him on the limitations. He had two or three briefings by his attorney as to the IAU Report. He discussed the Report with his attorney in his office and he also discussed it with legislators in the Executive Session prior to the vote. Of importance in this contempt proceeding, Presiding Officer Schmitt conceded that he was aware of the confidentiality requirement in the Court's Confidentiality Order. He understood that the Legislators could discuss the IAU Report with regard to the pending settlement, among themselves, but they were not to discuss the IAU Report for any other purpose. Again, as to the 22 police officers he referred to in his News 12 interview, Presiding Officer Schmitt testified that this was a number is his head; it was an "estimate".

The second statement made by Presiding Officer Schmitt in the News 12 interview was that "orders of protection were ignored." He testified that he knew that the District Attorney took the position that orders of protection were violated. He also read press reports that police officers were not doing their duty to enforce orders of protection. Presiding Officer Schmitt did not recall whether he was briefed on the fact that orders of protection had been ignored. The third statement made in the News 12 interview was that "mandatory arrests were called for and not performed."

The fourth and final statement made by Presiding Officer Schmitt to the news media, was that, "giving a cell phone to the prisoner when he was behind bars and allowing him to call the

victim 35-40 times, and on and on and on." This was the most serious alleged violation of the Confidentiality Order. Presiding Officer Schmitt admitted that this information as to the "35 to 40 telephone calls to the victim" came from the IAU Report and, "he shouldn't have said it."

Q.      You also mentioned 35 to 40 cell phone calls from the precinct that in fact Mr. Valdez-Cruz did actually do. You mentioned that as well?

A.      Yes.

                    *    *    *    *    *

Q.      Did you understand, at the time that you were saying 35 to 40 phone calls were made and that information came through the report, that you were violating the Court's confidentiality order?

A.      No.

        Did I understand at the time I said it to the reporter? No.

        Did I understand it afterwards in reviewing my notes and so forth?

        Yes, it would have been better if I didn't say it.

Q.      Would you repeat that, just that one last line today, other than in Court, would you repeat that he made 35 to 40 phone calls or permitted 35 to 40 cell phone calls, would you repeat that outside of the courtroom?

A.      No.

Q.      Why not?

A.      Because it violates the confidentiality agreement.

(Hearing at 114, 115).

    Presiding Officer Schmitt then went on to say that he did not purposefully violate this Court's Confidentiality Order. Also, he did not think that the Confidentiality Order "should or could be used to prevent me or other legislators from doing their jobs." (Hearing at 117).

On cross-examination, Presiding Officer Schmitt conceded that he knew that the IAU Report was under "wraps", in that it was not to be released to the public or to the media. He also knew that on December 15, 2011, this Court issued a Confidentiality Order, which rendered limited access to the IAU Report and data. As he stated previously, he did not read the Report himself but sent it to his attorneys who briefed him on the terms of the Report. However, his attorneys were limited in their review of the Report, in that they could not take notes and had to rely on their memory in reporting the terms to him. Presiding Officer Schmitt discussed the IAU Report with his counsel and in an executive session with members of the Legislature prior to their vote. Of importance in this proceeding, he also testified that he understood that the contents of the report were not to be revealed other than in executive session or with his counsel. Notwithstanding those constraints, he spoke to News 12, a television program, about the contents of the IAU Report.

Q.    And you also, I believe, also admitted that you made a statement with regard to the number of cell phone calls, did you not?

A.    Yes.

Q.    And that you said, I believe, that that was -- you got that information from the report.

A.    That's correct.

Q.    Or at least you got that from your briefing associated with the report.

        Correct?

A.    Yeah.

Q.    Well --

A.    I mean, I got the information from the report.

> I don't remember if it was -- how it was delivered to
> me, whether it was discussion or briefings.

Q.      And at the time that you made that statement I believe you said that you didn't
        understand at the time that that statement was a violation of the court order.

        Isn't that correct?  Is that what your testimony was?

A.      I did not understand at the time.

        Obviously I wouldn't have said it.

Q.      And some point right after that statement came out of your mouth you realized --

A.      Thinking about it after I made the statement.

Q.      Oops, I might have violated the order?

A.      I'm thinking it might have been better if I had not said what I said, but I said it.

(Hearing at 129, 130).

Although explaining that he did not think he violated the Order, he stated that it would

have been more "prudent" on his part if he had not said the number of telephone calls.  Even

though he felt that most of what he said "came from sources other than a report," he then stated

that:

> ". . . the 35 to 40 cell phone calls was definitely an error in
> judgment on my part.  That came from the report and I shouldn't
> have said it, but I said it."

(Hearing at 133).

At the time Presiding Officer Schmitt made his statements to the media, which are the

subject of this contempt proceeding, he understood that the IAU Report was confidential.

Although he was not aware of the "specific parameters" of the IAU Report, he knew that he was

not supposed to disclose any portions of the Report to the media. This interview with News 12 regarding the IAU Report was the only time he has spoken to anyone else other than in this courtroom in his contempt proceeding.

## III. DISCUSSION

### A. The Legal Standard as to Finding of Contempt of Court

Federal Rule of Civil Procedure 37(b)(2) states that a court may "treat[ ] as contempt . . . the failure to obey any order except an order to submit to a physical or mental examination." Fed. R. Civ. P. 37(b)(2); see also 18 U.S.C. § 401 ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority . . . as — (n.) . . . (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."). The Advisory Committee Notes make clear that noncompliance with protective orders issued pursuant to Rule 26(c) may be sanctioned under this provision. See 1970 Advisory Committee Note to Fed. R. Civ. P. 37 at 207 (2011 ed.); see also Schiller v. City of New York, No. 04 Civ. 7921, 2007 WL 1623108, *3 (S.D.N.Y. June 5, 2007) (concluding that Rule 37(b) authorizes a district court to impose sanctions on a party that fails to comply with a protective order); Poliquin v. Garden Way, Inc., 154 F.R.D. 29, 31 (D. Me. 1994) ("Discovery orders that can be enforced through Rule 37(b) include protective orders issued under Federal Rule of Civil Procedure 26(c)."); Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse § 48(A)(2) (4th ed. 2008).

"Even if there were no such authority under Rule 37(b), courts have the inherent power to maintain the integrity of protective orders by imposing sanctions on those who violate them." Schiller, 2007 WL 623108, at *3; In re Debs, 158 U.S. 564, 594, 15 S. Ct. 900, 910, 39 L. Ed.

1092 (1895) ("the power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court."). Of importance, "[i]t is well-settled that a court's contempt power extends to non-parties who have notice of the court's order and the responsibility to comply with it." Bridgeport Guardians v. Delmonte, 371 F. Supp. 2d 115, 121 n.5 (D. Conn. 2005) (quoting Chicago Truck Drivers v. Bhd. Labor Leasing, 207 F.3d 500, 507 (8th Cir. 2000)).

"District courts have broad discretion to invoke [Rule 37] sanctions." See Fonseca v. Regan, 734 F.2d 944, 947 (2d Cir. 1984). However, before the Court levies a sanction, it must be established that the party being penalized is in fact culpable. Compare Lyn-Lea Travel Corp. v. American Airlines, Inc., 283 F.3d 282, 290 & n.14 (5th Cir. 2002) (holding a party in contempt where it admitted providing information to the media in violation of a protective order), with In re Cendant Corp., 260 F.3d 183, 200 (3d Cir. 2001) (finding "no adequate factual predicate" for finding breach of a confidentiality order). The Second Circuit generally instructs that "[a] party may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc., 369 F.3d 645, 655 (2d Cir. 2004).

A "clear and unambiguous order" is one "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1352 (2d Cir. 1989) (quoting In re Baldwin-United Corp., 770 F.2d 328,

13

339 (2d Cir. 1985)). In other words, the "order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995) (citations and quotations marks omitted).

Certain courts outside of this circuit have also stated that the Court has the discretion to withhold a contempt adjudication when there is nothing more than a negligible violation. For instance, some courts have held that a party alleging a violation of a court order must establish by clear and convincing evidence, that: "'(1) the offending party violated an order of the court; (2) the violation was more than *de minimis* or technical noncompliance; and (3) the conduct was not the product of a good faith or reasonable interpretation of the order,'" ViroMed Labs., Inc. v. United States, 87 Fed. Cl. 493, 500 (2009) (quoting Navajo Nation v. Peabody Coal Co., 7 F. App'x 951, 955 (Fed. Cir. 2001) (unpublished)); August Tech. Corp. v. Camtek Ltd., No. 05 Civ. 1396, 2011 WL 7615088, at *2 (D. Minn. Aug. 11, 2011); see also N.L.R.B. v. Hospital San Francisco, Inc., 989 F.2d 484, at *4 (1st Cir. 1993) (Table) ("we nonetheless retain both the discretion to withhold a contempt adjudication for *de minimis* violations"). However, the fact "[t]hat the violation of a court order is *de minimis* does not itself prevent a finding of contempt." Idaho Potato Com'n v. Majestic Produce Corp., No. 97 Civ. 5512, 1998 WL 760333, at *5 (E.D.N.Y. Sept. 9, 1998); see Maya Swimwear LLC v. Rivera, No. 08 Civ. 9766, 2010 WL 1257436, at *2 (S.D.N.Y. March 26, 2010) ("However, the Court acknowledges that some of the web transmissions introduced by Maya Swimwear still contained some *de minimis* references to "Amaya Swimwear," and thus the matter of contempt is not free of all doubt."); Forschner Group, Inc. v. New Trends, Vrolixs J.-C. No. 89 Civ. 531, 1994 WL 708129, at *9 (D. Conn.

Aug. 10, 1994) ("Furthermore, the fact that the violation was 'insignificant' does not prevent a finding of contempt.").

Here, the Court need not be concerned with a *de minimis* violation. The Court finds that the statements made by the Presiding Officer were significant, of importance and, most troubling, broadcast to the general public.

In addition, a court need not find willfulness or bad faith as a prerequisite to a contempt finding pursuant to Rule 37. See Paramedics, 369 F.3d at 655; Cancer Research Institute, Inc. v. Cancer Research Soc., Inc., 744 F. Supp. 526, 529, 530 (S.D.N.Y. 1990). Cf. Rojas v. United States, 55 F.3d 61, 63 (2d Cir. 1995) (per curiam) (noting that in criminal contempt, the willfulness element requires proof of a volitional act done by who knows or should reasonably be aware that the conduct was wrongful."). Even in a case requiring a wilful act, this can be demonstrated by "volitional acts by one who knows *or reasonably should know* the conduct is wrongful." Drywall Tapers of Greater New York Local 1974, of I.B.P.A.T., AFL- Drywall Tapers of Greater New York Local 1974, of I.B.P.A.T., AFL-CIO v. Local 530 of Operative Plasterers and Cement Masons Intern. Ass'n, No. 81 Civ. 0337, 1986 WL 14711, at *14 (E.D.N.Y. Dec. 16, 1986) (emphasis added). Regardless, "[t]he contemnor's intent, . . . may be considered in fashioning an appropriate remedy." Cancer Research, 744 F. Supp. at 529.

Here, the Court finds that the Confidentiality Order was clear and unambiguous, and that based upon the evidence demonstrated during the relevant proceedings, the proof of noncompliance is clear and convincing. Therefore, the Court finds Presiding Officer Schmitt to be in contempt of court.

**B. The Legal Standard as to the Amount of Sanctions**

"Unlike sentences for criminal contempt, which are punitive in nature and intended to vindicate authority of the court, the sanctions for civil contempt serve two purposes:  to coerce future  compliance and to remedy any harm  past  noncompliance  caused the other party." Weitzman v. Stein, 98 F.3d 717, 719 (2d  Cir. 1996) (citing United States v. United Mine Workers of America, 330 U.S. 258, 302-04 (1997)); see also King, 65 F.3d at 1062 (finding that civil contempt sanctions should either seek to coerce the contemptor into future compliance with the court's order or compensate the complainant for losses resulting from the contemptor's past noncompliance).  Thus, "[c]ivil contempt proceedings must be 'remedial and compensatory, and not punitive.'" Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 5 (2d Cir. 1989) (quoting Sunbeam Corp. v. Golden Rule Appliance Co., 252 F.2d 467, 469 (2d Cir. 1958); Cancer Research, 744 F. Supp. at 529 ("Punishment of the contemnor is not a proper purpose of a civil contempt sanction.").

"A sanction may, of course, be both coercive and compensatory."  Terry, 886 F.2d at 1353. The Second Circuit has commented that, "[s]o far as the . . . [coercion] function [] is concerned, the district judge, sitting in equity, is vested with wide discretion in fashioning a remedy."  Weitzman v. Stein, 98 F.3d at 719 (quoting Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir. 1979).  When imposing coercive sanctions, the Court should consider:

> (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden.

Terry, 886 F.2d at 1353; see Dole Fresh Fruit Co. v. United Banana Co., 821 F.2d 106, 110 (2d

Cir. 1987) (vacating a contempt order because the district court had not considered the factors that must be weighed for a coercive remedy, including the contemnor's financial resources and the probable effectiveness of the sanctions).

The compensatory goal, by contrast, can only be met by awarding to the plaintiff any proven damages.  See id.  The awarding of compensatory sanctions is only appropriate if the injured party provides some proof of loss.  See id.  The compensatory sanction "should correspond at least to some degree with the amount of damages."  King, 65 F.3d at 1062.  Unlike compensatory sanctions, which are payable to the moving party, coercive sanctions are payable to the Court.  See id. (citing Terry, 886 F.2d at 1353-54).  In this case, as set forth in more detail below, the Court does not find that compensatory sanctions are appropriate.

A court is "free to consider the full record in the case in order to choose the appropriate sanction."  Southern New England Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 144 (2d Cir. 2010).  Trial courts have broad discretion in fashioning coercive remedies.  See N.A. Sales Co. v. Chapman Indus. Corp., 736 F.2d 854, 857 (2d Cir. 1984).

Of importance in this case, a sanction for violating a confidentiality order, in particular, should persuade the offender to take its obligations more seriously as well as to give warning that any further violations will result in harsher consequences.  See Frazier v. Layne Christensen Co., No. 04 Civ. 315, 2005 WL 372253, at *4 (W.D. Wis.  2005) ("That said, the protective order is not a paper tiger. . . the price extracted from plaintiffs for their disregard of the court's orders must be sufficient to constitute actual punishment and must serve as a specific and general deterrent to future violations in this case and in others.  Pursuant to Rule 37(b)(2) I am imposing a fine of $1000 for each of the four violations of the protective order, for a total of $4000.").

## C.  **The Appropriate Amount of Coercive Sanctions**

With regard to the amount of sanctions to be imposed, the Court's discretion in selecting appropriate sanctions is guided by a number of factors, including:  "(1) the willfulness of the noncompliant party or the reasons for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the noncompliant party had been warned of the consequences of his noncompliance."  Nieves v. City of New York, 208 F.R.D. 531, 535 (S.D.N.Y. 2002) (citations omitted).

As stated above, civil contempt sanctions should either seek to coerce the contemptor into future compliance with the court's order or compensate the complainant for losses resulting from the contemptor's past noncompliance.  See King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir.1995).  The Court will now review the factors to be considered, namely, as stated above, (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden.  Terry, 886 F.2d at 1353.

### 1. The Character and Magnitude of the Harm

Here, Presiding Officer Schmitt revealed only a few details of the report.  In particular, he did not reveal the names of the officers.  Thus, the magnitude of the harm may appear relatively minor.  On the other hand, he spoke to the media in a very public manner, which was communicated to the public in great numbers, and this increases the magnitude of the harm. Such a publication can be extremely damaging.

2. The Probable Effectiveness of the Sanction in Bringing about Compliance

Here, it is important that the sanction be of a sufficient sum in order to ensure future compliance by Presiding Officer Schmitt and by other legislators that have viewed this Report. If the sanction is too low, there will be an incentive for legislators to satisfy their constituents and reveal contents of the Report with the knowledge that the cost of doing so will be insubstantial. In addition, Presiding Officer Schmitt has not even stated that he will not violate a court order again.

3. Financial Resources

There is no proof in the record of the Presiding Officer's financial resources. However, as a salaried public official, it can be assumed that he earns a reasonable salary and has some financial net worth, resources or property.

4. Prior cases

A review of other cases reveals the following:

Utica College v. Gordon, 389 Fed App'x 71 (2d Cir. 2010): There was a consent judgment that prohibited the defendant from possessing a range of materials that were created during his employment. The defendant thereafter publicly presented the findings of a report he had worked on. The court imposed a sanction of $2,500, which was affirmed by the Second Circuit, although it was unclear what portion of that was for attorneys' fees and what part of that was a coercive sanction.

Dvorkin v. New York-Presbyterian Hosp., No. 10 Civ. 3680, 2011 WL 280801 (S.D.N.Y. Jan. 19, 2011): The Magistrate Judge sanctioned plaintiff's counsel $1,000 for not complying with a court order that required him to be at a settlement conference. Judge Daniels stated that

"The original sanction of $1,000 for willfully violating the December 7, 2010 Order and the December 13, 2010 Order is a reasonable and appropriate amount.  The Magistrate Judge increased the sanction at the conference in reaction to what he considered to be counsel's continued disrespectful conduct."

Mullins v. Dep't of Labor of Puerto Rico, 775 F. Supp. 2d 413 (D. Puerto Rico, 2011): The plaintiff used documents protected by a Confidentiality Order.  The court awarded a fine of $4,000.

**D. As to Whether Attorneys' Fees Should be Awarded**

In addition, any award of attorneys' fees, is reviewed by the Court of Appeals under the abuse of discretion standard, see McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1313 (2d Cir. 1993).  The Second Circuit has indicated that if the contempt is willful, that strongly supports an award of fees and costs.  See Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996) ("Thus, while willfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them."); Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1535 (11th Cir. 1986) ("[w]illfulness is a commonly accepted justification for awarding attorney fees.").  Here, the Court does not find that the Presiding Officer acted wilfully.  Therefore, the Court declines to impose an award of attorney's fees as an additional penalty in this matter.

## IV.  CONCLUSION

After a review of the facts and circumstances and the relevant statutes and case law, the Court imposes a coercive sanction of $2,500 for the disobedience of the Court's Confidentiality Order, in which the violation was made and disseminated on public television.

Presiding Officer Schmitt is directed to make this payment to the Clerk of the Court

within twenty (20) days from the date of this Order.

**SO ORDERED.**

Dated: Central Islip, New York
         June 7, 2012

_____ _/s/ Arthur D. Spatt_____
                ARTHUR D. SPATT
                United States District Judge