**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
SHANNON DORSETT, individually and as the
Administratix of the Estate of JO'ANNA BIRD,

                   Plaintiffs,               **MEMORANDUM OF**
                                      **DECISION AND ORDER**
             -against-               10-cv-1258 (ADS)(AKT)

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, OFFICE OF THE
NASSAU COUNTY DISTRICT ATTORNEY,
Detective ROBERT ARIOLA, in his official
and individual capacities, Police Officers and/or
Detectives JOHN AND JANE DOES 1 – 10,
and District Attorney JOHN AND JANE DOES
1 – 10

                   Defendants.
-------------------------------------------------------X
**<u>APPEARANCES:</u>**

**Law Offices of Frederick K. Brewington**
*Attorneys for the Plaintiff*
556 Peninsula Boulevard
Hempstead, NY 11550
        By:   Frederick K. Brewington, Esq.
               Valerie M. Cartright, Esq., of Counsel

**Office of the Nassau County Attorney**
*Attorneys for the Defendants*
1 West Street
Mineola, NY 11501
        By:   Sondra Meryl Toscano, Esq.
               Liora M. Ben-Sorek, Esq., of Counsel

**Greenberg Burzichelli Greenberg P.C.**
*Attorneys for the Intervenor the Police Benevolent Association*
300 Marcus Avenue, Suite 1W7
Lake Success, New York 11042
        By:   Seth H. Greenberg, Esq., of Counsel

**Levin Sullivan Koch & Shulz, LLP**
*Attorneys for the Intervenors Newsday LLC and News 12 Networks LLC*
321 West 44th Street, Suite 510
New York, NY 10036
      By:    Jacob P. Goldstein, Esq., of Counsel

**SPATT, District Judge.**

Presently before the Court are two motions, both of which stem from the continuous

effort by the Plaintiff and the press to obtain and publicize the contents of a major piece of

discovery in this now settled case: namely, the Internal Affairs Unit Report 14-2009 ( the "IAU

Report"). There are currently two restraints in place with regard to the disclosure of the IAU

Report. On January 14, 2011, a Protective Order was entered to restrict access to the IAU Report

to the parties in this litigation. On December 15, 2011, a Confidentiality Order was then entered

to expand access to the Nassau County legislators and their counsel, for the sole purpose of

facilitating the settlement. The Plaintiff has now filed a motion, which seeks to lift all bands and

restrictions pertaining to the Protective Order. In addition, the Proposed Intervenors Newsday

LLC and News 12 Networks LLC (the "Press Intervenors") have filed a motion, seeking to

intervene for the purpose of vacating the Confidentiality Order. For the reasons set forth below,

the Plaintiff's motion is denied and the Press Intervenors' motion is granted in part and denied in

part.

## I. BACKGROUND

The factual underpinnings of this litigation have been discussed in several prior

decisions. The Plaintiff Sharon Dorsett commenced this action after the March 2009 tragic death

of her daughter Jo'Anna Bird, a young mother, at the hands of Leonardo Valdez-Cruz, her

former boyfriend and the father of her child. Valdez-Cruz was tried and convicted for the

murder of Jo'Anna Bird and is currently serving a life sentence. The Plaintiff brought a series of

claims both individually and as the Administratrix of her daughter's estate, including Section 1983 violations against the individual Nassau County Defendants; municipal liability against Nassau County pursuant to <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); a Section 1983 conspiracy claim against Leonardo Valdez-Cruz and the Nassau County Defendants; as well as New York State claims asserting wrongful death, negligence, and abuse of process.

On August 5, 2010, at the Initial Conference before United States Magistrate Judge A. Kathleen Tomlinson to establish a discovery plan, the Plaintiff's counsel placed on the record his previous attempts to obtain the IAU Report.  The Nassau County Police Department ("NCPD") Internal Affairs Unit prepared the IAU Report.  It documents the NCPD's internal investigation into the death of Jo'Anna Bird.  Specifically, the Plaintiff sought to obtain a copy of the Report for the purpose of naming the actual officers in the complaint, rather than using John and Jane Does.  The Defendants did not object to the production of the Report at that time, but their counsel stated that the Report was incomplete.  Judge Tomlinson ruled that if the Defendants' position was to refuse to turn the Report over to the Plaintiff, it would need to file a motion for a protective order by September 3, 2010.

On August 6, 2010, the Defendants' counsel wrote to the Court stating that the IAU Report was complete, with the exception of the disciplinary review phase.  <u>See</u> DE 15.  The Defendants' counsel further noted that they were in the process of reviewing the IAU Report and reserved their right "to move for a protective order, a stipulation of confidentiality or, alternatively, a request for *in camera* inspection, by September 3, the date designated by the Court."  <u>Id.</u>  On September 9, 2010, the Plaintiff's counsel wrote to the Court, advising that the County had neither supplied the IAU Report nor filed a motion for a Protective Order on or

before September 3, 2010, as directed by the Court.  See DE 16.  Judge Tomlinson then issued an electronic order on September 10, 2010, requesting that the County Defendants inform the Court by September 15, 2010 why the IAU Report was not produced by September 3 and to provide information concerning any underlying circumstances related to the delay.  In response to the Court, counsel for the Nassau County Defendants filed a letter dated September 15, 2010 stating that "[t]he delay has been occasioned by the necessity to review and redact certain information from the voluminous report as well as the necessity to request the reproduction of the police officers' memo-book pages contained in the report."  DE 18.  The letter further advised that the Report would be furnished that week.  Id.

On October 12, 2010, the Plaintiff's counsel wrote to the Court seeking full disclosure of the IAU Report after advising that certain pages were withheld and made part of a privilege log and that substantial redactions had been made in various portions of the Report as produced.  See DE 20.  Thereafter, the unredacted IAU Report was submitted to Judge Tomlinson for an *in camera* inspection.  On October 29, 2010, the Court granted in part and denied in part the Plaintiff's application and specifically identified portions of the IAU Report which were to be produced without redactions.  See DE 22.

On November 30, 2010, counsel for the County Defendants contacted the Court to request an emergency hearing after learning indirectly that the Plaintiff's counsel had issued a press release earlier that day stating that the "attorneys and family of Jo'Anna [would] release [the] contents of [a] secret internal affairs report finding massive violations and failure by multiple members of the Nassau County Police—all leading to the death of Jo'Anna Bird."  That same day, Judge Tomlinson heard from both sides during a telephone conference.  At that time, she ruled that the County Defendants had met the requirements for a temporary restraining

4

order/preliminary injunction and that the Plaintiff had not established any prejudice that would accrue by permitting the parties to brief an issue of such significance to both sides so that a reasoned determination could be made upon an appropriate review of more fully developed and supported legal arguments.  See DE 25.  Thus, the preliminary injunction, which temporarily restrained and preliminarily enjoined the Plaintiff from releasing or disclosing the contents of the Report, temporarily stayed the disclosure of the IAU Report, at least until the issue was briefed and a decision on the merits could be made.  Id.  The parties were provided with a briefing schedule and were directed to file their motion papers under seal.

**A.  <u>The Protective Order</u>**

On January 14, 2011, Judge Tomlinson issued an extensive memorandum decision and order addressing the motion by the Nassau County Defendants for an injunction and/or protective order prohibiting the disclosure, dissemination, release or revelation of the contents of the IAU Report (the "Protective Order").

With regard to the County Defendants' motion for a protective order, the County Defendants asserted that they were entitled to a protective order for the IAU Report on a showing of good cause pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 26(c).  The County Defendants argued that on balancing the need for the information against the injury which might result from compelled disclosure, the Court should find that the scales tipped in favor of the Defendants.  On the other hand, the Plaintiff maintained that the County Defendants were not entitled to a protective order, in part because the Defendants failed to make particular and specific demonstrations of fact showing that disclosure would result in an injury sufficiently serious to warrant protection and that the Defendants instead relied on broad allegations of unsubstantiated harm.

5

Judge Tomlinson first explored the common law right of public access to judicial documents, citing the analysis established by the Second Circuit in <u>Lugosch v. Pyramid Co. of Onondaga</u>, 435 F.3d 110 (2d Cir. 2006), for a court to utilize in determining when the public has a right of access to particular documents.  Operating under this framework, the court found that: (1) in light of the fact that the IAU Report was not filed with the Court and did not play any role in the performance of Article III functions in accordance with the applicable case law, the Report was not a judicial document; (2) no presumption of access was afforded to the Report because it was not a judicial document and was merely passed between the parties in discovery; and (3) the Defendants established the limited baseline showing of "good cause" to warrant a protective order restricting access to the IAU Report to the parties in this litigation.  <u>See generally</u> DE 60.

With regard to the final prong, based upon Judge Tomlinson's previous examination of the IAU Report, as well as the information and arguments submitted by the Defendants and the applicable case law, she found that the law enforcement privilege applied to the IAU Report.  In addition, Judge Tomlinson noted that the privacy interests of third parties carry great weight in the balancing of interests.  In this vein, the Protective Order stated that "the IAU Report contains the names of numerous officers not yet parties to this litigation as well as witnesses and other third-parties not related to this action whose privacy interests would be seriously jeopardized with the publication of the IAU Report."  DE 60 at 24.  As for the Plaintiff, the court rejected the argument that there was a legitimate interest in the public disclosure of the IAU Report to inform the community and public of the factual findings of the internal investigation and to correct certain misleading information that had already been made part of the public conscience.

Next, Judge Tomlinson considered the First Amendment right of access.  In particular, one of the Plaintiff's primary arguments against restricting access to the IAU Report was that

such restriction was a prior restraint on speech, which would violate the First Amendment. However, as the court had found that the IAU Report was not a judicial document, consequently, it also found that no First Amendment right of access attached to the IAU Report.

With regard to the confidentiality of the IAU Report, the Defendants first argued that because internal affairs reports are used to evaluate the performance of officers, they are considered to be part of a personnel file pursuant to New York State Civil Rights Law § 50-a, and, as such, enjoy statutory protections against inspection and review.  Accordingly, the Defendants asserted that § 50-a applies as a bar against the Plaintiff's revelation of the IAU Report.  However, Judge Tomlinson disagreed with the Defendants' contentions in this regard and found that the Defendants had not satisfied the substantial threshold showing which would bring the IAU Report within the confidentiality  provisions of § 50-a.

Finally, with regard to preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65, the Defendants urged that there was irreparable harm which would result if the Plaintiff disclosed the IAU Report to the media and public, namely: (1) tainting the jury pool; (2) incomplete, false and inaccurate accounts; (3) prejudicial impact on arbitrators at police officer disciplinary hearings; (4) undermining police investigatory techniques and procedures; and (5) reluctance of domestic violence victims to cooperate with district attorney offices.  In all five categories, Judge Tomlinson found that the Defendants had failed to make the requisite showing of irreparable harm which would warrant the imposition of an injunction precluding disclosure.

In sum, Judge Tomlinson declined to issue a preliminary injunction enjoining the dissemination of the IAU Report and found that the Report is not afforded the protection of NY CRL § 50-a.  Nevertheless, she found that the Defendants had established the limited baseline

showing of "good cause" to warrant a protective order restricting access to the IAU Report to the parties in this litigation.

The Plaintiff and two news organizations, Newsday LLC and News 12 Networks, LLC (the "Press Intervenors"), objected to the entry of the Protective Order. Because it was a non-dispositive matter, this Court would modify or set aside a portion of the Judge Tomlinson's order only if it was found to be clearly erroneous or contrary to law. See, e.g., Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990). On August 8, 2011, this Court addressed those objections in a Memorandum of Decision and Order. The Order stated that "to the extent that the Court could read into the parties' submissions an objection to the County Defendants' 'good cause' for a timely protective order, the Court finds that Judge Tomlinson adequately identified sufficient good cause for the order." DE 110 at 9 (citing Dorsett I, 762 F. Supp. 2d at 514–26 (finding that the County Defendants' interests in keeping certain law enforcement techniques and sources of information non-public established the requisite harm to establish good cause for a protective order)).

In addition, the Court rejected the Press Intervenors' characterization of the prospective order as a gag order, which would require an exacting showing of harm. In this regard, the Court recognized that the Protective Order did not have the breadth of a true gag order, because the Plaintiff was not generally precluded from discussing her case in public, and more importantly, she was also not precluded from discussing the contents of the IAU Report if she obtained that information from a source other than civil discovery in this case. See id. at 11 ("Unlike a gag order, which places general limits on speech regardless of the source of the information being shared, the present protective order only precludes the dissemination of the IAU Report as received through discovery."). Therefore, the Court affirmed the Protective Order.

8

**B.  <u>The Confidentiality Report</u>**

On July 22, 2011, the parties indicated to the Court that they had reached a settlement agreement and that a stipulation of discontinuance would be filed following payment of the settlement funds.  However, on October 31, 2011, the Plaintiff filed a motion to convert the settlement agreement into a judgment because the Defendants had not paid the monies due under the settlement agreement.  The Defendants contended that the agreement was conditioned upon approval by the Nassau County Legislature ("Legislature"), and that the legislative process had yet to be completed.

At a hearing before this Court on December 15, 2011, the County represented to the Court that the delay was due to the desire of the members of the County Legislature to see the IAU Report, in order to understand the basis for the significant settlement amount.  However, because of the Protective Order, access to the IAU Report was restricted to the parties in this litigation.

In order to facilitate the settlement process and receive either final approval or denial of the settlement by the Legislature, the Court signed a Confidentiality Order, drafted by the County Attorney, on December 15, 2011 (the "Confidentiality Order").  The purpose of the Confidentiality Order was to permit members of the Legislature to have an opportunity to review the IAU Report so they could make an informed decision as to whether to approve the settlement.  In other words, it attempted to narrowly expand the Protective Order to permit review of the IAU Report to certain non-parties—namely the currently-sitting Nassau County Legislature and their counsel—in order to effectuate resolution of the proposed settlement.  In particular, the Confidentiality Order stated:

> Notwithstanding the parameters of the protective order . . . the Confidential Material [including the IAU Report] may be

9

> disclosed, summarized, described, characterized or otherwise communicated or made available in whole or in part only to members of the currently-sitting Nassau County Legislature and their in-house counsel for the sole purpose of deliberating the issue of approval of the Settlement Agreement and Release. . . .
>
> Any conversation, discussion, deliberation, communication regarding, or mention of, the Confidential Material shall be done in Executive Session and, under no circumstances shall same be communicated, disseminated, released, or disclosed to members of the public, the media or anyone other than duly-elected members of the Nassau County Legislature and their in-house counsel.
>
> In the event of a breach or violation of any term or condition of this Order, the County Defendants shall have the right to seek enforcement of the terms hereof and the imposition of any other appropriate remedy including, but not limited to, sanctions and contempt.

DE 128.

## C.  **The Present Motions**

The Legislature approved the settlement in or about January 2012, and thus the underlying case has been fully resolved and terminated.  However, the resolution of the lawsuit has not precluded the efforts by the Plaintiff and the press to publicly disclose the contents of the IAU Report.

On June 29, 2012, non-party Peter Schmitt filed a motion to intervene for the purpose of seeking modification of the Confidentiality Order.  On July 16, 2012, the Press Intervenors filed a motion to intervene and to vacate the December 15, 2011 Confidentiality Order.  On July 27, 2012, the Plaintiff filed a cross-motion to lift all bands and restrictions pertaining to Judge Tomlinson's January 2011 Protective Order, in addition to concurring with non-party Peter Schmitt's motion for leave to intervene for the purpose of modifying the Confidentiality Order.

On July 31, 2012, Peter Schmitt filed a letter motion to withdraw his previous motion with prejudice, which the Court has granted.  Therefore, only the motions by the Plaintiff and the Press Intervenors remain outstanding.  Both motions are opposed by both the Defendants and the

Intevenor the Police Benevolent Association of the Police Department of the County of Nassau (the "PBA").

The Press Intervenors raise several arguments as to why the Confidentiality Order should be modified or vacated. First, they claim that the Court lacks the authority to issue an Order restricting the use of material independent of the judicial process. Second, they argue that the Order may operate as a gag order by placing general limits on speech regardless of the source of the information being shared. Third, they contend that the Confidentiality Order improperly intrudes into the affairs of County government by purporting to dictate how and under what conditions County officials may use and disclose a County document. Finally, the Press Intervenors assert that the Order is an invalid prior restraint.

The Plaintiff's attention is focused on the initial Protective Order rather than the subsequent Confidentiality Order, but nevertheless raises overlapping arguments. First, she contends that the Protective Order should be vacated because it was improvidently granted. In this regard, the Plaintiff urges that the language of the Order is vague and overbroad. Second, she states that the Protective Order should be vacated because of an extraordinary circumstance or compelling need. Finally, similar to the Press Intevenors, she argues that the Protective Order is unconstitutional as a prior restraint, so that it offends the First Amendment.

Although chronologically the Press Intevenors' motion was filed first, the Court will address it subsequent to the Plaintiff's motion. This is because if the Court deems that the Protective Order should be vacated, it necessarily follows that the Confidentiality Order will be vacated as well. The Court will now turn to the instant motions.

11

## II.  DISCUSSION

**A.  <u>As to the Plaintiff's Motion</u>**

**1.   Whether the Plaintiff's Motion Is Procedurally Proper**

As an initial matter, the opponents to the Plaintiff's motion—namely the PBA and the County Defendants—point out several procedural hurdles that they believe the Plaintiff has not overcome in bringing a motion to vacate the Protective Order.

First, the Plaintiff's motion was technically filed as a cross-motion, in response to the motion filed by non-party Peter Schmitt.  Since that time, and prior to Mr. Schmitt's unfortunate death, he filed a motion seeking to withdraw his own motion.  Consequently, the PBA asserts that where the underlying motion is withdrawn, any cross-motions based on that motion will fall. However, the Plaintiff has requested that this Court convert her cross-motion into a regular motion in light of Mr. Schmitt's withdrawal from this matter.  The Court now grants that request and will consider the Plaintiff's motion independently.  However, the Court also agrees with the PBA that any reference to the Schmitt's position, alleged interests, and arguments made in this case will not be considered.

Next, the PBA contends that the cross-motion must be dismissed because the Court only allowed the Plaintiff to re-challenge the Protective Order if a final settlement was not reached. When the Court initially rejected the objections to the entry of the Protective Order, it specifically held that the Plaintiff's objections were dismissed "without prejudice to renew if a final settlement in this case is not consummated."  DE 110 at 17.  Nevertheless, despite this language, the Court finds that the Plaintiff's renewed attempt to once again vacate the restrictions of the Protective Order is not untimely or improper.  "In certain limited circumstances, a court can vacate a previously entered protective order."  <u>McAllister v. City of</u>

12

New York, 97 Civ. 7420, 2002 WL 975609, at *2 (S.D.N.Y. May 10, 2002) (citing In re:

"Agent Orange" Prod. Liab. Litig., 821 F.2d 139, 147 (2d Cir. 1987)).  This is so even when a

motion seeking modification of a protective order is filed after a case has already been settled

and closed.  See Fed. Deposit Ins. Corp. v. Ernst & Ernst, 677 F.2d 230 (2d Cir. 1982); see also

Westchester Radiological v. Blue Cross/Blue Shield, 138 F.R.D. 33 (S.D.N.Y. 1991) (ruling that

a motion to intervene was timely, even after the underlying antitrust action had been concluded).

### 2. Legal Standard for Vacating a Protective Order

The Second Circuit has expressly acknowledged that its protective order modification test

has, as a general matter, a "strong presumption against the modification of a protective order."

In re Teligent, Inc., 640 F.3d 53, 59 (2d Cir. 2011) (quoting SEC v. TheStreet.com, 273 F.3d at

229); see also Med. Diagnostic Imaging, PLLC v. Carecore Natl, LLC, Nos. 06 Civ. 7764 and 06

Civ. 13516, 2009 WL 2135294, at *1 (S.D.N.Y. July 16, 2009) (calling the modification of a

protective order test "stringent"); 8A Richard L. Marcus, Federal Practice and Procedure §

2044.1 (3d ed. Westlaw 2012) (asserting that the Second Circuit has "embraced a very restrictive

attitude toward modification of protective orders").  "[T]he Second Circuit has been hesitant to

permit modifications that might 'unfairly disturb the legitimate expectations' of the parties or

deponents."  In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 255 F.R.D. 308,

318 (D. Conn. 2009) (quoting SEC v. TheStreet.com, 273 F.3d at 230).

It is "presumptively unfair for courts to modify protective orders which assure

confidentiality and upon which the parties have reasonably relied."  S.E.C. v. TheStreet.com, 273

F.3d 222, 230 (2d Cir. 2001).  Consequently, in a major decision in this field, Martindell v.

International Telephone & Telegraph Corp., 594 F.2d 291 (2d Cir. 1979), the Second Circuit

determined that "absent a showing of improvidence in the grant of a Rule 26(c) protective order

or some extraordinary circumstance or compelling need . . . a witness should be entitled to rely upon the enforceability of a protective order against any third parties." Id. at 296.  Accordingly, "[w]here there has been reasonable reliance by a party or deponent, a District Court should not modify a protective order granted under Rule 26(c) 'absent a showing of improvidence in the grant of [the] order or some extraordinary circumstance or compelling need.'" S.E.C. v. TheStreet.com, 273 F.3d 222, 229 (2d Cir. 2001) (quoting Martindell, 594 F.2d at 296); see In re Prudential Secs. Inc. Ltd. P'ships Litig., 158 F.R.D. 301, 305 (S.D.N.Y. 1994) ("Protective orders cannot be vacated absent a showing that the order was improvidently granted, that exceptional circumstances exist, or that the movant has a compelling need to vacate the order.").

In this regard, reliance is crucial.  As recently noted by the District of Connecticut, "though the Martindell standard is admittedly a stringent one, it does not apply uniformly to all protective orders . . . Rather, the application of the strong presumption against modification is dependent upon a protective order's particular characteristics and whether it invites reasonable reliance on the permanence of the order."  In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig. ("In re Ethylene"), 255 F.R.D. 308, 318 (D. Conn. 2009).  "Even the Second Circuit recognizes that there must be a plausible showing of reliance on the order to narrow the grounds for modification."  8 Wright & Miller § 2044.1.

"In determining whether a party has reasonably relied on . . . designation[s of confidentiality], courts consider the scope of the protective order, the language of the order, the extent of the court's inquiry before entry of the order and the 'nature of the reliance on the order.'" Ceglia v. Zuckerberg, No. 10 Civ. 569, 2011 WL 3608008, at *2 (W.D.N.Y. Aug. 12, 2011) (quoting In re September 11 Litig., 262 F.R.D. at 277); In re Ethylene, 255 F.R.D. at 318 ("An examination of Second Circuit case law reveals the following factors are relevant when

determining whether a party has reasonably relied on the protective order: (1) the scope of the protective order; (2) the language of the order itself; (3) the level of inquiry the court undertook before granting the order; and (4) the nature of reliance on the order.  Additional considerations that may influence a court's decision to grant modification include: the type of discovery materials the collateral litigant seeks and the party's purpose in seeking a modification.").

It appears to the Court that the Defendants relied on the Protective Order in reaching the settlement in this case.  See, e.g., McAllister, 2001 WL 975609, at *3; see also Palmieri v. State of N.Y., 779 F.2d 861, 864–65 (2d Cir. 1985) ("We note first that the extent of appellants' reliance on Magistrate Tyler's sealing orders, though not fatal to the state's case, renders its burden heavier than it might otherwise be."); see also TheStreet.com, 273 F.3d at 230 ("In some cases, settlement would not be possible but for the parties' reliance on a protective order."). Here, the Protective Order was entered without time restraints; it was not a blanket protective order but rather was specific and targeted at one particular report; and there was thorough consideration by both the Magistrate Judge and this Court prior to its entry, in which the baseline "good cause" was found.  See In re Ethylene, 255 F.R.D. at 321 ("Whether a protective order is entitled to Martindell's strong presumption against modification is also dependent upon the circumstances surrounding its grant, *i.e.*, how much consideration the court gave to the request for a protective order before granting it.").  "A protective order granted on the basis of a stipulation by the parties carries less weight than a protective order granted after a hearing to show good cause."  Id. (citing Fournier v. McCann Erickson, 242 F.Supp.2d 318, 341 (S.D.N.Y.2003)).

Furthermore, "[a] litigant's purpose in seeking modification of an existing protective order is also relevant for determining whether to grant a modification.  Requests to modify

15

protective orders so that the public may access discovery materials is arguably subject to a more stringent presumption against modification because there is no public right of access to discovery materials." In re Ethylene, 255 F.R.D. at 324. "In the absence of a compelling need for the public to access sealed documents, courts have generally been reluctant to disturb discovery protective orders for public dissemination." See id.

In addition, the fact that the reliance occurred for the purpose of settlement is important to the analysis. As one court has noted, a "compelling reason to discourage modification of protective orders in civil cases is to . . . promote the settlement of disputes." S.E.C. v. TheStreet.Com, 273 F.3d at 231.

In their memoranda of law, the moving parties did not contest that reliance was present by the parties in this litigation. Yet, when asked at a hearing before this Court on November 15, 2012, both the Plaintiff and the Press Intervenors asserted that the County Defendants could not have reasonably relied upon the Protective Order in settling the underlying matter because they were aware of the Plaintiff's persistent attempts to disclose the contents of the IAU Report. (Transcript from Nov. 15, 2012 Hearing at 36.) The Court is aware that the Plaintiff's counsel has made it clear from the commencement of this case that he desired the IAU Report to be released to the public. However, while the Plaintiff's counsel may have had a right and interest to pursue an attempt to vacate the Order, this does not necessarily mean under the circumstances in this case that the County did not rely on the Protective Order.

Furthermore, as the Plaintiff pointed out, the Court has always recognized the Plaintiff's ability to move in the future to vacate the Protective Order. For example, the Confidentiality Order states that "[t]he terms and conditions of this Order shall, *subject to further Court Order*, govern the use of Confidential Material . . ." DE 128, at ¶8 (emphasis added). As the Second

16

Circuit has recognized, "some protective orders may not merit a strong presumption against modification. For instance, protective orders that are on their face temporary or limited may not justify reliance by the parties. Indeed, in such circumstances reliance may be unreasonable." Gambale v. Deutsche Bank AG, 377 F.3d 133, 142 n. 7 (2d Cir. 2004) (quoting TheStreet.com, 273 F.3d at 230–31); accord Lugosch, 435 F.3d at 126 (finding that party could not reasonably rely on confidentiality order stating that it "shall not prevent anyone from applying to the Court for relief therefrom.").

To be sure, the County Defendants "cannot claim that the protective order freed them from all risk of disclosure, since such an order is always subject to further modification." Madanes v. Madanes, 199 F.R.D. 135, 141 (S.D.N.Y. 2001). However, that is always the case, and that is the concept embodied by the language quoted above. Here, the Protective Order and the Confidentiality Order did not contain any temporal limits and were in no other way limited. See DE 128, at ¶ 8 ("The terms and conditions of this Order shall, subject to further Court Order, govern the use of Confidential Material *and shall continue to be binding throughout and after the conclusion of this Action and any appeals*.") (emphasis added). Thus, the Court finds the County Defendants' reliance on the Protective Order to be reasonable. Cf. Agent Orange, 821 F.2d at 147 (holding that because the very terms of the protective order applied solely to the pretrial stages of the litigation and because the judge "specifically indicated that the confidentiality issue would be reconsidered at the commencement of the trial", "[a]ny reliance on such a sweeping, temporary protective order simply was misplaced.").

Accordingly, as there undoubtedly was reliance by the parties on the Protective Order, it will only be vacated if the Plaintiff or the Press Intervenors have met their burden in demonstrating that the order was improvidently granted; that exceptional circumstances exist; or

17

that there is a compelling need to vacate the order.  See In re Grand Jury Subpoena Duces Tecum Dated Apr. 19, 1991, 945 F.2d 1221, 1224 (2d Cir. 1991) (noting that the district court erroneously placed the burden on the wrong party, because the burden should have been placed "on the government to show why the protective order should be overturned.").  see also Kamyr AB v. Kamyr, Inc., No. 91 Civ. 0453, 1992 WL 317529, at *8 (N.D.N.Y. Oct. 30, 1992) (stating that burden remains on party challenging protective order entered for good cause notwithstanding the "blanket" nature of order).

It also worth noting that the Second Circuit has explicitly rejected the notion that the Martindell standard should be limited to cases where the government seeks to modify a protective order.  Rather, Martindell has been applied even when the third party seeking access to discovery is a private litigant.  See Iridium India Telecom Ltd. v. Motorola, Inc., 165 Fed. App'x 878, 880 (2d Cir. 2005).

Again, the Court notes that "[w]hether to lift or modify a protective order is a decision committed to the sound discretion of the trial court."  In re Agent Orange Prod. Liability Litig., 821 F.2d 139 (overruled on alternate grounds).  "When courts in our circuit determine that a party has relied on a protective order, it is very difficult for movants to modify that order." Dandong v. Pinnacle Performance Ltd., 2012 WL 4793870, at *5 (S.D.N.Y. Oct. 9, 2012).

### a.  Improvidently Granted

Keeping in mind the strong presumption against modification mandated by the dictates of the relevant precedent, as well as the reliance reasonably exhibited in the present case, the Plaintiff and the Press Intervenors have a difficult burden to overcome.  One possible method to vacate a protective order that both movants attempt to utilize is the exception to Martindell as set forth above—namely, to demonstrate that the order was improvidently granted.  "Of course, [the

18

Defendants'] reliance on the [Protective or Confidentiality] orders would not insulate those orders from subsequent modification or vacating if the orders were improvidently granted *ab initio*." Palmieri, 779 at 865 ("no amount of official encouragement and reliance thereon could substantiate an unquestioning adherence to an order improvidently granted.").

As the Court is now focusing on the Plaintiff's motion in particular, which in turn contemplates only the initial Protective Order, the Court will assess only the Plaintiff's arguments in this section.  The Court will then assess the Press Intervenors' arguments concerning the Confidentiality Order further below.

First, the Plaintiff contends that the Protective Order is too vague and broad to withstand constitutional scrutiny, such that it was improvidently granted.  Accordingly, she argues that "the vague and overbroad restrictions . . . will undoubtedly obstruct the ideals embedded within the words of the First Amendment.  Vagueness and over breadth are held in disrepute because they chill constitutionally protected speech." (Pl. Mem. at 3.)  However, as addressed by Judge Tomlinson in her decision granting the protective order, the First Amendment right of access applies only to judicial documents.  See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Secs. Dealers, Inc., No. 07 Civ. 2014, 2008 WL 199537, at *6 (S.D.N.Y. Jan. 22, 2008) ("Because the non-judicial documents in this category were exchanged in discovery but never filed with the Court, they carry no presumption of public access under either the common law or the First Amendment").

This Court has found, and continues to find, that the IAU Report is not a judicial document.  The IAU Report in the instant case was not filed with the Court and did not play any role in the performance of Article III functions.  Consequently, the Court finds that no First Amendment right of access attaches to the IAU Report.  The Plaintiff's articulated desire in this

regard to "insure that the import of the findings of the IAU [Report] are shared with the community and public, that the factual findings of the internal investigation are not left to willful speculation or dark secrecy", certainly sounds in free speech.  However, the Plaintiff cannot demand unfettered free speech in relation to a document to which no First Amendment right of access attaches.

Moreover, as Justice Powell explained in <u>Seattle Times Co. v. Rhinehart</u>, 467 U.S. 20, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984), where "a protective order (1) is entered on a showing of good cause as required by Rule 26(c), (2) is limited to the context of pretrial civil discovery, and (3) does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment."  All three requirements were met in the instant case.  Therefore, the Order does not offend the First Amendment.

At a hearing before this Court on November 15, 2012, the movants raised the idea that the IAU Report could be considered a judicial document because it was used as the premise for this Court's contempt proceedings when it sanctioned Peter Schmitt for violating the Confidentiality Order based on his statements to the press concerning details he learned from the IAU Report.  This argument is interesting, for it is indisputable that when a Court draws upon its inherent contempt powers it engages in the performance of Article III functions.  Moreover, the IAU Report was certainly the impetus behind the contempt proceedings.  However, while it may be a nuanced distinction, the IAU Report itself did not actually play a role in the contempt proceedings.  Rather, it was the Confidentiality Order, along with Schmitt's own testimony that he garnered certain relevant facts from the Report, which formed the basis for the sanctions.  Further, the movants have not provided the Court with any case law to support the notion that when a Court uses its contempt power to enforce a protective order with regard to a discovery

document, that transforms it into a judicial document.  Cf. Roberts v. Lederman, No. 04 Civ. 0033, 2004 WL 2238564, at *6 (E.D.N.Y. Oct. 4, 2004) (finding that motion papers were judicial documents because they were filed with the court and relied upon in reaching its adjudication of the alleged contempt).

Next, the Plaintiff alleges that the scope of the Protective Order was not clearly defined. In particular, she states that "[w]hile the Protective Order and subsequent Confidentiality Order both limited the use of and access to the IAU Report, and strictly limited the audience of the Report, the Protective Order never explained with enough specificity what conduct—or in this case, 'speech'—was outside the bounds to allow [the] Plaintiff the freedom to exercise [her] First Amendment rights."  (Pl. Mem. at 9.)  However, contrary to the Plaintiff's assertions, the Court finds that the Protective Order was sufficiently detailed as to what information the Plaintiff was enjoined from disclosing.  As explained by this Court in addressing objections to Judge Tomlinson's Protective Order:

> Here, the plaintiff is not generally precluded from discussing her case in public. More importantly, she is also not precluded from discussing the contents of the IAU Report if she obtains that information from a source other than civil discovery in this case . . . the present protective order only precludes the dissemination of the IAU Report as received through discovery.

DE 110 at 11.

Finally, the Plaintiff urges the Court to find that the Protective Order was improvidently granted because Judge Tomlinson arguably appeared to favor protecting the named police officers' privacy more than she sought to protect the disciplinary process within the department. Dorsett contends that the privacy interests of the police officers are not a valid reason to enjoin the Plaintiff from disseminating the contents of the IAU Report.

21

According to the Plaintiff, Judge Tomlinson held that the officers' privacy interests were a common law exception to the presumption of access and were also incorporated into the law enforcement privilege because they were individuals involved in an investigation.  To the extent that Judge Tomlinson acknowledged the competing consideration of the law enforcement privilege as "worthy of protection" in the balancing of interests to overcome the potential presumption of a right of access, the Court sees no error in that finding.  As thoughtfully explained by Judge Tomlinson, not only would public dissemination of the IAU Report likely reveal the particular techniques and methodology utilized by the specialized police unit, but the privacy interests of third parties can also carry great weight in the balancing of interests.  See DE 60 at 24 n.8 ("Typically, the weight to afford these privacy rights are considered pursuant to such factors as 'the degree to which the subject matter is traditionally considered private rather than public' and the 'nature and degree' of the injury.  However, based upon the document at issue here, Defendants need only make the 'baseline showing of harm' referred to earlier since there is no presumption of access in play here." (citing Amodeo I, 71 F.3d at 1051)); see also In re Newsday, Inc., 895 F.2d 74, 79–80 (2d Cir. 1990) (concluding that "the privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure of the [ ] material should weigh heavily in a court's balancing equation"); Kelly v. City of New York, No. 01 Civ. 8906, 2003 WL 548400, at *5 (S.D.N.Y. Feb. 24, 2003) (holding that the sensitive investigation records of non-party individuals should be "guard[ed] against disclosure that has the potential to invade their privacy and impair their personal reputations").

There was no improvidence in finding it relevant to the balancing analysis that the IAU Report contained the names of numerous officers not parties to this litigation, as well as witnesses and other third-parties not related to this action, whose privacy interests would be

seriously jeopardized with the publication of the IAU Report.  Furthermore, the Plaintiff's attempt to point to Judge Tomlinson's rejections of other potential harms that would result from disclosure—i.e., jury contamination; incomplete and inaccurate account of the report; arbitrator contamination; and compromised techniques and procedures—is without merit.  Her consideration of these other potential harms had no effect upon her findings concerning the law enforcement privilege and third parties' privacy interests.  Contrary to the Plaintiff's reasoning, this does not show that the "Defendants never made the necessary showings and that they failed to establish that disclosure of the contents of the Report posed a threat to the Defendants' fundamental rights."  (Pl. Mem. at 11.)

In sum, the Court does not find any merit to the Plaintiff's contentions that the Protective Order was improvidently granted.

**b.  Extraordinary Circumstances or Compelling Need**

Now that the Court has addressed the improvidence exception, the Court will focus on the other potential bases for vacating a protective order:  extraordinary circumstances or compelling need.  These two grounds form the core of the Plaintiff's arguments for the disclosure of the IAU Report.  Yet, "[a] compelling need is a very high bar to overcome." Dandong v. Pinnacle Performance Ltd., No. 10 Civ. 8086, 2012 WL 4793870, at *5 (S.D.N.Y. Oct. 9, 2012).

The Plaintiff does not explicitly state that there is an "extraordinary circumstance" or "compelling need" to vacate the Protective Order.  However, she does set forth several assertions as to why the IAU Report should have been disclosed initially and should be released now, largely concerning the interest in fostering a relationship of trust between the community and the NCPD.  Moreover, the Plaintiff's counsel made impassioned arguments at a hearing before this

Court as to why disclosure of the Report would be beneficial to the county and its residents, and why it would be a substantial stepping stone in the pursuit of justice.  "The principle favoring full access by the courts and litigants to relevant information . . . is an important foundation for the achievement of justice . . . This principle is national policy of high rank, wholeheartedly endorsed and furthered by Congress."  Freeman v. Seligson, 405 F.2d 1326, 1348 (D.C. Cir. 1968).  The motivation behind the Plaintiff's relentlessness concerning the IAU Report appears to the Court to be entirely commendable.

Nonetheless, these arguments are not new.  The Plaintiff has stated this position from the inception of this litigation, including the briefing to Judge Tomlinson when the initial Protective Order was granted.  The original objections by the Plaintiff and the Press Intervenors to the Protective Order were heard and rejected by Judge Tomlinson.  See McAllister, 2001 WL 975609, at *3.  Thus, the Court need not readdress the same arguments it has previously rejected on a number of occasions, largely because they would not now qualify as exceptional or compelling.  The Plaintiff has only pointed to two circumstances that are different from when the initial Protective Order was granted.

First, the Plaintiff claims that several facts have already been leaked, so that disclosure of the remainder of the Report is necessary so that the public is not misinformed.  The Court finds that this has not been sufficiently established.  However, even if this was so, the Court does not find that constitutes a compelling need or extraordinary circumstance adequate to warrant vacating the Protective Order.

Second, the Plaintiff points out the other major distinction between the factual setting of the initial Protective Order as opposed to the circumstances today—namely, that the underlying case has been settled.  However, again, the Court does not find this to be a compelling need or

24

extraordinary circumstance that would rebut the presumption against disclosure.  In this regard, when the Plaintiff chose to settle this lawsuit and accept a substantial sum of money, she also chose to remove the opportunity for a trial in which the Report would possibly become part of the public record and the specific facts at issue contained in the Report may have become public knowledge.  Thus, it would be odd to also use the fact that the case is settled as an argument for dissemination.

In any event, "public interest in particular litigation does not generate a public right of access to all discovery materials."  In re Terrorist Attacks, 454 F. Supp. 2d at 222 (citing United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995)); see Daniels v. City of N.Y., 200 F.R.D. 205, 210 (S.D.N.Y. 2001) ("According to the City, the mere fact that the investigation involves a matter of public interest is not extraordinary given that most Government investigations involve issues of public interest. . .  I agree.  To hold otherwise would effectively eviscerate the Martindell standard.").  "[T]he cases hold that even a First Amendment right to certain documents does not constitute 'compelling need' to modify a protective order for discovery matter."  Kamyr AB v. Kamyr, Inc., No. 91 Civ. 453, 1992 WL 317529, at *9 (N.D.N.Y. Oct. 30, 1992) (citing Pellegrino v. United States, No. 89 Civ. 8406, 1992 WL 84475 (S.D.N.Y. April 15, 1992)).

As the Plaintiff has not demonstrated that the Protective Order was improvidently granted, or that extraordinary circumstances existed, or that a compelling need exists under the relevant standard, the Court sees no reason to vacate the Protective Order.  Therefore, the Plaintiff's motion to vacate the Protective Order is denied.

**B.  <u>As to the Press Intervenors' Motion</u>**

Next, the Court will determine the Press Intervenors' motion.  In particular, the Press

Intervenors are seeking to intervene for the purpose of challenging the Confidentiality Order.

The Court will first assess whether intervention is proper under the circumstances.  Then, the

Court will address the Press Intevenors' arguments concerning the Confidentiality Order, along

with the Plaintiff's specific arguments relating to this Order, that were not addressed above.

**1.  As to Whether Intervention to Challenge the Confidentiality Order is Proper**

Under Federal Rule of Civil Procedure 24(a) ("Fed. R. Civ. P. 24(a)" or "Rule 24(a)"), a

putative intervener of right must establish four criteria: "the applicant must (1) file a timely

motion; (2) claim an interest relating to the property or transaction that is the subject of the

action; (3) be so situated that without intervention the disposition of the action may impair that

interest; and (4) show that the interest is not already adequately represented by existing parties."

<u>Butler, Fitzgerald & Potter v. Sequa Corp.</u>, 250 F.3d 171, 176 (2d Cir. 2001).  "Failure to satisfy

any one of these requirements is a sufficient ground to deny the application."  <u>Security Pacific</u>

<u>Mortg. and Real Estate Servs., Inc. v. Republic of Philippines</u>, 962 F.2d 204, 208 (2d Cir. 1992)

(<u>quoting Farmland Dairies v. Comm'r of N.Y. Dep't of Agriculture</u>, 847 F.2d 1038, 1043 (2d

Cir. 1988)).

For a party to intervene in a case as of right under Rule 24(a)(2), that party must have an

interest in the case that is "'direct, substantial, and legally protectable.'"  <u>United States v.</u>

<u>Peoples Benefit Life Ins. Co.</u>, 271 F.3d 411, 415 (2d Cir. 2001) (quoting <u>Washington Elec.</u>

<u>Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.</u>, 922 F.2d 92, 97 (2d Cir. 1990)).  According to

the Second Circuit, "[a]n interest that is remote from the subject matter of the proceeding, or that

is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." Washington Elec., 922 F.2d at 97.

Intervention may also be granted on a permissive basis under Federal Rule of Civil Procedure 24(b) ("Fed. R. Civ. P. 24(b)" or "Rule 24(b)"). Rule 24(b) provides in part:

> On timely motion, the court may permit anyone to intervene who:
> . . . (B) has a claim or defense that shares with the main action a common question of law or fact. . . . In exercising its discretion the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Permissive intervention is thus within the court's broad discretion. Diversified Group, Inc. v. Daugerdas, 217 F.R.D. 152, 157 (S.D.N.Y. 2003); see U.S. Postal Service v. Brennan, 579 F.2d 188, 192 (2d Cir. 1978). In exercising that discretion, courts consider factors that include "'the nature and extent of the intervenors' interests,' the degree to which those interests are 'adequately represented by other parties,' and 'whether parties seeking intervention will significantly contribute to [the] full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.'" Id. (quoting H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc., 797 F.2d 85, 89 (2d Cir. 1986)). It is notable that "[t]he test is flexible and courts generally look at all of the factors rather than focusing narrowly on any one of the criteria." Mass. Bricklayers and Mason Funds v. Deutsche Alt-A Secs., 273 F.R.D. 363, 365 (E.D.N.Y. 2011).

In considering a motion to intervene, the court must accept as true non-conclusory allegations of the motion. Oneida Indian Nation of Wisc. v. New York, 732 F.2d 261, 265 (2d Cir. 1984); Sackman v. Liggett Group, Inc., 167 F.R.D. 6, 20 (E.D.N.Y. 1996). Allegations that are frivolous on their face need not be considered by the court. Bay Casino, LLC v. M/V Royal Empress, 199 F.R.D. 464, 466 (E.D.N.Y. 1999). In addition, "an application to intervene cannot

be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention . . . ." Brennan v. N.Y.C. Bd. of Educ., 260 F.3d 123, 129 (2d Cir. 2001). The putative intervenor has the burden of showing a right to intervene. In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 490 (S.D.N.Y. 1998); Diduck v. Kaszycki & Sons Contractors, Inc., 149 F.R.D. 55, 58 (S.D.N.Y. 1993).

"Prior case law provides little guidance in determining what is the proper procedural mechanism for a nonparty to seek modification of a protective order." Application of Akron Beacon Journal, No. 94 Civ. 1402, 1995 WL 234710, at *3 (S.D.N.Y. April 20, 1995). See In re New York Times Co., 828 F.2d 110, 113 (2d Cir. 1987) (noting that "the district court chose to treat [news bureaus seeking to vacate district court's protective order] as intervenors" without commenting on the proper procedure for such a motion), cert. denied sub nom., Esposito v. New York Times Co., 485 U.S. 977 (1988). While the criteria for intervention under 24(a) and (b) differ, the "distinction is neither as clearcut nor as important as the usual statement would suggest." 7C Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1902, at 231 (2d ed. 1986 & Supp. 1993).

In the instant case, the Press Intervenors filed their Notice of Motion without stating whether they were proceeding under Rule 24(a) or (b). However, the Press Intervenors' memorandum of law adequately states their grounds for intervention. The Press Intervenors state that they seek to modify this Court's Confidentiality Order—an expansion of the previous Protective Order—based on a number of different rationales that will be explored below. The Press Intervenors' claims are sufficient for this Court to make a determination as to whether there is a basis for intervention. Accordingly, this Court construes the Press Intervenors' motion as properly made under Fed. R. Civ. P. 24(b)(2). See Gulf Underwriters Ins. Co. v. The Hurd

Ins. Agency, No. 03 Civ. 1277, 2004 WL 2935794, at *2 n.3 (D. Conn. Dec. 16, 2004) (concluding that permissive intervention is appropriate and that the "more difficult question" of intervention under Rule 24(a) need not be reached); State of New York v. Reilly, 143 F.R.D. 487, 489 (N.D.N.Y. 1992) ("Having granted the [intervenors'] motions for permissive intervention, there is no need for the court to decide whether or not these applicants are entitled to intervention of right pursuant to Rule 24(a)(2).").

Under the circumstances of this case, permissive intervention is the more proper procedural route for intervention by a non-party in a private civil action for the purpose of vacating or modifying a confidentiality order.  See Palmieri v. State, 779 F.2d 861, 864 (2d Cir. 1985); Martindell v. Int'l Tel and Tel. Corp., 594 F.2d 291, 293 (2d Cir. 1979) ("If the Government had sought and obtained permission from the court to intervene in the action pursuant to Rule 24(b), F.R. Civ. P., for the limited purpose of seeking modification of the protective order, the district court could then have exercised its power under Rule 26(c), F.R. Civ. P., to modify or vacate the order"); Diversified Group, Inc. v. Daugerdas, 217 F.R.D. 152, 157 (S.D.N.Y. 2003) (stating that Rule 24(b) is the proper procedure for a third party to seek modification of a protective order in a private suit) (citing cases).  Indeed, "every circuit court that has considered the question has come to the conclusion that nonparties may permissively intervene for the purpose of challenging confidentiality orders."  EEOC v. Nat'l Children's Ctr., Inc., 146 F.3d 1042, 1045 (D.C. Cir. 1998).

Now having established that the Press Intervenors will be considered to have moved to intervene pursuant to Rule 24(b) and that permissive intervention is the appropriate method to vacate or modify a confidentiality order, the Court must determine whether the Press Intervenors' motion is timely.

Although this case settled several months ago, "dismissal of the underlying action is not dispositive for motions to intervene for the limited purpose of challenging a protective order. The trial court continues to have the power to modify a protective order, even after the underlying action has been dismissed." Application of Akron Beacon Journal, 1995 WL 234710, at *5.  For instance, in Federal Deposit Ins. Corp. v. Ernst & Ernst, 677 F.2d 230 (2d Cir. 1982), a motion seeking modification of a protective order was filed two years after the settlement of the underlying claim.  See id. at 471 (holding that a liberal interpretation of the intervention rule was appropriate); Westchester Radiological v. Blue Cross/Blue Shield, 138 F.R.D. 33, 34 n.1 (S.D.N.Y. 1991) ("[a] court that enters a protective order retains the power to modify it as long as it is in effect, even if the underlying suit has been dismissed.").

Putting aside the issue of settlement, "[d]etermination of the timeliness of an application to intervene is committed to the sound discretion of the trial court." Application of Akron Beacon Journal, 1995 WL 234710, at *6.  Courts are instructed to evaluate the timeliness of the proposed intervention "against the totality of the circumstances before the court." Farmland Dairies v. Com'r of N.Y. Dept. of Agr., 847 F.2d 1038, 1044 (2d Cir. 1988).  A district court has discretion to evaluate the timeliness of a motion to intervene in light of "all the circumstances," including "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." United States v. Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir. 1994).  Particularly apt here, the Second Circuit noted in Farmland Dairies that "post-judgment intervention is generally disfavored because it fosters delay and prejudice to existing parties." Farmland Dairies, 847 F.2d at 1044.  On the other hand, many courts have observed that "ordinary principles applicable

to intervention do not necessarily apply to intervention for the limited purpose of modifying a protective order to gain access to documents." <u>Application of Akron Beacon Journal</u>, 1995 WL 234710, at *6.

Under the first factor, the Court must consider the length of time that the Press Intervenors knew or should have known of its interest in this case before it made its motion to intervene. The Press Intervenors are seeking to vacate a Confidentiality Order entered in December 2011, but did not file the instant motion until July 2012, some seven months later. Moreover, the Press Intervenors have been granted permission on previous occasions to assert essentially the same arguments in support of their desire to gain access to the IAU Report. Accordingly, it appears that the Press Intervenors would have become aware of their interest in the Confidentiality Order at an earlier date. Thus, the Court finds that there was some delay in the filing of the motion. On the other hand, at a hearing before this Court, the Press Intervenors explained that it was not until the contempt proceedings against Peter Schmitt in June 2012 that they realized the potential ramifications of the Court's orders, and then immediately moved to intervene. This would appear to weigh against a finding of delay.

The second factor that the Court must consider is prejudice to the existing parties due to any delay in intervening. "This factor encompasses the basic fairness notion that intervention should not work a 'last minute disruption of painstaking work by the parties and the court.'" <u>Public Citizen</u>, 858 F.2d at 786. Thus, if intervention "relates to an ancillary issue and will not disrupt the resolution of the underlying merits, untimely intervention is much less likely to prejudice the parties." <u>Id.</u> Here, the Court finds that there is no risk of undue delay or prejudice because the underlying case has been closed for more than one year. "Rule 24(b)'s timeliness requirement is to prevent prejudice in the adjudication of the rights of the existing parties, a

31

concern not present when the existing parties have settled their dispute and intervention is for a collateral purpose." United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1427 (10th Cir. 1990); see E.E.O.C. v. Nat'l Children's Ctr., Inc., 146 F.3d 1042, 1047 (D.C. Cir. 1998) (quoting Pansy v. Borough of Stroudsburg, 23 F.3d 772, 779 (3rd Cir. 1994)) ("'[I]ntervention to challenge confidentiality orders may take place long after a case has been terminated.'").  Thus, the Court finds that the Press Intervenors, while not necessarily making the present motion in a timely fashion, have not done so in a way that would result in prejudice to the parties to the action.

Moreover, the Press Intervenors are only seeking to intervene for the limited purpose of challenging the Confidentiality Order.  "Any 'delay' in litigating this discrete and ancillary issue will cause little prejudice to the existing parties in the case, especially since the parties to the underlying action have agreed to a settlement of all claims." Application of Akron Beacon Journal, 1995 WL 234710, at *7.  "Furthermore, a number of circuits have held that the question of prejudice resulting from postjudgment access to documents is best applied to the merits of the motion to lift the protective order rather than to the issue of the motion's timeliness." Id.

With regard to the other relevant factors, the Court finds that they favor granting intervention.  The third factor concerns the prejudice that would be suffered by the Press Intervenors if its motion were denied due to untimeliness.  If the motion is denied, then "the public's right of access in this case would go untested." Id.  In addition, there is some concern that if the Order at issue is unconstitutional, then every day the order stands would impose a continued denial of the public's right to receive timely information on governmental affairs. Cf. Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 560–61 (1976) ("Delays imposed by governmental authority" are inconsistent with the press' "traditional function of bringing news to the public

32

promptly."); <u>Lugosch v. Pyramid Co. of Onondaga</u>, 435 F.3d 110, 126–27 (2d Cir. 2006) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); <u>Hirschkop v. Snead</u>, 594 F.2d 356, 373 (4th Cir. 1979) ("the first amendment protects not only the content of speech but also its timeliness").

Finally, the Court considers any unusual circumstances present in this case that would weigh in favor of or against intervention.  The IAU Report at issue concerns the NCPD's internal investigation into the Department's handling of a certain domestic violence matter.  This Report undeniably relates to matters of public concern.  "Matters of public concern would be unusual circumstances that would militate for a finding of timeliness."  <u>Id.</u>

In sum, after consideration of the relevant factors, the Court grants the Press Intervenors' motion to intervene on a permissive basis.

### 2.  Whether the <u>Martindell</u> Standard Applies to Vacate or Modify the Confidentiality Order

Before the Court proceeds to assess the merits of the Press Intervenors' motion, it is necessary to ascertain under what framework the Court should consider the motion.  According to the Press Intervenors, the <u>Martindell</u> standard does not apply because the IAU Report is a "county document", rather than a discovery document.  However, characterizing the Report as a county document merely because it was created by the NCPD, an arm of the municipality, does not change the fact that the IAU Report was exchanged between the parties and by extension, to the County legislators, as a result of the discovery process.  Therefore, the Court sees no reason why the IAU Report would not continue to be treated as a non-judicial document for the same reasons articulated above.  Accordingly, the Court finds that the <u>Martindell</u> standard applies and the Court will assess whether the Press Intervenors can demonstrate that the Confidentiality Order was improvidently granted or whether extraordinary circumstances and/or a compelling

need exists.  See Shingara v. Skiles, 420 F.3d 301, 306 (3d Cir. 2005) (stating that the Third

Circuit has indicated that the good cause analysis of Rule 26(c) applied "whether an order of

confidentiality is granted at the discovery stage or any other stage of litigation.") (quoting Pansy

v. Borough of Stroudsburg, 23 F.3d 772, 783–84 (3d Cir. 1994)); City of Hartford v. Chase, 942

F.2d 130, 137 (2d Cir. 1991) (remanding the Intervenors' motion to vacate a confidentiality

order under the standards set forth in Palmieri v. State of N.Y., 779 F.2d 861, 866 (2d Cir. 1985),

such as improvidence, and noting that the "district court could alternatively predicate

modification or vacation on a finding of 'extraordinary circumstances' or 'compelling need.'").

### 3.  Whether the Objectors Have Met Their Burden to Prove that the Confidentiality Order was Improvidently Granted

The Court will now proceed to address the merits of the Press Intervenors' contentions

regarding the December 2011 Confidentiality Order.  The Court will first analyze the Press'

arguments concerning whether the Confidentiality Order was improvidently granted.  The Court

will then assess whether the Press Intervenors have met their burden to demonstrate that

extraordinary circumstances exist or that there is a compelling need to vacate or modify the

Confidentiality Order.

### a.  Whether the Court Can Restrain Non-parties from Using a Non-Judicial Document through a Confidentiality Order

First, the Press Intervenors argue that this Court lacks the authority to issue an order

restricting the use of material independent of the judicial process.  In particular, they assert that

Rule 26 is not a blanket authorization for the court to prohibit disclosure of information

whenever it deems it advisable to do so, but is rather a grant of power to impose conditions on

discovery in order to prevent injury, harassment, or abuse of the court's processes.  See Bridge

C.A.T. Scan Assocs., 710 F.2d at 944.  Put another way, according to the Press Intervenors, the

Confidentiality Order is not a limitation on the use of information obtained in discovery, but rather bars County officials and others for all time from using and disclosing a County document prepared entirely outside this litigation without first seeking permission from this Court. Accordingly, the argument is that the Order contravenes the well-settled rule that federal courts lack authority under Rule 26 to issue protective orders that restrict the use of material obtained by a litigant outside of the judicial process. See Shanahan v. Vallat, No. 03 Civ. 3496, 2006 WL 3317018, at *1 (S.D.N.Y. Nov. 15, 2006) ("a Rule 26 protective order is appropriate only when a document is obtained through the discovery process. Rule 26 does not apply to documents obtained by other means.").

As an initial matter, it was entirely proper for the Court to expand the scope of the Protective Order in the Confidentiality Order to non-parties, namely the County Legislators and their counsel. Courts have protected the legitimate interests that defendants have in keeping the materials covered by a protective order out of public hands, even when non-parties seek access to those materials. For example, there are instances where an intervening party involved in bona fide collateral litigation seeks access to protected discovery materials. In that case, the court can accommodate interests "by placing the intervening party under the same use and disclosure restrictions contained in the original order." In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 255 F.R.D. 308, 318 (D. Conn. 2009); see United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1428 (10th Cir. 1990); see also In re Linerboard Antitrust Litig., 333 F. Supp. 2d 333, 339–40 (E.D. Pa. 2004) (allowing modification of a protective order on the condition that the Canadian third-party intervenor be bound by the protective order's use and disclosure requirements and submit to the personal jurisdiction of the court for purposes of enforcing the agreement). This is essentially what the Court did here. However, instead of

permitting third parties access to protected discovery materials for use in collateral proceedings, the Court permitted third parties access to protected discovery materials for the purpose of facilitating a settlement.  Yet, the third parties were essentially under the same use and disclosure restrictions as in the original Protective Order.

More importantly, the Confidentiality Order was not intended to control non-parties' use of a County document in an absolute fashion in perpetuity.  Rather, the purpose of the Confidentiality Order was to allow certain non-parties to view a discovery document covered by a Protective Order subject to the same restrictions as the parties.  Certainly, if these non-parties obtain a copy of the Report from a means independent of the court's processes, or if they acquired information contained in the Report from an alternate source, there would be no restrictions to the use of that information.  For example, if there was a legal basis in which the County legislators would have the right to view and utilize the IAU Report, the Court would not interfere with that authority and it would be beyond the scope of the Court's power and the relevant Orders to do so.  There is some dispute as to whether New York State Civil Rights Law § 50-a gives the Nassau County Legislators the right, separate and apart from this litigation, to view the IAU Report.  The Court will not opine on this matter as it is not an issue that is properly before the Court.  However, what is crucial in the instant motion is that the Court is only restricting the County officials' use of the IAU Report if the sole avenue through which they viewed the Report was a result of the judicial processes in this case.

It appears that certain language contained in the Confidentiality Order may be ambiguous and has caused some confusion as to the breadth of the restrictions in place.  Therefore, the Court hereby revises the Confidentiality Order to state the following:

IT IS HEREBY ORDERED, as follows:

36

1. For purposes of this Order, documents and information considered to be confidential (the "Confidential Material"), includes only the Nassau County Police Department's Internal Affairs Unit Report number 14-2009 pertaining to police response to domestic incidents involving Jo'Anna Bird and Leonardo Valdez-Cruz (the "IAU Report"), and all documents attached thereto and made a part thereof.

2. As set forth herein, Confidential Material, *if viewed or obtained solely as a result of this litigation*, shall be used solely for purposes of this Action and shall not be used for any other purpose without leave of the above-named Court on notice to opposing counsel.

3. Notwithstanding the parameters of the protective order (DE 60 and DE 110) the Confidential Material may be disclosed, summarized, described, characterized or otherwise communicated or made available in whole or in part only to members of the currently-sitting Nassau County Legislature and their in-house counsel for the sole purpose of deliberating the issue of approval of the Settlement Agreement and Release.

4. Review of the Confidential Material by members of the Nassau County Legislature and/or their in-house counsel, *if done so as a result of this litigation*, must be conducted in the presence of a designated member(s) of the Nassau County Police Department, the Nassau County Attorney or designated Deputy County Attorney(ies).  No person given access to the Confidential Material or information contained therein shall be given possession of same, nor may they copy, duplicate, photograph, record, transcribe (or have transcribed), take notes, or in any way memorialize the contents of the Confidential Material.

5. Any conversation, discussion, deliberation, communication regarding, or mention of, the Confidential Material shall be done in Executive Session and, under no circumstances shall same be communicated, disseminated, released, or disclosed to members of the public, the media or anyone other than duly-elected members of the Nassau County Legislature and their in-house counsel. Moreover, all Executive Sessions are to take place in a location where same cannot be overheard and shall not be recorded in any fashion. The terms of the reviewing process set forth herein are supplemented by Exhibit C, attached hereto.  *These restrictions only apply if the Confidential Material is viewed or obtained solely as a result of this litigation.*

6. Every person given access to the Confidential Material or information contained therein *as a result of this litigation* shall be advised in writing and agree in writing in the form attached hereto as Exhibits A and B, to be bound by the terms and conditions of this Order, consenting to the jurisdiction of this Court for purposes of enforcement of the terms of this Order, and agreeing not to

disclose or use any Confidential Material for purposes other than those permitted herein.

7. Every person given access to the Confidential Material *as a result of this litigation* acknowledges to be subject to contempt of court and/or other sanctions for non-compliance with this Order.

8. The terms and conditions of this Order shall, subject to further Court Order, govern the use of Confidential Material *viewed or obtained as a result of this litigation* and shall continue to be binding throughout and after the conclusion of this Action and any appeals.

9. In the event of a breach or violation of any term or condition of this Order, the County Defendants shall have the right to seek enforcement of the terms hereof and the imposition of any other appropriate remedy including, but not limited to, sanctions and contempt.

10. If any person receiving Confidential Material is subpoenaed in any other action or proceeding or is serviced with a subpoena or document demand that seeks Confidential Material, he shall give prompt written notice by hand within twenty-four (24) hours of receipt of such subpoena or document demand, to the other parties to this Order. Any party hereto may seek judicial relief from such subpoena or document demand. Compliance with any order directing production of any Confidential Material pursuant to the subpoena shall not constitute a violation of this Order.

11. No other aspect of the prior protective orders (DE 60 and DE 110) shall be impacted or altered by this Order.

(The words in italics were newly added.)

Again, the Court is not mandating that the County Legislators, as a general matter, need the Court's permission to view or use the Report. Instead, the Court's order directs that if Legislators viewed or obtained the report solely as a result of this litigation, then they are restricted in their use of it as they would be similar to the parties under the Protective Order. With these clarifications of the Order's language, the Court rejects the Press Intervenors' argument that it lacks the authority to issue an order restricting the use of material independent of the judicial process, as the Order only restricts the use of material dependent on the judicial process.

### b.   Whether the Confidentiality Order is an Invalid Gag Order

The Press Intervenors also assert that the Confidentiality Order may operate as a gag order by placing general limits on speech regardless of the source of the information being shared.  However, as set forth in this Court's prior decision:

> the Press Intervenors' characterization of the protective order as a gag order ignores differences between the breadth of the protective order and the breadth of a true gag order.  Here, the Plaintiff is not generally precluded from discussing her case in public.  More importantly, she is also not precluded from discussing the contents of the IAU Report if she obtains that information from a source other than civil discovery in this case.  Cf. Seattle Times Co., 467 U.S. at 34 ("the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes").  Unlike a gag order, which places general limits on speech regardless of the source of the information being shared, the present protective order only precludes the dissemination of the IAU Report as received through discovery.  The single fact that the Press Intervenors identify so as to transform this protective order into a gag order is that the Plaintiff possessed the IAU Report without restriction— and also without publishing it—for approximately twenty-five days.  The Court cannot conclude from this that the Plaintiffs are entitled to stronger First Amendment protections, or that the protective order is in fact a gag order.

DE 110 at 10–11.

The Press Intervenors are correct that the Confidentiality Order, prior to the modifications reflected above, arguably placed limits on speech regardless of the source of the information being shared.  Paragraph One stated: "For purposes of this Order, documents and information considered to be confidential (the "Confidential Material"), *regardless by whom produced*, includes only the Nassau County Police Department's Internal Affairs Unit Report number 14-2009 pertaining to police response to domestic incidents involving Jo'Anna Bird and Leonardo Valdez-Cruz (the "IAU Report"), and all documents attached thereto and made a part

39

thereof." Thus, they are correct that this clause poses serious concerns as to the meaning of the Order. This language appears to have been approved by the Court inadvertently, in part because it is in conflict with all of the Court's prior decisions. For example, the Court's previous entry of the Rule 26 Protective Order expressly did not apply to dissemination of information obtained other than through "civil discovery in this case".

Moreover, this statement is in conflict with the Court's practice throughout the course of this litigation. For instance, the Court previously issued sanctions for prior Presiding Officer Peter Schmitt's contempt of this Confidentiality Order. Schmitt made several statements to the press regarding the IAU Report. However, the majority of the contempt hearing was devoted to ascertaining the source of Schmitt's knowledge as to the facts he disclosed—namely whether the information was ascertained from the IAU Report, Newsday articles, the criminal trial of the perpetrator, or otherwise. Ultimately, when the Court decided to issue sanctions, it was based on the premise that at least some portion of Schmitt's statements to the press were admitted to having been drawn from the briefing he received from his counsel on the IAU Report. Thus, it is evident from this proceeding that the source of the information was far from irrelevant, but rather was determinative. Furthermore, if Schmitt had the ability to obtain the Report or information contained therein through another legal measure in his role as a County Legislator separate and apart from this litigation, then certainly he would have raised that at the contempt proceedings and this Court would not have sanctioned him for that conduct. It was directly due to the fact that Schmitt had obtained at least a portion of the information he disclosed to the Press solely as a result of this litigation that was sanctionable.

Therefore, the Court agrees with the Press Intervenors that the clause "regardless by whom produced" should not be included in the Confidentiality Order, as it is not consistent with

40

this Court's previous decisions or practice, and raises several concerns as to wisdom of the Order in the first instance.  This language is hereby removed from the Confidentiality Order as reflected in the modifications to the Order stated above.  To be clear, with regard to the Protective Order, the parties are restricted from disclosing the contents of the IAU Report but are not precluded from discussing the contents of the IAU Report if the information is obtained from a source other than civil discovery in this case.  Similarly, with regard to the Confidentiality Order, the parties, Nassau County Legislators, and their counsel, are restricted from disclosing the contents of the IAU Report but are not precluded from discussing the contents of the IAU Report if the information is obtained from a source other than civil discovery, and the corresponding settlement process, in this civil case.

### c.   Whether the Confidentiality Order is an Invalid Prior Restraint

The Press Intervenors also contend that the Order prohibiting the use of and discussion about the IAU Report imposes a prior restraint against true speech on matters of public significance, and thus bears a heavy presumption against constitutional validity.  They argue that on the facts presented, Magistrate Judge Tomlinson previously rejected the County Defendants' and the PBA's claims that public disclosure of the Report would harm any compelling interest, including the due process and law enforcement concerns that the PBA raise again in conclusory terms.  Accordingly, they state that this is not such an exceptional case as to justify the Order imposing a direct restraint on the speech of non-parties.

A prior restraint on speech "is a law, regulation or judicial order that suppresses speech— or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression."  United States v. Quattrone, 402 F.3d 304, 308 (2005).  It is also settled law that the public and press have a "qualified First

Amendment right to attend judicial proceedings and to access certain judicial documents."
Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 91 (2d Cir. 2004).

However, as with the Protective Order, this Confidentiality Order which prohibits the dissemination of material that was discovered before trial is "not the kind of classic prior restraint that require[ ] exacting First Amendment scrutiny."  In Re Zyprexa, 474 F. Supp. 2d. at 417 (quoting Seattle Times, 467 U.S. at 31).  For all of the reasons stated in Judge Tomlinson's order and also stated above, the Court does not find the Confidentiality Order to be a prior restraint.

### d.  Whether the Confidentiality Order Improperly Interferes with Government Affairs or Violates Separation of Powers

Next, the Press Intevenors assert that the Confidentiality Order improperly intrudes into the affairs of County government and thereby violates the separation of power by purporting to dictate how and under what conditions County officials may use and disclose a County document.  However, that is not an accurate description of the circumstances of this case.  This Court simply issued a Protective Order over a document that was exchanged in discovery, and then expanded that protection to specific non-parties for the purpose of facilitating settlement.  If County officials obtained the document, it possibly was only as a result of the discovery process and subsequent settlement procedures in this specific litigation.  The Court has the authority to issue orders in this regard.  It is well-settled that courts have broad power to enter protective orders under Rule 26(c) that prohibit parties from sharing discovery materials with non-litigants, and can sometimes expand the scope of that order.  See Newby v. Enron Corp., 443 F.3d 416, 424 (5th Cir. 2006) ("Nonparties to a case routinely access documents and records under a protective order or under seal in a civil case through motions for permissive intervention under Rule 24(b)(2)."); In re: Baycol Products Litig., MDL No. 1431, 2003 WL 22331293, at *6 (D.

Minn. May 6, 2003) ("This Court also has broad discretion in deciding whether to amend the protective orders. . . . Protective orders may be amended to allow access to non-parties for use in other litigation.").

      As set forth above, if County officials obtain the information contained in the IAU Report from another source, or even obtain a copy of the Report itself through a method outside of this litigation, the Court cannot control the exchange of that information nor does it attempt to do so. Thus, the Confidentiality Order by no means improperly intrudes into the affairs of County government by purporting to dictate how and under what conditions County officials may use and disclose a County document. Rather, the Court is restricting information which came into certain individuals' possession only as a direct result of the court's processes. See Int'l Prods. Corp. v. Koons, 325 F.2d 403, 407–08 (2d Cir. 1963) ("we entertain no doubt as to the constitutionality of a rule allowing a federal court to forbid the publicizing, in advance of trial, of information obtained by one party from another *by use of the court's processes*. . . . we have no question as to the court's jurisdiction to do this under the inherent 'equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices'") (emphasis added).

      In connection with whether the Confidentiality Order improperly interferes with government affairs, the Press Intervenors also raise concerns regarding New York Civil Rights Law §50-a. Specifically, they assert that the Confidentiality Order, by purporting to dictate how and under what conditions County officials may use and disclose a County document, runs afoul of New York Civil Rights Law §50-a and other State laws.

      New York State Civil Rights Law § 50-a provides that

> [a]ll personnel records, used to evaluate performance toward continued employment or promotion, under the control of any police agency . . . shall be considered confidential and not subject to inspection or review without the express written consent of such

police officer . . . except as may be mandated by lawful court order.

N.Y. Civil Rights Law §50-a(1).  Under New York State Public Officer's Law § 87, where agency records are presumptively available for public inspection and disclosure under FOIL, an agency may nonetheless deny access to records that are specifically exempted from disclosure by either state or federal statute.  See N.Y. Pub. Officer's Law §87(2)(a); Gould v. New York City Police Dep't, 89 N.Y.2d 267, 274-75 (1996).

Before the Protective Order was initially granted, the Defendants argued that because internal affairs reports are used to evaluate the performance of officers, they are considered to be part of a personnel file pursuant to New York State Civil Rights Law § 50-a, and, as such, enjoy statutory protections against inspection and review.  Accordingly, the Defendants asserted that in these circumstances, § 50-a applies as a bar against the Plaintiff's revelation of the IAU Report.  At that time, the Plaintiff responded that the IAU Report was not a personnel record since it is not used to evaluate performance, and thus the IAU Report should be produced.

Judge Tomlinson found that taking into account the guidelines provided in defining a personnel record by the New York State Court of Appeals, citing Prisoners' Legal Servs. v. New York Dep't of Corr. Servs., 73 N.Y.2d 26 (1988), some portions of the IAU Report fell within that definition of documents "containing personal, employment-related information about a public employee . . . received, processed and maintained as part of a [public employer's] operations" and "are clearly relied upon in evaluating the employee's performance."  Id. at 31; see Matter of Capital Newspapers Div. of Hearst Corp. v. City of Albany, 63 A.D.3d 1336, 1338, 881 N.Y.S.2d 214, 217 (3d Dep't 2009) ("Documents pertaining to an officer's misconduct are the type of records specifically intended to be kept confidential under the statute, mainly to

44

prevent use of the records in litigation to harass, embarrass, degrade or impeach an officer's integrity.").

Nevertheless, because state law does not govern discoverability and confidentiality in federal civil rights actions, and because state rules protecting state officers must always be viewed with caution, Judge Tomlinson rejected the Defendants' position that that § 50-a should apply as a direct bar against the Plaintiff's disclosure of the IAU Report to the public. Rather, Judge Tomlinson found that the Defendants did not satisfy the substantial threshold showing of how disclosure under a protective order would cause the harms identified, which would bring the IAU Report within the confidentiality provisions of § 50-a.

According to the Press Intervenors, the Confidentiality Order provides the PBA with a confidentiality injunction that it is not entitled to as a matter of State law. Certainly, the Press Intervenors are correct that the Court has never found that the Defendants were entitled to a confidentiality injunction pursuant to § 50-a, and in fact Judge Tomlinson explicitly rejected this proposition in the context of the Protective Order. Therefore, the portion of the Confidentiality Order which states "that disclosure of Confidential Material is a violation of New York State General Municipal Law Article 18, the New York State Civil Rights Law § 50-a, as well as the Nassau County Code of Ethics" is hereby removed. Confidentiality Order, at ¶ 7. The Court has never expressly ruled that disclosure of the IAU Report would equate to violations of these state laws, and their inclusion by the County Attorney in the Confidentiality Order was in error. The Confidentiality Order is hereby modified in this regard.

### e.   Vague/Overbroad

The Press Intervenors also make several arguments as to why the Confidentiality Order was improvidently granted, specifically in connection with the language of the Order.

45

First, they assert that the Court did not issue specific findings of fact as required by Rule 52(a)(2). This rule states: "In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action." Second, they claim that the Order violates the form and content required by Rule 65, because "every injunction and restraining order must (a) state the reasons why it issued; (b) state its terms specifically; and (c) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." (Press Mem. at 22.)

However, the Court never issued an injunction, but rather a Protective Order pursuant to Rule 26. In fact, as stated in Judge Tomlinson's Order, "the Court declines to issue a preliminary injunction enjoining the dissemination of the IAU Report." DE 60 at 53. Therefore, the Press Intervenors' arguments with regard to Rule 52 and Rule 65 are inapplicable and without merit.

Third, to the extent that the Confidentiality Order is overbroad in that it regulates more speech than is allowed under the Constitution, with the modifications of the order described above, the Court finds those concerns to be alleviated.

### 4. Whether the Objectors Have Met Their Burden to Demonstrate Extraordinary Circumstance or Compelling Need to Vacate

Finally, the Court notes that the Press Intervenors have not asserted any extraordinary circumstance or compelling need to vacate the Confidentiality Order other than their asserted right to report on newsworthy topics. As news-gathering and reporting organizations, the Press Intervenors certainly enjoy important speech and press rights protected under the First Amendment of the United States Constitution. However, these rights are not sufficient to qualify as an extraordinary circumstance or compelling need to vacate the Confidentiality Order. If that were the case, it "would effectively eviscerate the Martindell standard." See Daniels v. City of N.Y., 200 F.R.D. 205, 210 (S.D.N.Y. 2001) ("According to the City, the mere fact that the

46

investigation involves a matter of public interest is not extraordinary given that most Government investigations involve issues of public interest.").  Therefore, the Court agrees with the County and the PBA that no extraordinary circumstance or compelling need exists so as to vacate the Confidentiality Order.

### III.  CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Plaintiff's motion to vacate the Protective Order is denied; and it is further

**ORDERED**, that the Press Intervenors' motion to vacate the Confidentiality Order is denied.  However, the Court notes that the Confidentiality Order is modified as set forth in this decision.

**SO ORDERED.**
Dated: Central Islip, New York
November 26, 2012


_\_\_\_/s/ Arthur D. Spatt_____
   ARTHUR D. SPATT
United States District Judge